IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

DAVID S. MOORE, Ph.D,

        Plaintiff,

    Vs.                                          No.  14-2420-SAC

UNIVERSITY OF KANSAS, et al.,

        Defendants.

MEMORANDUM AND ORDER

    The case comes before the court on the motion to dismiss filed by the defendant The University of Kansas Center for Research ("KUCR") (Dk. 61) and the motion to dismiss filed by the defendant Dr. Bernadette Gray-Little (Dk. 63). This action arises from plaintiff David S. Moore's suspension, allegations of a hostile work environment, and eventual termination from the position of Assistant Scientist and Director of the Microscopy Analysis and Imaging Laboratory ("MAI Lab") at the University of Kansas ("KU"). In his 116-page complaint that contains 231 numbered paragraphs, Moore alleges the violations of his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12,101, *et seq.* (Count One) for discrimination based on his disability and retaliation for exercising his disability rights; the Rehabilitation, Comprehensive Services and Developmental Disabilities Act ("Rehabilitation Act"), 29 U.S.C. § 701, *et seq.* (Count Two) for

1

discrimination based on his disability and retaliation for exercising his disability rights; National Defense Authorization Act, Pilot Program for Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information ("NDAA"), 41 U.S.C. § 4712, *et seq.*, (Count Three) for being a whistleblower in disclosing mismanagement, waste, abuses and non-compliance with federal grants and contracts; False Claims Act, ("FCA"), 31 U.S.C. § 3730, *et seq.*, (Count Four) for being a whistleblower in investigating and requesting information reasonably believed to evidence fraud and mismanagement of federal grants and contracts; Federal Civil Rights Act, 42 U.S.C. § 1983 (Count Five) for sustaining adverse employment action in retaliation for speaking on matters of public concern protected by the First Amendment, namely the violation of federal laws governing the federal funds; Federal Civil Rights Act, 42 U.S.C. § 1983, (Count Six) for sustaining adverse employment in violation of his constitutional right to substantive due process; and the whistleblower exception for retaliatory discharge to the Kansas common-law policy on employment at will (Count Seven) for being a whistleblower and disclosing what he reasonably believed were violations of law and KU policy.

The plaintiff names KUCR as a defendant to the following four counts: Count Two (Rehabilitation Act), Count Three (NDAA), Count Four (FCA), and Count Seven common law unlawful termination. On the latter three counts, KUCR seeks dismissal on Eleventh Amendment grounds first and argues

2

other issues in the alternative. On Count Two, KUCR seeks dismissal of any

claim for monetary damages. The plaintiff names Dr. Gray-Little in her

official capacity as a defendant to Count One (ADA), Count Three (NDAA),

Count Four (FCA) and Count Seven common law unlawful termination. She

seeks dismissal of all claims except for Count One's claim for prospective

injunctive relief based on arguments made by other defendants in earlier

motions.

**BRIEF SUMMARY OF RELEVANT FACTUAL ALLEGATIONS**

KU employed Moore who was appointed and worked as an Assistant

Scientist and Director of the MAI Lab on its Lawrence Campus from 2005

until he was discharged on October 18, 2013. The MAI Lab is one of 11 Core

Labs doing scientific research at the University "conducted by and through"

KUCR. (First Amended Complaint, Dk. 30, ¶ 14). The plaintiff describes the

MAI Lab in these terms:

> The MAI Lab includes over $6.5 million in highly sophisticated electron
> and other advanced microscopy and scanning instruments acquired
> with federal grant funds used to examine, evaluate, analyze and
> manipulate cells and molecules images down to the single-atom level
> to support sophisticated research work conducted by University
> professors, researchers and graduate students for scientific training,
> education and research funded with University funds, federal research
> grants and contracts, and private sector industry sponsored work,
> primarily in materials and life sciences, including grants, contracts and
> fee-for-services work to produce income for the University in addition
> to providing scientific training, education and research for University
> students and researchers.

*Id.* at ¶ 15. The plaintiff's first amended complaint alleges the following as to

3

KUCR:

> 39. The KU Center for Research is a contractor, subcontractor or grantee of federal contracts and grants in that is has been the recipient, custodian or administrator of numerous federal grants from the Public Health Service, the National Institutes of Health and the National Science Foundation, and has been and/or continues to be a contracting party with the Public Health  Service, the National Institutes of Health and the National Science Foundation for significant funds in the hundreds of millions of dollars used to conduct scientific research, including the purchase of scientific instruments and compensation of scientific personnel to operate such instruments in Core Labs in the University, the Research and Graduate Studies program or otherwise has been the agent of the University for the administration and operation of the Core Labs and the University's Research and Graduate Studies program.
> 40. The KU Center for Research is an independent, separate entity from the University and the State of Kansas. On information and belief, it is not an "arm of the state" in that, inter alia, it derives significant sums for its operation from sources other than the University, it operates autonomously from the University, it has the right to sue and be sued in its own name and it owns property in its own name.

*Id*. at ¶¶ 39-40). Moore alleges his action arises from KU suspending him for four weeks without pay in September of 2013 for "disruptive" and "unprofessional" behavior and then terminating him the next month when his appeal of the suspension was still pending. The court's prior order briefly summarized the factual backgrounds on discrimination, retaliation and whistleblowing, and that court incorporates that here by reference. (Dk. 79).

**STANDARDS GOVERNING RULE 12(B)(1) and (B)(6) MOTIONS**

A court may dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. "Federal courts are courts of limited jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002). The burden is with

the plaintiff to establish subject matter jurisdiction. Rule 12(b)(1) motions generally will take either of two forms:  one, a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or two, a factual attack that goes beyond complaint's allegations and challenges the facts upon which subject matter jurisdiction depends. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). With a facial attack, the "district court must accept the allegations in the complaint as true." *Id*. With a factual attack, "the district court may not presume the truthfulness of the complaint's factual allegations," but it "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). *Id*.; *see Los Alamos Study Group v. U.S. Dept. of Energy*, 692 F.3d 1057, 1064 (10th Cir. 2012).

In deciding a Rule 12(b)(6) motion, a court accepts as true "all well-pleaded factual allegations in a complaint and view[s] these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 558 U.S. 1148 (2010). This duty to accept a complaint's allegations as true is tempered by the principle that "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As recently clarified by the Supreme Court, the

5

standard under 12(b)(6) is that to withstand a motion to dismiss, "'a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face.'" *Al–Owhali v. Holder*, 687 F.3d 1236, 1239 (10th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Thus, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level.'" *Kansas Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). It follows then that if the "complaint pleads facts that are 'merely consistent with' a defendant's liability it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. "'A claim has facial plausibility when the [pleaded] factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1178 (10th Cir. 2012). "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming*, 656 F.3d at 1214.

**ELEVENTH AMENDMENT IMMUNITY—KUCR—ARM OF THE STATE**

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity,

6

commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. As interpreted by the Supreme Court, "[t]he Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner County Rural Water Dist. No. 2 v. Grand River Dam Authority*, 577 F.3d 1255, 1258 (10th Cir. 2009)). Eleventh Amendment immunity extends to state entities that are deemed to be "arm[s] of the state." *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30 (1997). The opening question is whether the entity "is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend." *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977). In explaining this doctrine, the Tenth Circuit has said, it "bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000) (quotation marks and citation omitted).

The arm of the state inquiry looks first at two general areas:

"[T]he court first examines the degree of autonomy given to the agency, as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state. Second, the court examines the extent of financing the agency receives independent of the state treasury and its ability to provide for

7

its own financing. The governmental entity is immune from suit if the money judgment sought is to be satisfied out of the state treasury."

*Sturdevant v. Paulsen*, 218 F.3d at 1164 (quoting *Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 574-75 (10th Cir. 1992)). On the inquiry of state treasury liability, the court "focus[es] on legal liability for a judgment, rather than practical, or indirect, impact a judgment would have on a state treasury." *Id.* at 1164 (quoting *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 981 (10th Cir. 1997)). "The key question is whether funds to satisfy a money judgment would come directly from the state, or indirectly through commingled state and local funds or state indemnification provisions." *Sturdevant*, 218 F.3d at 1165 (citation, quotation marks and italics omitted). "In answering this question, we focus on the legal incidence, not the practical effect, of liability." *Id.* (citation omitted). While the state treasury's liability "strongly favors arm-of-the-state status," *id.*, "the lack of clarity" on this liability factor simply moves the court to consider the remaining *Mount Healthy* factors, *id.* at 1166; *see U.S. Ex rel. Sikkenga v. Regence BlueCross*, 472 F.3d 702, 718 (10th Cir. 2006) ("[T]he absence of legal liability is not determinative."). For determining whether an entity is an "arm of the state," the Tenth Circuit has looked at "four primary factors":

> First, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state. *See Sturdevant* [*v. Paulsen*], 218 F.3d [1160] at 1164, 1166 [(10th Cir. 2000)] . Second, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control

8

the state exercises over the entity. *See id.* at 1162, 1164, 1166. Third, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf. *See id.* Fourth, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose. *See id.* at 1166, 1168–69.

*Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007).

As is often the case, the court realizes it is not writing on a clean slate, for the Tenth Circuit has held that "the University of Kansas, as a state university, and the University Press of Kansas, as a state institution serving the state universities, function as arms or alter egos of the State of Kansas," *Brennan v. University of Kan.*, 451 F.2d 1287, 1290 (10th Cir. 1971), and that the University of Kansas Medical Center is an arm of the State of Kansas, *Ellis v. University of Kansas Medical Center*, 163 F.3d 1186, 1195 (10th Cir. 1998). There are also this court's decisions in *Kansas State University v. Prince*, 673 F.Supp.2d 1287 (D. Kan. 2009), and *Teichgraeber v. Memorial Union Corp. of the Emporia State University*, 946 F. Supp. 900, 903 (D. Kan. 1996). In both cases, the court performed some analysis on whether particular corporations connected to and supporting the universities constituted arms of the state, but it did not reach a final determination on that issue in either case. The court also realizes that this arm-of-the-state "inquiry turns on an analysis of state law and financial arrangements so the answer may well differ from state to state and agency to agency and epoch

9

to epoch." *Ute Indian Tribe of the Uintah and Ouray Reservation v. Utah*, 790 F.3d 1000, 1012 (10th Cir. Jun. 16, 2015). Finally, the defendant KUCR cites the Kansas Attorney General Opinion, No. 95-115, 1995 WL 708238 (Nov. 21, 1995), which opined that the Kansas State University Research Foundation ("KSURF") was a governmental entity under the Kansas Tort Claims Act. Some limited weight is given to this opinion, but it is hardly dispositive on the issue. *See Steadfast*, 507 F.3d at 1253.

"A majority of circuit courts have 'concluded that "the entity asserting Eleventh Amendment immunity has the burden to show that it is [an 'arm' of the state] entitled to [Eleventh Amendment] immunity."'" *Giddings v. Utah Transit Authority*, ---F. Supp. 3d---, 2015 WL 2248172 at *2 (D. Utah May 13, 2015) (quoting *Woods v. Rondout Valley Cent. Sch. Bd. of Educ.*, 466 F.3d 232, 237 (2d Cir. 2006) (quoting in turn *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958 (6th Cir. 2002)) (citing cases in the Third, Fifth, Seventh and Ninth Circuits); *see Teichgraeber v. Memorial Union Corp. of the Emporia State University*, 946 F. Supp. 900, 903 (D. Kan. 1996). This court in *Teichgraeber* noted:

> Serious factual disputes over Eleventh Amendment immunity occur "only where a relatively complex institutional arrangement makes it unclear whether a given entity ought to be treated as an arm of the state." *ITSI TV* [*v. Productions Inc. v. Agricultural Associations*], 3 F.3d [1289] at 1292 [(9th Cir. 1993)]. Giving the burden to the party asserting immunity seems appropriate and fair in this situation, since "the 'true facts' as to the particulars of this arrangement will presumably 'lie peculiarly within the knowledge of' the party claiming immunity." *Id*.

10

946 F. Supp. at 903. As both the movant and the party bearing the burden, KUCR must establish that the issue is ripe for decision now and that the plaintiff is not entitled to a reasonable opportunity to complete limited discovery on certain factors before the matter is then submitted on a summary judgment motion. Convinced of its soundness, the court will follow the analytical framework used in *Prince.*

*Characterization under State Law*

On this factor, the court looks at how the entity in question is characterized in any "relevant state statutes, regulations, and constitutional provisions" or state court decisions. *Prince*, 673 F. Supp. 2d at 1299. KUCR is a Kansas not-for-profit corporation. It is not named in a state statute. The parties point to several state statutes which are indicators of its character. The first authorizes a state educational institution to contract with a corporation and requires:

> If such contract is with a corporation whose operations are substantially controlled by the board or any state educational institution, such contract shall provide that the books and records of such corporation shall be public records and shall require an annual audit by an independent certified public accountant to be furnished to the board of regents and filed with the state agency in charge of post auditing state expenditures.

K.S.A. 76-721. As noted in *Prince*, this statute reveals the Kansas legislature "contemplated that a State University could 'substantially control' a corporation whose purpose is related to the university's function." 673 F.

11

Supp. 2d at 1300.

The parties point to several other Kansas statutes having some relevance. The Kansas Legislature specifically addresses "Research and Development Facilities for State Educational Institutions," K.S.A. 76-777 through 76-788 ("Research Act"). The legislative findings express that scientific research is "essential to promote the economic development of the state," that state citizens and universities are "best served if the board of regents is granted specific authority to assist the state educational institutions in the provision of scientific research," and that *the exercise of powers authorized by this act are deemed an essential governmental function in matters of public necessity for the entire state in the provision of scientific research.*" K.S.A. 76-778 (italics added). The Research Act empowers the Board of Regents ("Regents") to contract for "the operation and management of scientific research and development facilities," "to borrow money from the Kansas development finance authority to finance the costs of acquiring, constructing and equipping" such facilities, to "do any and all things necessary or convenient to exercise the powers authorized by this act," and "to participate in joint ventures with . . . corporations . . . to facilitate any activities or programs consistent with the public purpose and intent of this act." K.S.A. 76-780. The Kansas legislature has plainly recognized the importance of scientific research to the state universities and has provided that contracts for the operation, management and construction

12

of such research facilities are "an essential governmental function in matters of public necessity." K.S.A. 76-778(b).

The Regents is authorized to construct such facilities on state property but only after consulting with the legislative joint committee on state building construction. K.S.A. 76-782(a). Such "facilities shall become the property of the state upon completion and acceptance by the board of regents." K.S.A. 76-782(a). The Kansas development finance authority is authorized to issue bonds as "necessary to provide sufficient funds to finance" the facilities. K.S.A. 76-783(a)(1). "[E]very obligation of the board of regents with respect to such bonds shall be an obligation of the board of regents payable out of any revenues or moneys of the board of regents derived from annual appropriations of the legislature." K.S.A. 76-783(a)(2). Any bonds so issued "shall at all times be free from taxation by the state or any agency." K.S.A. 76-783(g). The bonds are the "special, limited obligations of the Kansas development finance authority and the state shall not be liable for bonds issued." K.S.A. 76-783(i). The Regents' purchases relating to the facilities are not subject to sales tax. K.S.A. 76-784. The Act is to be liberally construed and, thus, not construed to limit the Regents' authority and particularly its finance authority under other state laws. K.S.A. 76-785. The Kansas Legislature has made special provision for the development of funds for such facilities.

By statute, "the state educational institutions are separate state

13

agencies and state institutions and shall be controlled by and operated and managed under the supervision of the board of regents." K.S.A. 76-712. The Regents may "adopt orders, policies or rules and regulations as are authorized by law." *Id.* The plaintiff refers to the Regents' policy laying out criteria for distinguishing "affiliated corporations" that are university controlled and those that are not. The identified criteria include:

> (1) A majority of a quorum of the board of directors, or other committee charged with making decisions on behalf of the corporation, are university personnel or appointed by the state university chief executive officer, or
> (2) The corporation is otherwise controlled by the university or the university chief executive officer, as determined by the following considerations.

(Dk. 74-2, p. 1). The policy precludes state universities from using "state funds for the operation of non-controlled affiliated corporations." *Id.* at 2.

Applying these statutes and policies to the undisputed facts offers some conclusions. First, by statute, KU is a state agency, K.S.A. 76-712, and any corporation that it substantially controls must comply with the terms of K.S.A. 76-721 and make public its books and records and conduct an annual audit that is furnished to the Regents and filed with the state. Consistent with K.S.A. 76-721, the Affiliation Agreement between KUCR and KU provides that, "the books and records of KUCR shall be public records and shall be audited annually" with copies of the audit "provided to the University Chief Business and Financial Planning Officer for distribution to the Regents, and to the state agency in charge of post-auditing state

14

expenditures (Regents Policy II.B.8.b(3))." (Dk. 62-5, p. 5). Second, scientific research in universities is "essential to promote the economic development of the state," and contracts for the operation, management and construction of such research facilities are "an essential governmental function in matters of public necessity." K.S.A. 76-778.

Finally, the KUCR's bylaws specify that the officers of the corporation (board chair, chief executive officer, vice chair, president [chief operating officer], vice presidents, and treasurer) are filled by those having designated University titles. (Dk. 62-3, p. 2). The bylaws give the president the duty "to actively manage the business of the corporation." (Dk. 62-3, p. 2). The bylaws create an executive committee consisting of the six officers who are University staff or faculty, and five other members, two of which must be KU faculty members. (Dk. 62-3, p. 3). Thus, a prevailing majority on the executive committee are KU staff. (Dk. 62-3, pp. 2-3). The bylaws give the executive committee "all of the powers of the trustees except to fill vacancies on the Board" and "full charge of the business and general operation of the corporation, . . . full power and authority to do all business that it deems for the best interest of the corporation . . . ." (Dk. 62-3, p. 3). In short, KUCR meets the Board's policy definition of a corporation controlled by the university in that KUCR's executive committee, which is charged with making decisions on behalf of the corporation and has all the operational powers of the trustees, is made up of a majority of members who are

15

university personnel.

Under Kansas statutes and policies, KUCR is a corporation substantially controlled by KU. KUCR's contracting for the operation and management of scientific research facilities at KU is "an essential governmental function in matters of public necessity." K.S.A. 76-778. The manner in which state law addresses KUCR's function and role is an important consideration and favors finding it to be an arm of the State.

*Degree of Autonomy*

The court next assesses the degree of KUCR's autonomy from the state agency, that is, the University of Kansas. In doing so, the court will examine its articles of incorporation, bylaws, its affiliation agreement with KU, and its public financial records. As pointed out above, the relationship between KU and KUCR as defined by state law and Board policy is that KUCR is substantially controlled by KU. This conclusion is affirmed by analysis of this factor.

KUCR is a not-for-profit created by KU "to promote scientific and educational development by encouraging, fostering and conducting scholarly investigations and industrial and other types of research at the University of Kansas by the faculty, staff, and students thereof, and those associated therewith, . . . ." (Dk. 62-1, p. 1). The articles of incorporation give KUCR the powers to contract with inventors, applicants or owners of patents and related interests; to receive gifts; to experiment with inventions and

16

processes; to prosecute applications for patents; to acquire and sell
inventions and patents and to secure rights and collect royalties therefrom;
to prosecute infringement suits and to defend against infringement; to hold
purchase and sell real or personal property; to borrow money and to engage
in various debt transactions; to enter and "carry out contracts of every kind
for any lawful purpose with any entity or person. (Dk. 62-1, p. 1-3). These
powers are indicative of an "autonomy analogous to those enjoyed by local
school districts." *Sturdevant*, 218 F.3d at 1168.

Thus, it is critical to consider these powers in the context of their
"purpose, composition and function of the state entity in question." *Id.*
Purpose is evident from what was quoted above as taken from KUCR's
restated Articles of Incorporation which requires that all of KUCR's "assets
and earnings . . . shall be used exclusively for the purposes" found there.
(Dk. 62-1, p. 4). The affiliation agreement spells out that KUCR was
organized for this purpose too. (Dk. 62-5, p. 1). A similar purpose statement
can be found in KUCR's financial statements:

> The University of Kansas Center for Research, Inc. . . . is a not-for-
> profit organization that operates under the administrative jurisdiction
> of the University of Kansas . . . . The Center is a *component unit* of the
> University and administers sponsored agreements to conduct research
> and training for the University. The Center's revenues and other
> support are derived principally from federal, state, and private grants
> and its activities are conducted principally in Lawrence, Kansas.

(Dk. 74-3, p. 9) (italics added). The italicized language shows the University
regards the Center as part of University and as a unit handling certain

17

functions on behalf of the University. The affiliation agreement also includes

the following terms which are consistent with KUCR's stated purpose:

> 2. **INTERNAL RESEARCH FUNDS.** KUCR will establish and manage
> research funds for internal support of KU faculty and staff research
> efforts. KUCR will develop written policies for the operation and
> management of research funds for the support of KU faculty and staff
> research. Such policies shall specify the nature of accounts held by
> KUCR, including research overhead accounts, and shall indicate those
> individuals who, by virtue of position, have authority to approve use of
> such funds in support of research and research development.
> 3. **FACILITIES**. All activities, contracts and research that are
> conducted in research facilities developed and/or operated by KUCR
> shall be consistent with the mission of KU and shall not jeopardize KU
> or KUCR missions. The management of facilities owned or leased by
> KUCR shall be conducted such that the property or properties that are
> leased, developed or purchased will be acquired, built and/or
> maintained in such condition so as to be transferred to KU upon the
> completion of their intended purpose or mission or at a time the
> parties mutually agree to be appropriate.

(Dk. 62-5, p. 3). The agreement also provided that "KUCR shall undertake

all appropriate activities to accomplish the development and transfer of

technology that is determined by the KUCR Executive Committee and the

Vice Provost for Research to be appropriate for management by KUCR." (Dk.

62-5, p. 4). As shown in these terms and others, KUCR agreed to manage

grants and contracts for KU, to establish research funds for KU faculty and

staff research, to manage facilities that would be transferred to KU at some

point, and to undertake all technology transfers as determined appropriate

by KU's Vice Provost of Research and the KU faculty-dominated executive

committee. There is little question but KUCR's overriding purpose was to

serve and meet KU's scientific and educational development in research

18

efforts.

The composition of those governing KUCR and its functioning also weighs in favor of finding it to be an arm of the state. As already discussed, a majority of KUCR's executive committee is made up of university staff and faculty (8 of 11 members). The bylaws give the executive committee "all of the powers of the trustees except to fill vacancies on the Board" and "full charge of the business and general operation of the corporation, . . . full power and authority to do all business that it deems for the best interest of the corporation . . . ." (Dk. 62-3, p. 3). The executive committee's power includes "to borrow money, give evidence thereof and give security therefore, and do any or all things which the trustees may except to fill vacancies in the membership of the trustees." (Dk. 62-3, p. 3). A majority of the committee constitutes a quorum. (Dk. 62-3, p. 4). The executive committee has the same power as the board of trustees to amend the bylaws, but the committee's amendment is only effective until the next regular meeting of the trustees[1] who must approve the amendment for it to

---

[1] The plaintiff argues for KUCR's autonomy by speculating that KU faculty and staff need not make up a majority of the board of trustees. The restated articles designate 36 trustees plus 6 ex officio trustees who are members of KU staff. The bylaws specify that the board of trustees numbers 36, consisting of approximately an equal number of KU and non-KU employees, plus the ex officio members who are KU staff. (Dk. 62-3, p. 1). With regard to nonprofit organizations, the "[b]ylaws do not always specify whether the position is voting or nonvoting; while statutory failure to address such a situation implies that every board member has the right to vote in the absence of an explicit statement in the bylaws or other relevant document to

remain effective. *Id.* The bylaws give the president, the Vice Provost for

Research at KU's Lawrence Campus, the duty "to actively manage the

business of the corporation." (Dk. 62-3, p. 2).  As stated above, KUCR meets

the Regent's policy definition of a corporation controlled by the university

based on the composition and power of KUCR's executive committee. While

possessing significant autonomous powers, KUCR largely operates in

purpose, composition and function at the University's substantial control and

on behalf of the University. The court finds that the considerations of

autonomy and control weigh in favor of characterizing KUCR as an arm of

the state.

*KUCR's Finances*

From his review of the KUCR's audited financial statements, the

plaintiff concludes that it does not receive any state public funds to fulfill its

---

the contrary, in practice there seems to be no consensus over whether the
term 'ex officio' connotes voting or nonvoting status." *Principles of the Law
of Nonprofit Organizations* § 320 TD No 1 (2007). None of the corporate
documents here spell out the voting rights of the "ex officio trustees." It is
noteworthy that they are referred to as "trustees" and "members" of the
board. The bylaws do set out certain exceptions for the "ex officio trustees"
concerning the length of their terms and their removal from office. The
bylaws, however, are silent as to any exceptions or limitations on their
voting rights. Considering that the ex officio trustees are already exercising
nearly all of these same powers as members of the executive committee,
there is logical consistency in their possession of board voting rights as ex
officio trustees. In light of the general rule and these terms of the relevant
documents, the court is satisfied that the most reasonable reading is that
the University staff/faculty has majority control over the board of trustees.
The court gives little weight to the plaintiff's speculative argument to the
contrary.

responsibilities and mission. The plaintiff explains that he has an outstanding request for production of documents on this topic. The parties' presentations fail to offer much meaningful analysis of these financial statements, and their conclusions are largely argumentative and appear superficially based on the statements. On the state of this record, the court offers a couple observations plain from the statements. The 2013 and 2014 financial statements show KUCR has three revenue bonds from the Kansas Development Finance Authority that were obtained to finance the construction of research facilities. (Dk. 74-3, pp. 15-16). By statute, the state is not liable for these bonds, and they do not constitute a debt of the state. K.S.A. 76-783(i).  Nonetheless, the powers exercised in securing these bonds are "deemed an essential governmental function." K.S.A. 76-778(b). There is nothing in these statements to suggest that the KUCR is a line item on the state budget and so receives direct appropriations for its operations. At the same time, there is plenty in those statements to show that most of KUCR's revenue comes from federal and state research awards. This is monies that were appropriated by legislative bodies to executive agencies and given to KUCR who administers these monies and facilities for KU, a state agency, to do research critical to various governmental agency functions.

On the issue of state liability, the plaintiff cites K.S.A. 76-734 which provides, "The state of Kansas and its agencies, institutions, officers and

employees shall not be liable for the debts, obligations or liabilities of any

organization for which a function under this act is performed." As this court

has interpreted this provision, neither the State of Kansas nor KU is liable for

KUCR's debts. *Prince*, 673 F. Supp. 2d at 1304. The plaintiff contends this

provision should be dispositive. However, "the absence of legal liability is not

determinative." *Sikkenga*, 472 F.3d at 718. By the same token, the

affiliation agreement between KU and KUCR provides:

> 7. **INSURANCE AND INDEMNIFICATION**. In addition to, or as a
> part of its Directors and Officers insurance coverage, KUCR agrees to
> maintain liability insurance coverage for its operations in a
> commercially reasonable amount, and in no event in an amount less
> than $1 million per incident and $2 million in the aggregate per year.
> KUCR agrees to be responsible for liability arising out of the negligence
> and errors and omissions of KUCR's agents and its employees,
> excluding KU faculty and staff members to the extent they are
> participating in or supporting sponsored research or technology
> transfer through KUCR, up to and subject to the limitations contained
> in the provisions of the Kansas Tort Claims Act, K.S.A. 75-6101 <u>et seq</u>.
> KU agrees to be responsible for liability arising out of the negligence
> and errors and omissions of its agents and employees, subject to the
> limitations contained in the provisions of the Kansas Tort Claims Act,
> K.S.A. 75-6101 <u>et seq</u>.

(Dk. 62-5, pp. 5-6). Under the agreement, KU retained liability for its faculty

and staff "to the extent they are participating in or supporting sponsored

research or technology through KUCR" and for its agents and employees

with liability for both subject to the Kansas Tort Claims Act limitations. On

the other hand, KUCR has its own insurance too. The parties have not

addressed how this provision impacts the liability question particularly on the

claims alleged in this case.

22

Finally, the plaintiff concedes KUCR lacks the authority to issue bonds or levy taxes. In sum, this factor certainly is open to more discussion and analysis. The plaintiff's arguments generally lean this factor in his favor. But as pointed out above, there are circumstances and contexts that make the factor less clear. At this time, the court finds the financial factor to have some weight in favor of finding against KUCR being an arm of the state.

*State or Local Concern*

As already set out above, KUCR is concerned primarily with state affairs as confirmed by the relevant state statutes and its restated articles of incorporation, bylaws and affiliation agreement. KUCR was organized for the purpose of meeting the objective to "promote scientific and educational development by encouraging, fostering and conducting scholarly investigations and industrial and other types of research at The University of Kansas by the faculty, staff and students thereof, and those associated therewith." (Dk. 62-5, p. 1). The performance of scientific research at its state educational institutions is deemed "essential to promote the economic development of" Kansas. K.S.A. 76-778(a)(1). The court here questions the weight to give this factor as it did in *Prince*, because this factor seems oriented to distinguishing between levels of governmental entities and not to discerning whether a corporate entity is functioning as an alter ego. Nonetheless, the accepted analysis of this factor is in favor of an arm of the state finding.

23

*Conclusion*

The factors certainly point in different directions, and so "the Eleventh Amendment's twin reasons for being remain our prime guide." *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 47 (1994). Those twin reasons are that federal court judgments not deplete the state treasury and that the "dignity" of the states be preserved. *Id.* The court is simply not convinced that it can make a final determination at this time on this motion. The factual record is incomplete in certain respects as highlighted above. Additionally, the parties' analysis fails to address several circumstances critical to this determination. Thus, the court will grant the plaintiff's request and permit him to complete his discovery relevant to these Eleventh Amendment issues. Based on that discovery, the court expects KUCR will renew its Eleventh Amendment challenge in a properly supported motion for summary judgment. Without prejudice to the above, the court denies KUCR's motion to dismiss on this ground.

**EMPLOYEE/EMPLOYER RELATIONSHIP--KUCR**

KUCR argues the plaintiff in alleging he was an employee of KU, not KUCR, has failed to state a claim for relief, because an employee/employer relationship is a requirement for each of these counts according to the defendant. The plaintiff's amended complaint identifies himself as being employed by KU. (Dk. 30, ¶¶ 2 and 13). The plaintiff responds that having now been provided with KU/KUCR's Employee Services Agreement and

24

Affiliation Agreement (Dks. 62-4 and 62-5) that he now can allege an employment relationship also with KUCR as under the agreements he was a "borrowed servant." (Dk. 62-4, p. 2). Assuming that the plaintiff would amend his complaint to include allegations of a borrowed servant relationship, KUCR factually challenges whether the relationship meets the definition of a borrow servant under Kansas law. The defendant's arguments first raised in it reply brief will not be addressed. The court sees little reason to address KUCR's opening arguments, as the plaintiff is prepared to amend his complaint to allege the nature of his relationship to KUCR based on recently disclosed documents. The court will permit the plaintiff twenty days to add these allegations regarding his work relationship with KUCR so the issues will be framed by a proper pleading for a subsequent dispositive motion. If the plaintiff fails to amend his complaint, the court will grant the defendant's motion as the plaintiff has failed to allege any employment relationship with KUCR.

**DAMAGES--REHABILITATION ACT--KUCR**

The plaintiff concedes that punitive damages and compensatory damages are unavailable under the Rehabilitation Act. The plaintiff agrees his prayer for relief on this count should state, "all other appropriate relief as may be appropriate under" the Rehabilitation. Thus, the plaintiff is not seeking and is not entitled to recover compensatory or punitive damages on count two.

25

**NDAA—EXHAUSTION OF ADMINISTRATIVE REMEDIES—KUCR and GRAY-LITTLE**

As far as the applicability of this act to any of the contracts and grants, the plaintiff concedes his allegations are lacking and seeks discovery on what contracts were awarded or modified after July 1, 2013. The plaintiff is only seeking prospective injunctive relief against Dr. Gray-Little. On the issue of exhaustion, counsel for the parties incorporate the arguments made in the earlier set of motions already decided by the court. The court's ruling applies with equal force here. Exhaustion is a jurisdictional requirement which the plaintiff concedes he has not alleged but which he is working to satisfy now. As it ruled earlier, the court will give the plaintiff some reasonable time to cure this pleading deficiency. The plaintiff will have 20 days from this order to file either an amended claim with curative allegations for this exhaustion requirement or a report as to the status of the administrative proceedings with an estimate on when curative allegations may be offered. The court expects the plaintiff to address the applicability of the NDAA similarly in his amended complaint.

**FCA-SOVEREIGN IMMUNITY AND "IN FURTHERANCE OF"—KUCR and GRAY-LITTLE**

The court's ruling above on the "arm of the state" issue applies here as well on the sovereign immunity argument. KUCR's arguments on the availability of state suits and the "in furtherance" element were addressed and denied in the court prior order. (Dk. 79, pp. 18-23). The court

26

incorporates its rulings here without further elaboration.

## ADA/REHABILITATION ACT-DAMAGES—GRAY-LITTLE

Dr. Gray-Little acknowledges she is the appropriate defendant against whom to seek prospective injunctive relief under *Ex parte Young* for violations of the ADA and the Rehabilitation Act, but she seeks dismissal of any allegations in the plaintiff's amended complaint which could be construed as seeking monetary damages. The plaintiff clarifies that he is not seeking monetary damages from Dr. Gray-Little and is pursuing the relief available under *Ex parte Young.*

## COMMON-LAW RETALIATORY DISCHARGE—GRAY-LITTLE

For the reasons and on the authorities cited in its prior order, (Dk. 79, p. 36), the court grants Dr. Gray-Little's motion to dismiss this claim.

IT IS THEREFORE ORDERED that the motion to dismiss (Dk. 61) filed by the defendant KUCR is denied on the 11th Amendment issues but without prejudice to a new dispositive motion being filed after additional discovery, is denied on the issue of having failed to allege an employer/employee as the plaintiff will be filing an amended complaint based on recent discovery, and is denied subject to the court's rulings, reasons and authorities contained in its prior order (Dk. 79) as incorporated herein;

IT IS FURTHER ORDERED that the motion to dismiss (Dk. 63) filed by the defendant Dr. Gray-Little is granted as to count seven and denied in all other respects subject to the court's rulings, reasons and authorities

27

contained in its prior order (Dk. 79).

Dated this 21st day of August of 2015, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge