**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS
AT KANSAS CITY, KANSAS**

| | | |
|---|---|---|
| DAVID S. MOORE, Ph.D., | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:14-CV-02420-SAC-KGS |
| | ) | |
| vs. | ) | Hon. Sam A. Crow |
| | ) | |
| THE UNIVERSITY OF KANSAS, *et al*., | ) | Hon. K. Gary Sebelius |
| | ) | |
| Defendants. | ) | |

**Filed Electronically CM/ECF**

**THIRD AMENDED COMPLAINT
FOR DISABILITY DISCRIMINATION AND RETALIATION,
WHISTLEBLOWING RETALIATION AND
DEPRIVATION OF CONSITUTIONAL RIGHTS**

COMES NOW plaintiff David S. Moore, Ph.D., by and through his attorney, and for his *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights* against defendants University of Kansas, the University of Kansas Center for Research, Inc., Bernadette Gray-Little, Jeffrey S. Vitter, Steven F. Warren and Joseph A. Heppert states:

**Introduction**

1.     This is an action for damages and equitable relief arising from the suspension, hostile work environment and subsequent termination of appointment and employment of plaintiff David S. Moore, Ph.D., as the Director of the University of Kansas Microscopy and Analytical Imaging Laboratory, Lawrence Campus, such suspension, hostile work environment and termination being unlawful and in violation of plaintiff's rights:

(a)     *Americans with Disabilities Act.*  As a disabled person and an employee of the University of Kansas and the University of Kansas Center for Research, Inc. under Title I of the federal Americans with Disabilities Act, as amended, 42 U.S.C. Secs. 12,101, *et seq.,* because of his disability and in retaliation for exercising his rights as a disabled person under such Act;

(b)      *Rehabilitation Act.*  As a disabled person and an employee of the University of Kansas and the University of Kansas Center for Research, Inc. under the federal Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701*, et seq.*, as amended, because of his disability and in retaliation for exercising his rights as a disabled person under such Act;

(c)      *False Claims Act.*  As a person who exercised his rights as a "whistleblower" and was suspended, subjected to a hostile work environment, discharged and otherwise discriminated against as reprisals for lawful acts done by plaintiff in furtherance of his rights under the federal False Claims Act, 31 U.S.C. Sec. 3730, *et seq.,* particularly the provisions of 31 U.S.C. Sec 3730(h) protecting persons from retaliatory employment actions, including his investigating and requesting information to stop what he reasonably believed was evidence of fraud and mismanagement of federal contracts or grants, including presenting false or fraudulent claims for federal funds and making false records or statements material to a false or fraudulent claim in violation of such Act;

(d)      *Federal Civil Rights Act – Freedom of Speech.*  As a person whose clearly established constitutional right of free speech under the U. S. Const., First and Fourteenth Amendments, to speak out on matters of public concern regarding violation of federal laws regarding the expenditure of federal funds have been violated under color of state law by defendants Steven Warren and Joseph Heppert in instigating and taking various adverse employment actions against plaintiff including but not limited to suspension from employment, creation of a hostile work environment and termination of employment in violation of the federal Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, *et seq.*; and

(e)      *Federal Civil Rights Act –Substantive Due Process.*  As a person whose clearly established constitutional right of substantive due process the U. S. Const., Fourteenth Amendment, to be free from arbitrary, capricious and unreasonable actions regarding violation of

federal laws regarding the expenditure of federal funds and otherwise have been violated under color of state law by defendants Steven Warren and Joseph Heppert in instigating and taking various adverse employment actions against plaintiff including but not limited to suspension from employment, creation of a hostile work environment and termination of employment in violation of the federal Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, *et seq.*

## Parties, Jurisdiction and Venue

### *Parties*

2.      Plaintiff David S. Moore, Ph.D. is an individual and resident of the state of Kansas, residing at 17222 W. 70th St., Shawnee, Kansas 66217-9523, which address is plaintiff's mailing address. Plaintiff was employed by defendant University of Kansas and defendant University of Kansas Center for Research, Inc., as a "borrowed servant," as an Assistant Scientist and the Director of the Microscopy and Analytical Imaging Laboratory at the Lawrence, Kansas campus until October 18, 2013.

3.      Defendant University of Kansas ("University") is a state university, state agency and institution of the State of Kansas with principal campuses in Lawrence, Kansas City and Overland Park, Kansas.  Defendant University of Kansas may be served with process by service thereof upon Bernadette Gray-Little, Chancellor, at Strong Hall, Room 230, 1450 Jayhawk Blvd., Lawrence, Kansas; James P. Pottorff, Jr., General Counsel, at Strong Hall, Room 245, 1450 Jayhawk Blvd., Lawrence, Kansas; or Derek Schmidt, Attorney General of the State of Kansas, 120 S.W. 10th St., Topeka, Kansas.  The University's mailing address is Strong Hall, Room 230, 1450 Jayhawk Blvd., Lawrence, Kansas 66045-7535.

4.      Defendant University of Kansas Center for Research, Inc. ("Center for Research") is a nonprofit corporation organized and existing under the laws of the State of Kansas.  The Center for Research may be served with process by service thereof upon Linda Sadler, its registered agent, at Youngberg Hall, University of Kansas, 2385 Irving Hill Rd., Lawrence, Kansas 66045.  The mailing address for the Center for Research is 2385 Irving Hill Rd., Lawrence, Kansas 66045-7535.

5.      Defendant Bernadette Gray-Little, Ph.D., ("Gray-Little"), is Chancellor of defendant University of Kansas and Chair of the Center for Research.  Defendant Bernadette Gray-Little is sued in her official capacity as Chancellor of defendant University of Kansas for prospective injunctive relief (Counts One and Four), all as more particularly set forth below.  Defendant Bernadette Gray-Little may be served with process by service thereof upon her at Strong Hall, Room 230, 1450 Jayhawk Blvd., Lawrence, Kansas.  Defendant Bernadette Gray-Little's mailing address is at Strong Hall, Room 230, 1450 Jayhawk Blvd., Lawrence, Kansas.

6.      Defendant Jeffrey S. Vitter, Ph. D. ("Vitter"), is Provost and Executive Vice Chancellor for defendant University of Kansas and Vice Chair of the Center for Research.  Defendant Jeffrey S. Vitter is sued in his official capacity as Provost and Executive Vice Chancellor for defendant University of Kansas for prospective injunctive relief (Counts One and Four), all as more particularly set forth below.  Defendant Jeffrey S. Vitter may be served with process by service thereof upon him at Youngberg Hall, Room 212, 2385 Irving Hill Rd., University of Kansas, Lawrence, Kansas.  Defendant Jeffrey S. Vitter's mailing address is Youngberg Hall, Room 212, 2385 Irving Hill Rd., University of Kansas, Lawrence, Kansas 66045-7535.

7.      Defendant Steven F. Warren, Ph.D. ("Warren"), is a Professor of Applied Behavioral Science, Senior Scientist and, at all times relevant hereto, was Vice Chancellor for Research and Graduate Studies for the University of Kansas and President of the Center for Research.  Defendant Steven F. Warren is sued in his official capacity as Vice Chancellor for Research and Graduate Studies for the University of Kansas for injunctive relief (Counts One and Four) and in his capacity as an individual for money damages and injunctive relief (Counts Five and Six), all as more particularly set forth below.  Defendant Steven F. Warren may be served with process by service thereof upon him at Youngberg Hall, Room 212, 2385 Irving Hill Rd., University of Kansas, Lawrence, Kansas.  Defendant Steven F. Warren's mailing address is Youngberg Hall, Room 212, 2385 Irving Hill Rd., University of Kansas, Lawrence, 66045-7535.

8.     Defendant Joseph A. Heppert, Ph.D. ("Heppert"), is a Professor and Associate Vice Chancellor for Research and Graduate Studies for the University of Kansas and a Vice President of the Center for Research.   Defendant Joseph A. Heppert is sued in his official capacity as Professor and Associate Vice Chancellor for Research and Graduate Studies for the University of Kansas for prospective injunctive relief (Counts One and Four) and in his capacity as an individual for money damages and injunctive relief (Counts Five and Six), all as more particularly set forth below.  Defendant Joseph A. Heppert may be served with process by service thereof upon him at Youngberg Hall, Room 211, 2385 Irving Hill Rd., University of Kansas, Lawrence, Kansas.   Defendant Joseph A. Heppert's mailing address is Youngberg Hall, Room 211, 2385 Irving Hill Rd., University of Kansas, Lawrence, Kansas 66045-7535.

*Jurisdiction*

9.     *Federal Question Jurisdiction.*   Subject matter jurisdiction of this court to hear and adjudicate plaintiff's claims is proper as a matter of enforcing the rights of plaintiff under the laws of the United States, particularly:

(a)     Title I of the federal Americans with Disabilities Act, as amended, 42 U.S.C. Secs. 12,101, *et seq.* (Count One)*;*

(b)     The federal Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. *Sec. 701, et seq.*, as amended, as above stated (Count Two);

(c)     The False Claims Act, 31 U.S.C. Sec. 3730, *et seq.*,  particularly the provisions of 31 U.S.C. Sec 3730(h) protecting persons from retaliatory employment actions, as above stated (Count Four)*;*

(d)     The federal Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, *et seq.,* and the U.S. Const., First and Fourteenth Amendments, particularly a government employee's clearly established right of freedom of speech on matters of public concern, as above stated (Count Five); and

(e)     The federal Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, *et seq.,* and the U.S. Const., Fourteenth Amendment, particularly a government employee's clearly established right to be free from arbitrary, capricious and unreasonable actions by supervisory personnel, as above stated (Count Six).

*Venue*

10.     Venue is proper before this court under 28 U.S.C. Sec. 1391(b) inasmuch as all defendants are residents of the state of Kansas.  This judicial district is coterminous with and located in the state of Kansas.

**Facts Common to All Counts**

11.     Plaintiff incorporates herein by reference paragraphs 1 through __10   above   as   though fully set forth herein.

*Employment History and Notice of Disability*

12.     Plaintiff David S. Moore, Ph.D. was employed by the University and the Center for Research, as a "borrowed servant," as an Assistant Scientist and the Director of the Microscopy and Analytical Imaging Laboratory ("MAI Lab") at its Lawrence, Kansas campus, from December 1, 2004, until his discharge from employment on October 18, 2013.

13.     Scientific research at the University and the Center for Research includes research conducted in eleven or more "core" laboratories ("Core Labs").  The MAI Lab is one of eleven or more Core Labs.  Core Labs are specialized, highly technical shared-resource laboratories available to University and Center for Research scientists and researchers with specialized instruments, equipment, processes, techniques and trained professionals that otherwise would be too expensive for individual departments or programs to equip and maintain, *e.g.,* electron microscopy and analytical imaging, mass spectrometry and analytical proteomics, molecular graphics and screening.

14.     The MAI Lab includes over $6.5 million in highly sophisticated electron and other advanced microscopy and scanning instruments acquired with federal grant funds used to examine,

evaluate, analyze and manipulate cells and molecules imaged down to the single-atom level to support sophisticated research work conducted by University and Center for Research professors, researchers, scientists, and graduate students for scientific training, education and research funded with University funds, Center for Research funds, federal research grants and contracts, and private sector industry sponsored work, primarily in materials and life sciences, including grants, contracts and fee-for-service work to provide scientific training, education and research for students and researchers and income for the Center for Research.

15.     Plaintiff's duties as Director of the MAI Lab included the following:

(a)     Overseeing operation of the MAI Lab including fiduciary responsibilities and report preparation for the MAI Lab;

(b)     Maintenance and daily operation of MAI Lab equipment;

(c)     Overseeing training of MAI Lab equipment users;

(d)     Seeking external funding for the MAI Lab;

(e)     Collaborating and/or assisting researchers in measurements and methods development;

(f)     Acquiring and developing image analysis software;

(g)     Overseeing continued modernization of the facility;

(h)     Establishing research collaborations with faculty and students; and

(i)     Disseminating research findings through publications and presentations.

16.     Plaintiff's duties as Director of the MAI Lab did not include:

(a)     Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for the accurate and regular tracking and timely reporting of items of income, expense, billing and accounts receivable collection for the MAI Lab, other Core Labs, the University or the Center for Research, nor were such matters subject to plaintiff's control;

(b)      Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for associating the use of specific scientific equipment acquired with federal funds with specific federal research grants and cooperative agreements as well as private sector research projects for the MAI Lab, other Core Labs, the University or the Center for Research, nor were such matters subject to plaintiff's control;

(c)      Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for assuring that proper charges were made to private sector companies using scientific equipment acquired with federal funds in the MAI Lab, other Core Labs, the University or the Center for Research, nor were such matters subject to plaintiff's control;

(d)      Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for preventing the booking of time for the use of Core Lab scientific instruments without actually using the instruments in order to avoid the return of unused federal research grant and cooperative agreement funds upon the expiration of such grants and cooperative agreements for the MAI Lab, other Core Labs, the University or the Center for Research, nor were such matters subject to plaintiff's control;

(e)      Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for preventing charges for overhead and administration to the MAI Lab, other Core Labs, the University or the Center for Research for federal grant or cooperative agreement work in excess of or not in compliance with charges for Facilities and Administration as provided by federal regulations, including but not limited to the United States Office of Management and Budget Circular A-21, nor were such matters subject to plaintiff's control;

(f)     Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for preventing the use of federal grant or cooperative agreement funds for purposes not allowed under such federal grants or cooperative agreements in the MAI Lab, other Core Labs, the University or the Center for Research, nor were such matters subject to plaintiff's control;

(g)     Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws for the timely and on-budget completion of physical renovations and improvements for the MAI Lab, other Core Labs, the University or the Center for Research facilities, nor were such matters subject to plaintiff's control;

(h)     Developing, operating, maintaining or reporting insufficiencies, irregularities or violations in accounting systems, internal controls, policies and procedures or applicable laws in the University or the Center for Research for preventing or otherwise controlling plagiarism in scholarly research writings and otherwise discouraging toleration of plagiarism in scholarly research writings, nor were such matters subject to plaintiff's control; or

(i)     Supervising University or Center for Research employees or researchers other than the two-person staff working in the MAI Lab.

17.     Plaintiff began his relationship with the University beginning in 1996 in the National Institutes of Health Medicinal Chemistry and Pharmacology Training Program at the University, completing his Master's of Science degree in the Department of Pharmacy, Toxicology and Medicinal Chemistry in 1998 and his Ph.D. degree in Pharmacy and Toxicology at the University of Kansas two years later in 2000.  Before coming to the University, plaintiff began graduate studies at the University of Wisconsin, Madison, Wisconsin, in Neurophysiology under the National Institute of Health Training Program in Neuroscience in 1992.

18.     From 1996 through 2000, before and while engaged in pre-doctoral studies with the University, plaintiff was employed by the University and the Center for Research, as a "borrowed servant," as a pre-doctoral research assistant in the Department of Pharmacology and Toxicology conducting research in drug discovery using a variety of scientific methods, including but not limited to, physiological imaging or neuronal responses in pharmaceutical characterizations, optical methods of monitoring live cell neuronal biophysics and the pharmacology and toxicology of glutamate-sensitive neuronal activity and neurotoxicity.

19.     While working in the Department of Pharmacology and Toxicology as aforesaid, plaintiff advised his superior and advisor that he had been diagnosed with Attention Deficit Disorder, also known as Attention Deficit Disorder/Attention Deficit and Hyperactivity Disorder ("ADD/ADHD").  Plaintiff's advisor was informed of the disability after plaintiff requested special conditions in which to re-take a test given in a graduate level cell biology course in the Department of Molecular Biosciences.  The University had been notified of plaintiff's ADD/ADHD condition prior to that date through what has since been re-named, on information and belief, the KU Academic Achievement and Access Center.  Both course instructors of the cell biology class were informed of plaintiff's ADD/ADHD disability, which already had been registered with what is now known, on information and belief, as the Academic Achievement & Access Center.

20.     Accommodations were provided.   Plaintiff's advisor, although supportive, advised plaintiff not to inform anyone else at the University or the Center for Research of his condition because it could be viewed negatively, preclude him from opportunities at the University and the Center for Research and affect his chances of success.

21.     ADD/ADHD can affect, *inter alia,* an individual's ability to concentrate, avoid distractions, get organized, meet deadlines, set priorities, manage time, focus on tasks, speak impulsively without first fully processing thoughts, observe social norms, obsess and persist in correcting perceived wrongs, and deal with anxiety and restlessness.

22.     Plaintiff at that time, thereafter and through the current day has experienced symptoms referred to in the preceding paragraph, but over the years has managed them with prescribed medications, counseling and behavior management skills and learning.

23.     From 2003 through 2005, while engaged in post-doctoral studies in the Department of Chemistry at the University, plaintiff was employed by the University and the Center for Research, as a "borrowed servant," as a post-doctoral research associate conducting research in various areas, including, but not limited to, atomic force microscopy of single nuclear pore complexes, biophysics, development of scanning probe microscopy methods and optical imaging assays for single molecule characterization in biological membranes.

24.     While working in the Department of Chemistry as aforesaid, plaintiff advised his superior and post-doctoral advisor that he had been diagnosed with ADD/ADHD, which sometimes contributed to taking longer time to write up papers for publication and which affected plaintiff's ability to prepare, long in advance, abstracts and posters for presentation at national meetings and poster presentations.  Plaintiff was advised by his superior and post-doctoral advisor not to inform anyone else with the University or the Center for Research of his ADD/ADHD condition because it could be viewed negatively and affect his chances for success with the University and the Center for Research.

25.     Beginning in 2005, plaintiff was appointed Assistant Scientist and Director of the University's Microscopy and Analytical Imaging Laboratory ("MAI Lab"), a laboratory equipped with highly sophisticated electron and other advanced microscopic and scanning instruments and equipment used to support sophisticated research work conducted by University and Center for Research professors, graduate students, scientists and researchers for scientific training, education and research funded with University funds, Center for Research funds, federal grants, federal cooperative agreements, private sector corporate and foundation research grants and private sector industry sponsored work, primarily in materials and life sciences, including grant and fee-for-service work to provide scientific training, education and research for University students and researchers and income for the Center for Research.

26.     Shortly after being appointed Director of the MAI Lab, plaintiff informed his superior and advisor, then Dr. George S. Wilson, Ph.D., that he that he had been diagnosed with ADD/ADHD, which sometimes caused him to be late with written administrative reports to the University and the Center for Research, but plaintiff was advised by Dr. Wilson not to inform anyone else with the University or the Center for Research of his condition because it could be viewed negatively and affect his chances for success with the University and the Center for Research.

27.     Dr. Joseph Heppert became plaintiff's immediate superior during an approximate six-month transition period from late 2009 through early 2010.  Plaintiff informed Dr. Heppert that he had been diagnosed with ADD/ADHD, which sometimes caused him to be late with written administrative reports to the University and the Center for Research, but Dr. Heppert advised plaintiff not to inform anyone else with the University or the Center for Research of his condition because it could be viewed negatively and affect his chances for success with the University and the Center for Research.   Dr. Heppert remained as plaintiff's immediate superior until October 18, 2013 when plaintiff's employment was terminated.

28.     In addition, plaintiff informed additional University and Center for Research officials of his ADD/ADHD disability, as follows:

(a)     Plaintiff orally informed Deborah Mitra, an accounting officer with the Center for Research, in 2012 or 2013 of his ADD/ADHD condition;

(b)     Plaintiff confirmed his ADD/ADHD condition in writing in an August 16, 2013 letter to Mary Lee Hummert, Ph.D., Vice Provost for Faculty Support, which, on information and belief, was provided by Dr. Hummert to Drs. Vitter, Warren and Heppert;

(c)     Plaintiff confirmed his ADD/ADHD condition in writing in August 30, 2013 letter to Rachel Rolf, Esq., of the University's Office of General Counsel, which, on information and belief, was provided to Drs. Hummert, Vitter, Warren and Heppert; and

(d)      Plaintiff confirmed is ADD/ADHD condition in writing in his October 3, 2013 Notice of Appeal for Review of Disciplinary Action Together with Support filed with the University's Faculty Senate Faculty Rights Board which, on information and belief, was provided to Ms. Rolf and Drs. Hummert, Vitter, Warren and Heppert.

29.      In addition to being informed orally and in writing of his ADD/ADHD disability, on information and belief, plaintiff was perceived and regarded in the workplace as impaired and disabled by virtue of his ADD/ADHD condition, specifically, perception based on Dr. Warren's extensive knowledge of attentive and cognitive disabilities, particularly among high functioning individuals with attentive and cognitive disabilities, as a published Ph.D. behavioral psychologist.

30.      Plaintiff's work in the MAI Lab included molecular and atomic level assay and methods development, experimental design and optimization, computational analysis for electron beam spectroscopy microscopy, tomography and diffraction, cation beam microscopy, dual-beam scanning electron microscope/focused ion beam microscopy and spectroscopy, tomography, diffraction, milling, scanning probe microscopy, fluorescence microscopy, high content imaging, fluorescence activated cell-sorting and imaging cytometry, electron beam gas deposition, cryo-electron transmission electron microscopy and environmental scanning electron microscopy.

31.      As Director of the MAI Lab plaintiff improved the laboratory from an unremarkable university electron microscopic teaching facility to a highly technical teaching, training and hard-science research facility with several million dollars in additional state-of-the art electron microscopic instruments and equipment, funded with federal government grants and cooperative agreements for purchasing such instruments and equipment.

32.      More specifically, plaintiff improved the MAI Lab physically and operationally from a typical research service core facility with only three instruments into an intensive microscopy and spectroscopy educational resource with fourteen major instruments. For example:

(a)      The facility went from being equipped with approximately $1.0 million worth of older equipment, not all of which worked properly, for collecting pictures to a highly technical teaching, training, research and quantitative spectroscopic imaging facility with over $6.5 million in new scientific equipment;

(b)      Funding sources for new equipment secured by plaintiff ranged from prestigious federal agencies including the National Institutes of Health ("NIH") and the National Science Foundation ("NSF") to the Defense Advance Research Projects Authority ("DARPA"), the Department of Defense ("DOD") and the Department of Energy ("DOE");

(c)      The MAI Lab's users increased in number from two to three visiting scientists or students per week, to two to three researchers per hour daily, frequently fully booked several weeks in advance;

(d)      Plaintiff was a primary investigator at the University both performing original research and writing both research and instrument grant proposals;

(e)      The MAI Lab at the time of plaintiff's termination of employment in October 2013 supported a registered list of over 700 users of the laboratory since its opening of the laboratory in 2005;

(f)      Plaintiff educated hundreds of undergraduate, graduate and post-doctoral researchers in the science of spectroscopic imaging as well as professors and scientists from multiple Kansas businesses relying on such technologies for their research and development operations;

(g)      Plaintiff secured federal and other grant funds to acquire and install approximately $5.5 million dollars in new state-of-the-art electron microscopic and related instruments and equipment from 2006 through 2013;

(h)     Plaintiff restored to service electron microscopic and related instruments and equipment in the MAI Lab that long had been unused due to not being upgraded or receiving maintenance prior to plaintiff's becoming Director of the MAI Lab;

(i)     Plaintiff maintained electron microscopic and related instruments and equipment with his and his staff's in-house capabilities rather than spending University or other funds for costly outside vendor service contracts; and

(j)     Plaintiff significantly increased contracting with outside private sector clients and other universities for income-producing research projects.

33.     As Director of the MAI Lab, plaintiff and his laboratory staff pioneered significant, nationally recognized developments in applied electron microscopy analysis and imaging used by University and Center for Research professors and researchers, enhancing the University's and the Center for Research's regional, national and international reputations, including hosting and sponsoring the work of visiting Fulbright Scholars, assisting in the development of the directorship and microscopy facility at Wichita State University and acting as a regional resource for nanoscience related research being performed at Kansas State University, the University of Kansas Medical Center ("KU Medical Center"), researchers at the University of Missouri-Kansas City, and providing solutions for multiple nanoscience-based commercial enterprises.  The MAI Lab was the only such nanoscience facility offering students full 24 hours a day/seven days a week access during school terms to such advanced instrumentation.

34.     During plaintiff's tenure as Director of the MAI Lab, plaintiff and his staff supported sophisticated research by University and Center for Research faculty, students, scientists and researchers leading to publication of such persons' research, and corresponding enhanced national and international reputations for the University and the Center for Research, in highly regarded national and international peer-reviewed scientific journals including, but not limited to, *Nature Communications*, the *Proceedings of the National Academy of Sciences*, the *Journal of Biological Chemistry*, the *Journal of the American Chemical Society*, *Applied Physics Letters*, *Human Vaccines* and *Infection and Immunity*.

35.     Specific publishing achievements during plaintiff's tenure as Director of the MAI Lab include the following:

(a)     Plaintiff was co-author of a textbook chapter on "Near-Field Optical Microscopy;"

(b)     An additional paper co-authored by plaintiff was cited as one of the 20 most read papers in *Infection and Immunity*;

(c)     An additional paper was cited as reasons for a University student and Center for Research researcher to receive a "Young Investigator of the Year" designation from the *Journal of Molecular Neuroscience*; and

(d)     An additional paper published in *Nature Communications* resulted in a patent for plaintiff and Kansas State University for nanotomy-based production of transferable and dispersible graphene nanostructures of controlled shape and size.

36.     As Director of the MAI Lab, plaintiff increased his productive output, regularly publishing work in significant national scientific journals, for example:

(a)     Plaintiff published over 25 peer-reviewed articles while serving as Director of the MAI Lab, most recently six in 2012, seven in 2013 and two or more that were being assembled for publication at the time of plaintiff's termination in October 2013 and since published in 2014;

(b)     Over 100 peer-reviewed articles acknowledge plaintiff's significant contributions to their publication;

(c)     Plaintiff has published in prestigious journals such as *Nature Communications*, and the *Proceedings of the National Academy of Sciences* on topics ranging from molecular biology, cancer, pharmaceuticals development, bioengineering and drug discovery to algae-derived alternatives to fossil fuels and solar cell development, geology and paleontology; and

(d)     Plaintiff is listed as one of four co-principal investigators on a National Science Foundation Major Research Instrumentation Award resulting in the purchase of a $2.3 million

multi-disciplinary instrument that permits simultaneous chemical mapping of biological and materials samples in two dimension, three dimension and time-lapse modes of operation.

37.     During plaintiff's tenure as Director of the MAI Lab, his work, and that of his staff, was highly regarded.  It was noted for dedication to excellence and innovative approaches to addressing scientific problems brought to plaintiff by University and Center for Research faculty, students, scientists and researchers.  Plaintiff's and his staff's work was regarded as having helped push the research of University and Center for Research faculty, students, scientists and researchers relying on microscopic imaging technology much farther than they otherwise would have gone.  The MAI Lab under plaintiff's direction was recognized as having a broad impact in materials and life science research. Plaintiff's superior had the utmost respect for the quality of science produced by plaintiff and his laboratory staff.

38.     Further, the MAI Lab under plaintiff's direction was regionally recognized as having a broad impact across the life sciences, natural sciences, materials sciences and engineering.

### Federal Funding and Monitoring

39.     The University is a college, university, or other postsecondary institution, or a public system of higher education that receives federal financial assistance, including under programs and activities conducted by executive agencies of the federal government.

40.     The Center for Research is a contractor, subcontractor or grantee of federal contracts and grants in that is has been the recipient, custodian or administrator of numerous federal grants from the Public Health Service, the National Institutes of Health, the National Science Foundation and other federal agencies, and has been and/or continues to be a contracting party with the Public Health Service, the National Institutes of Health, the National Science Foundation and other federal agencies of approximately $150.0 million annually used to conduct scientific research, including the purchase of scientific instruments and compensation of scientific personnel to operate such instruments in Core Labs for the University and the Center for Research.

41.     In that regard, the Center for Research under and pursuant to various agreements with the University including, but not limited to, an "Indirect Cost Return Agreement" dated June 1, 1982; a technology transfer agreement dated April 20, 1994; an "Affiliation Agreement" dated December 21, 2004; and an "Employee Services Agreement" dated June 14, 2009, conducts public and private third-party-sponsored scientific research and funded, accordingly, with (a) federal grants and contracts, (2) private corporate grants and contracts and (3) private foundation grants and contracts (altogether "Sponsored Research") on its own account and separate from the University, including scientific research using its own research facilities, instruments and equipment and those of the University, as well as faculty, staff and students of the University as "borrowed servants," including plaintiff, to develop patentable scientific discoveries, inventions and processes for the purpose of generating revenues for the Center for Research, primarily from securing, monetizing and protecting patents thereon including, but not limited to, patent royalties, patent licensing fees, patent assignment income and, on information and belief, stock and other equities in private sector companies in order to fund additional scientific research and other activities conducted by the Center for Research.

42.     The Center for Research as aforesaid in the preceding paragraph is an independent entity, separate from the University and the State of Kansas, not an "arm of the state," in that it is autonomous from and financially independent of the University and the State of Kansas based on *inter alia*:

(a)     Neither the University nor the State of Kansas is liable for any obligations, including judgments, of the Center for Research as a matter of state law;

(b)     It receives significant funding, if not all funding, independent of the University and the State of Kansas and provides for its own revenues;

(c)     It remits no net revenues derived from patent royalties, patent licensing fees, patent assignment income or any other income producing activities, or stock or other equities in private sector companies, to the University or the State of Kansas;

(d)     It is not characterized as an agency or arm of the state under state law; and

(e)      It is controlled by a board of trustees under its articles of incorporation and bylaws that includes, but is not controlled by, University officials serving as *ex officio* trustees and *ex officio* officers*,* and otherwise functions as a "university non-controlled affiliated corporation" under the policies of the Kansas Board of Regents, the state agency statutorily charged with governing the University.

43.      Dr. Gray-Little is and at all times relevant herein was a management official or other employee of the University and the Center for Research for whose duties include and included the responsibility to investigate, discover or address misconduct prescribed by federal laws including gross waste; gross mismanagement; abuse of authority; and violation of federal laws, rules and regulations regarding federal contract and grant proceeds used in scientific research, instruments, equipment and staffing in research laboratories of the University and the Center for Research.  Finally, Dr. Gray-Little is the principal officer of the University authorized to make hiring and firing decisions, including reinstatement of discharged employees according to state law and University policies and procedures, for example, K.S.A. Secs. 76-714 and 715 and University of Kansas "Handbook for Faculty and Other Unclassified Staff, Part I, Sec. B, second para., and Part II, first para.

44.      Dr. Vitter is and at all times relevant herein was a management official or other employee of the University and the Center for Research whose duties include and included the responsibility to investigate, discover or address misconduct prescribed by federal laws including gross waste; gross mismanagement; abuse of authority; and violation of federal laws, rules and regulations regarding federal contract and grant proceeds used in scientific research, instruments, equipment and staffing in research laboratories of the University and Center for Research.  Finally, on information and belief, Dr. Gray-Little's authority to make hiring and firing decisions, including reinstatement of discharged employees, has been delegated under University policies and procedures, for example, University of Kansas "Handbook for Faculty and Other Unclassified Staff," Part I, Sec. B, third para., and Part II, Sec. D(2), to

Dr. Vitter as part of his responsibility and authority to direct the internal affairs of the University's Lawrence campus and the Research and Graduate Studies Program.

45.     Dr. Warren is and at all times relevant herein was a management official or other employee of the University and the Center for Research whose duties included oversight of all scientific research activity of the University, if any, and the Center for Research, including particularly:

(a)     Spending and monitoring the use of federal funds received by the University, if any, and the Center for Research under federal grants and contracts for scientific research, including scientific research conducted in the MAI Lab and other Core Labs, in compliance with requirements of federal laws, rules, and regulations; federal grant requirements and conditions; and federal contract requirements and conditions;

(b)     The management and supervision of the Center for Research's performing Sponsored Research in the Core Labs and otherwise to generate revenues for the Center for Research;

(c)     The responsibility to investigate, discover or address misconduct prescribed by federal laws including gross waste; gross mismanagement; abuse of authority; and violation of federal laws, rules and regulations regarding federal contract and grant proceeds for use in scientific research, instruments, equipment and staffing in research laboratories of the University and the Center for Research; and

(d)     Working with one or more Center for Research related, affiliated, sponsored or membership-based non-profit organizations formed to develop, expedite and translate into commercial uses patentable and other scientific discoveries and new technologies developed through the Center for Research's medical life sciences research activities ("Commercialized Medical Research") including but not limited to:

(i)     The Institute for Advancing Medical Innovations, f/k/a the Office of Therapeutics and Drug Development, f/k/a the Biotechnology, Innovations and Optimization Center ("Institute for Advancing Medical Innovations");

(ii)    The KU Center for Technology Commercialization;

(iii)   The Bioscience and Technology Business Center;

(iv)    The Higuchi Biosciences Center;

(v)     The Kansas City Area Life Sciences Institute;

(vi)    The Kansas Bioscience Authority;

(vii)   The Kansas Technology Enterprise Corporation, now part of the Kansas Department of Commerce; and

(viii)  The Kansas Bioscience Organization, Inc. a/k/a KansasBio ("Commercialized Medical Research Organizations").

(e)     Further, on information and belief and in the alternative:

(i)     Dr. Gray-Little's and Dr. Vitter's authorities to make hiring and firing decisions, including reinstatement of discharged employees, has been delegated under University policies and procedures, for example, University of Kansas "Handbook for Faculty and Other Unclassified Staff," Part I, Sec. C(2), to Dr. Warren, as part of his responsibility and authority to supervise Core Labs on the University's Lawrence campus; or

(ii)    Dr. Warren at all times relevant herein did not have authority to make hiring and firing decisions regarding Core Labs including, but not limited to, the MAI Lab, such authority being vested with Dr. Gray-Little as the principal officer of the University authorized to make hiring and firing decisions, including reinstatement of discharged employees according to state law and University policies and procedures, for example, K.S.A. Secs. 76-714 and 715 and University of Kansas "Handbook for Faculty

and Other Unclassified Staff, Part I, Sec. B, second para., and Part II, first para., and Dr. Vitter as the Provost and Executive Vice Chancellor under University policies and procedures, for example, University of Kansas "Handbook for Faculty and Other Unclassified Staff," Part II, Sec. D(2).

(f)       In addition, until Summer 2011, Dr. Warren was the Research Integrity Officer for the University.

46.     Dr. Heppert is and at all times relevant herein was a management official or other employee of the University and the Center for Research whose duties included oversight of all scientific research activity of the University and the Center for Research, including particularly:

(a)       Spending and monitoring the use of federal funds received by the University, if any, and the Center for Research under federal grants and contracts for scientific research, including scientific research conducted in the MAI Lab and other Core Labs, in compliance with requirements of federal laws, rules, and regulations; federal grant requirements and conditions; and federal contract requirements and conditions;

(b)       The management and supervision of the Center for Research's performing Sponsored Research in the Core Labs and otherwise to generate revenues for the Center for Research;

(c)       The responsibility to investigate, discover or address misconduct prescribed by federal laws including gross waste; gross mismanagement; abuse of authority; and violation of federal laws, rules and regulations regarding federal contract and grant proceeds for use in scientific research, instruments, equipment and staffing in research laboratories of the University and the Center for Research; and

(d)       Working with one or more of the Commercialized Medical Research Organizations formed to develop Commercialized Medical Research.  For example, Dr. Heppert

was and may continue to be a member of the Institutional Advisory Committee of the Kansas City Area Life Sciences Institute.

47.     George S. Wilson, Ph.D. was at all times relevant herein a Professor and Associate Vice Provost for Research and Graduate Studies for the University of Kansas.  Dr. Wilson at all times relevant herein was a management official of the University and the Center for Research whose duties included oversight of all scientific research activity of the University and the Center for Research, including particularly:

(a)     Spending and monitoring the use of federal funds received by the University, if any, and the Center for Research under federal grants and contracts for scientific research, including scientific research conducted in the MAI Lab and other Core Labs, in compliance with requirements of federal laws, rules, and regulations; federal grant requirements and conditions; and federal contract requirements and conditions;

(b)     The management and supervision of the Center for Research's performing Sponsored Research in the Core Labs and otherwise to generate revenues for the Center for Research;

(c)     The responsibility to investigate, discover or address misconduct prescribed by federal laws including gross waste; gross mismanagement; abuse of authority; and violation of federal laws, rules and regulations regarding federal contract and grant proceeds for use in scientific research, instruments, equipment and staffing in research laboratories of the University and the Center for Research; and

(d)     Working with one or more of the Commercialized Medical Research Organizations formed to develop Commercialized Medical Research, defined below.  For example, Dr. Heppert was and may continue to be a member of the Institutional Advisory Committee of the Kansas City Area Life Sciences Institute.

**Commercialized Medical Research**

48.     Prior to 1980, scientific discoveries and technologies developed at U.S. universities with the use of federal grant and contract funds were titled to the federal government, not the universities or their researchers for purposes of patent ownership and protection, and the federal government licensed such patents on a nonexclusive basis only.

49.     In December 1980, the Bayh Dole Act, 35 U.S.C. Secs. 200 – 212, was enacted at the federal level for the first time permitting universities, non-profit institutions and their researchers to retain title and patent rights to such scientific discoveries and technologies developed with federal funds and to derive revenues from such patents, *e.g.,* patent royalties, patent license fees, patent assignment income, and private company stock and other equities, as long as such revenues were used for additional scientific research or scientific education.

50.     Upon information and belief, the Center for Research at this time, if not before, developed or had developed a strong interest in using patentable scientific discoveries and technologies developed in its materials and life sciences research activities to, *inter alia,* secure patents to generate earned income and private equity to support Commercialized Medical Research as well as commercialized materials research ("Commercialized Materials Research), including assisting in the formation of private sector businesses for these purposes.

51.     Upon information and belief, the University participated with private sector for-profit business entities and private sector non-profit entities to form the Center for Research, separate from the University and the State of Kansas, to conduct Commercialized Materials Research and Commercialized Medical Research on or in relation to the University's Lawrence Campus and, on information and belief, the KU Medical Center, using its own facilities, equipment and instruments, as well as the University's Lawrence Campus' and, on information and belief, the KU Medical Center's, faculty, students, scientists and researchers as "borrowed servants" in order to undertake, directly or as a participant, a number of initiatives and programs to generate earned income, patent ownership and stock or other equity positions

from scientific research discoveries and technologies on its own account and through Commercialized Medical Research Organizations including but not limited to:

(a)     The Institute for Advancing Medical Innovations, a project management operation intended to convert basic medical research into commercial medical applications by, *inter alia,* shortening the approvals process for drugs and medical innovations through the federal Food and Drug Administration ("FDA") from the research laboratory through clinical trials to commercial use, initially funded with an $8.0 million grant from the Kauffman Foundation in Kansas City, Missouri and $8.1 million in matching funds from the Kansas University Endowment Association, a Kansas non-profit corporation independent and separate from the University and the State of Kansas, directed by Scott Weir, Ph.D., upon information and belief, a principal person leading the Commercialized Medical Research program, including a primary role in the 2011 application to the National Institutes of Health for designation of the KU Medical Center as a National Cancer Institute, discussed below, paras. 58 – 60, and including as Institute for Advancing Medical Innovations employees or in other capacities Sitta Sittampalam, Ph.D., Deputy Director; Ross Stein, Ph.D., Deputy Director; and Melinda Broward, Project Director.

(b)     The KU Center for Technology Commercialization, a technology transfer organization formed to take drug formulations and medical innovations marshaled through the FDA approvals process by the Institute for Advancing Medical Innovations and license them to private businesses or otherwise find earned income opportunities in the private sector;

(c)     The Bioscience & Technology Business Center, a business incubator for bioscience and technology start-up companies located in Lawrence, Kansas, a spin-off from the KU Center for Technology Commercialization;

(d)     The Higuchi Biosciences Center, an operation for providing laboratory and administrative support for basic research in biosciences at the University and/or the Center for Research;

(e)      Participation in the Kansas Bioscience Authority, a state-sponsored effort to promote Kansas resources for animal health, bioenergy, biomaterials, human health and plant biology;

(f)      Participation in the Kansas City Area Life Sciences Institute, Inc., a non-profit organization including academic institutions, health care providers and private sector companies formed to advance the life sciences in metropolitan Kansas City and surrounding areas through medical research commercialization and workforce development;

(g)      Participation in the Kansas Technology Enterprise Corporation, now a part of the Kansas Department of Commerce; and

(h)      Participation in the Kansas Biosciences Organization, Inc. a/k/a BioKansas.

52.      The Commercialized Medical Research effort to shorten the time for federal government drug approvals focused on combining two or more existing, approved drugs into a reformulated combination based on a "bioequivalency" concept that the combined drugs and excipient should be subjected to less stringent and less time consuming testing since their component drugs had already been determined as safe for humans, even though in isolation from each other and not combined into a single formulation.

53.      Plaintiff's superiors, particularly Drs. Warren, Heppert and Wilson, as well as Drs. Weir and Sittampalam as the Director and Deputy Director, respectively, of the Institute for Advancing Medical Innovations, worked together and were active in the governing and advising bodies for the Commercialized Research Organizations, particularly, the Institute for Advancing Medical Innovations (for project management), the Kansas University Center for Technology Commercialization (for technology transfer) and the Kansas City Area Life Sciences Institute.

54.      A principal accomplishment from the Commercialized Medical Research program was and is CyDex Pharmaceuticals, Inc. ("CyDex") and its drug formulation Captisol®, a patented modified cyclodextrin non-therapeutic drug delivery agent developed by Valentine J. Stella, Ph.D., a Professor of

Pharmaceutical Chemistry with the University's School of Pharmacy, assisted by Roger Rajewski, Ph.D., then a graduate student in the University's School of Pharmacy, who developed it as an excipient that in some instances can be combined with other drugs or reformulated as a soluble drug formulation agent for therapeutic drugs.

55.     Captisol® originally was patented, on information and belief, in 1990 and again in alleged reformulations and differential morphologies as Captisol+® in 2009 and 2010.  It was and is used as a delivery agent in cosmetics, for example, Botox®.  Captisol® in and of itself has no advertised or patented healing or therapeutic properties.  Instead, it is an excipient used as a carrier or delivery agent that, notwithstanding known toxicity issues, in some instances when combined with therapeutic drugs, is believed to keep them in solution before being injected into the bloodstream or muscle tissue in cancer formulations.  While many therapeutic drugs are taken orally, oral administration in some instances can cause side effects, *e.g.,* liver or kidney damage.  Cydex claimed that Captisol® could be used as a delivery agent to inject these therapeutic drugs directly into some patients' blood streams or muscle tissue as an alternative to oral chemotherapeutic delivery.

56.     Ligand Pharmaceuticals, Inc. of La Jolla, California ("Ligand") acquired CyDex in 2011. On information and belief, Dr. Weir, Director of the Institute for Advancing Medical Innovations, made Ligand aware of the Commercialized Medical Research efforts and the commercial aspirations of CyDex. Ligand today does not maintain laboratories or otherwise conduct its own pharmaceutical or medical research, although it may have in the past. It is a publicly traded company with approximately 20 employees.  Instead, it functions as a "patent shop" that acquires patent rights to drugs like Captisol® and pursues business relationships with drug companies that reformulate Captisol® with existing therapeutic drugs which, if successful, earn "milestone" payments or other forms of remuneration for Ligand as the reformulated drug passes through government drug trials, particularly on information and belief, after Phase II animal trials, and presumably if reformulations reach sale on the market, as profitable prescription medications.  Reformulation is also a successful means of extending the patent life of

expiring drugs.  On information and belief, Captisol® milestone payments are Ligand's principal source of income.

57.     Ligand has agreements with several drug companies to formulate Captisol® with drugs normally taken orally, *e.g.,* drugs for depression, fungus, canine motion sickness and multiple myeloma, in order to provide non-oral injectable formulations or alternate formulations which re-purpose existing drugs and extend patent exclusivity.

National Cancer Institute Application and Designation

58.     After the Center for Research began the Commercialized Medical Research efforts, the University and the KU Medical Center began efforts to secure National Cancer Institute ("NCI") designation from the National Institutes of Health for the University and the KU Medical Center.  While the University and the KU Medical Center had prepared prior applications for NCI designation in the past without proceeding, the University and the KU Medical Center ultimately submitted an application in September 2011, including Dr. Weir of the Institute for Advancing Medical Innovations in the application's senior leadership team as Director of the KU Medical Center's "Drug Discovery, Delivery & Experimental Therapeutics" program.

59.     Among other requirements for NCI designation, on information and belief, an applicant must have developed or have in the FDA approvals "pipeline" a minimum number of new or "novel" cancer drug formulations or other drugs purposed or repurposed for cancer.  The University at that time had seven drugs in trials, the majority (five) of which were Captisol® reformulations or Captisol® related, and were not new or "novel" drugs.  These were older drugs, orphaned drugs, or drugs approaching generic designation, selected for trial with Captisol® as a delivery agent to re-purpose the older drugs originally designed for diseases or conditions other than cancer, but intended to be repurposed for cancer for stability, solubility or delivery applications in cancer treatments, namely:

(a)     *Melphalan/Captisol®.*  This is a Captisol® reformulation with Melphalan (a nitrogen mustard antineoplastic originally characterized as a DNA alkylating derivative of

mustines, historically derived from mustard gasses from the USSR, Soviet name, Alkeran®), an aging multiple myeloma cancer drug, to be used for intravenous injection of Melphalan in chemotherapy treatment of blood-born cancers and as a pre-conditioning treatment against blood-born cancers prior to stem cell injections.

(b)     *Nanotax®*.  This is an injectable form of nano-particle reformulated Taxol, an existing cancer drug, used for peritoneal cancers.

(c)     *SR-13668*.  This is a modification of an existing therapeutic drug used as a putative chemotherapy drug agent.

(d)     *Auranofin*.  This is an existing anti-rheumatic agent delivered inside Captisol® stabilized, liquid gel-containing capsules. In this form, the drug was reformulated with Captisol® to be used in trials for chronic lymphocytic leukemia.

(e)     *6 – Mercaptopurine*.  This is a nucleotide synthesis inhibitor with additional components of "pharmaceutical kits" of combined anti-cancer agents in prior use. In such cases, Captisol® is used as re-formulation agent and diluent, for example, as an excipient alongside an existing anti-mycobaterial and immunosuppressive drug like 6-Mercaptopurine in combination with other older drugs that use Captisol® for leukemia and pediatric non-Hodgson's lymphoma.

(f)     *Tigecycline*.  This is an older repurposed antibiotic, still primarily used in anti-biotic resistant bacteria, but used in conjunction with other drugs that use Captisol® for relapsed or refractory acute myeloid leukemia tumor mass and volume reduction.

(g)     *Ciclopirox olamine*.  This is a now off-patent anti-fungal originally patented in 1982 and commercialized by Sonofi.  It is an older compound typically used in topical creams and ointments.  As a reformulated topical antifungal agent, it was being repurposed as a Captisol® reformulation in mice ultimately to be attempted as an oral formulation for relapsed or refractory acute myeloid leukemia.  This strategy, on information and belief, was ultimately abandoned for a prodrug methodology.

60.     While plaintiff did not know it at the time, much of the microscopy and imaging base assay and methods development work for developing the Captisol® reformulations and Captisol® related drugs supporting the NCI application was done in the MAI Lab by plaintiff and his research staff. Plaintiff at the time did not know what Captisol® was or how any of the compounds or constituents examined were to be used.

### Federal Funds Mismanagement

61.     As the MAI Lab's work and capabilities increased in the years following plaintiff's appointment as its Director, while outside his job responsibilities, after approximately five years in the position plaintiff in good faith and with reasonable belief became increasingly concerned about the University's and the Center for Research's financial management and accountability for federal grant and contract funds used in the MAI Lab, as well as in other Core Labs, handled by the University and/or the Center for Research, including but not limited to the following:

(a)     *Two Sets of Books.*  Maintaining two different sets of accounting records for the use of federal grant and contract funds, specifically, on information and belief, a confidential set showing actual uses for eligible, ineligible, charged and non-charged uses, and a public set re-allocated to conceal ineligible and non-charged uses, described by one University and/or Center for Research administration employee as "where the money was laundered," thereby creating conditions for the misapplication of federal grant and contract funds and violation of federal accounting and internal control requirements intended to prevent fraud and misapplication in the use of federal funds, including but not limited to the use of federally funded scientific equipment without required charges, indeed, for free and without any charge, for, *inter alia,* Commercialized Medical Research;

(b)     *Fictitious Instrument Charges.*  Fictitious charges, on information and belief, to federal grants and contracts for the use of federally funded scientific instruments to avoid returning unused federal grant or contract funds to federal agencies, thereby creating conditions

for the misapplication of federal grant and contract funds and violation of federal accounting and internal control requirements intended to prevent fraud and misapplication in the use of federal funds;

(c)    *Ad Hoc Instrument Use Tracking.*  Not having an effective system for tracking or properly charging for the use of scientific instruments and research projects funded with federal grant or contract funds, thereby creating conditions for the misapplication of federal grant and contract funds and violation of federal accounting and internal control requirements intended to prevent fraud and misapplication in the use of federal funds, including but not limited to the use of federally funded scientific equipment without required charges, indeed, for free and without any charge, for, *inter alia,* Commercialized Medical Research;

(d)    *Double Billing "Facilities and Administration."*  Double billing "Facilities and Administration" charges by charging overhead and related expenses to the MAI Lab and other Core Labs in addition to the "Facilities and Administration" reimbursements negotiated with federal agencies by the University and/or the Center for Research, thereby creating conditions for the misapplication of federal grant and contract funds and violation of federal accounting and internal control requirements intended to prevent fraud and misapplication in the use of federal funds;

(e)    *Ad Hoc Accounting and Internal Controls.*  Loose, *ad hoc* accounting practices and insufficient internal controls for billing, collections, financial reporting and budgeting which, on information and belief, did not comply with federal requirements for the proper accounting, internal control and expenditure of federal grant or contract funds, thereby creating conditions for the misapplication of federal grant and contract funds and violation of federal accounting and internal control requirements intended to prevent fraud and misapplication in the use of federal funds, including but not limited to the use of federally funded scientific equipment without

required charges, indeed for free and without any charge, for, *inter alia,* Commercialized Medical Research;

   (f) *Ad Hoc Private Commercial Contracting Procedures.* Not having established, uniform and effective procedures for contracting with "for profit" private sector industry clients for research and other work performed in Core Labs with federally funded scientific instruments to assure that federally funded instruments when used for private sector purposes were billed at rates not less than what private companies would charge for equivalent services as required by federal law and, indeed, for use without any charges, thereby creating conditions for the misapplication of federal grant and contract funds and violation of federal accounting and internal control requirements intended to prevent fraud and misapplication in the use of federal funds, including but not limited to the use of federally funded scientific equipment without required charges, indeed for free and without any charge, for, *inter alia,* Commercialized Medical Research;

 (altogether, "Federal Funds Mismanagement"), all of which are described in detail below in eighteen separate "Specifications of Federal Funds Mismanagement" in paras. 124 – 134 of this complaint.

  62. Plaintiff was particularly concerned that the absence of proper accounting and proper business practices eroded separation between the use of the University's and/or the Center for Research's federally funded laboratory instruments for eligible academic and other research vs. the uncontrolled use of its federally funded laboratory instruments for the growing Commercialized Medical Research program directed in large part by Drs. Weir and Sittampalam of the Institute for Advancing Medical Innovations, including private commercial research, litigation and other activities without proper charges for use to the point that the University and/or the Center for Research may have been using the Core Labs as a "no charge" hub for the Commercialized Medical Research program.

  63. Indeed, it appeared to plaintiff that the accounting practices and controls likely did not comply with federal requirements, for example, Office of Management and Budget Circular A-21 ("OMB

Circular A-21") and Office of Management and Budget Circular A-133 ("OMB Circular A-133"), the purpose of which federal requirements included the prevention and detection of unlawful use of federally funded scientific equipment for private, commercial purposes, litigation and other activities without required charges, indeed, for free and without any charge.

## Plagiarism

64.      In addition to the Federal Funds Mismanagement problems, plaintiff at the same time became increasingly concerned about repeated incidents of University and/or Center for Research research misconduct, particularly plagiarism in federally funded research and instrument acquisitions, in violation of the policies and regulations of Department of Health and Human Services' Office of Research Integrity and the University, amounting to tolerance of plagiarism by the University and/or the Center for Research.  Plaintiff communicated his concerns to stop these practices and tolerance to his superiors including Drs. Wilson, Heppert and Warren as set forth below.

65.      Four separate specifications of plagiarism are separately described in detail below in the "Plagiarism" section of this complaint, paras. 136 - 154.

## MAI Lab Renovation Mismanagement

66.      Further, plaintiff was concerned about the manner in which renovations to the MAI Lab premises were undertaken in 2012 and 2013 by the University and/or the Center for Research.  Plaintiff communicated his concerns to stop these practices to his superiors including Drs. Heppert and Warren as set forth below.

67.      As undertaken, the renovation, which included the use of federal funds, was improperly planned, designed, scheduled, estimated and bid, producing tremendous cost overruns and late completion, all of which is described below in two separate categories of specifications in the "MAI Lab Renovation Mismanagement" section of this complaint, para. 135.

## Research Bias

68.     Further, throughout plaintiff's tenure as Assistant Scientist and Director of the MAI Lab, researchers frequently (a) submitted research proposals or requests to the MAI Lab reflecting scientific bias in assumptions, design or methodologies that if followed would lead to misleading or incorrect outcomes consistent with researchers' hypotheses and desired outcomes or (b) would seek to exclude results of in-process or completed research not supporting researchers' hypotheses and desired outcomes ("Research Bias").

69.     In such events, plaintiff would advise researchers of such (a) shortcomings in assumptions, design or methodologies or (b) results not supporting researchers' hypotheses and desired outcomes, to which many researchers reacted appropriately and objectively and revised their assumptions, design or methodologies or hypotheses, many times based on plaintiff's recommendations, but as to which other researchers reacted defensively and with enmity towards plaintiff, three specifications of which are described in the "Research Bias" section of this complaint, paras. 155 - 158.

## Instrument Funding Diversion

70.     In 2008 Core Lab staff salaries and benefits were changed from 100% state-funded to 80% state-funded and 20% Center for Research-funded in order to return Center for Research earned income to each Core Lab to build separate financial reserve funds for each Core Lab to purchase needed scientific instruments and equipment.

71.     In February 2013, however, plaintiff learned that using such funds for Core Lab equipment reserves had been discontinued, apparently in 2010, and such funds, without announcement to Core Lab directors, since then were being retained by the Center for Research for its own purposes, putatively as part of "budget cuts," all as more fully described in the "Instrument Funding Diversion" section of this complaint, paras. 159 – 164.

## Disclosure of Information to Superiors to Stop Practices

72.     Plaintiff's long-standing and repeated expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument

Funding Diversion were not welcomed by his superiors, but was tolerated, on information and belief, because of the quality of his science . . . described as excellent; innovative; as having pushed research of University and Center for Research faculty, students, scientists and researchers relying on microscopic imaging technology much farther than they otherwise would have gone; and as forming the basis of the utmost respect of respect for the quality of science produced by plaintiff and his staff.

73.     The concerns expressed by plaintiff to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion were and are matters of public concern, specifically speech concerning the use of public funds and the objectives, purposes, and mission of a government agency; evidence of possible corruption, impropriety or other malfeasance on the part of government officials; the disclosure of wrongdoing or inefficiency in the conduct of official duties; and the potential illegal conduct by government officials.

74.     The University's and/or the Center for Research's interests in promoting the efficiency of public service are insufficient to outweigh plaintiff's free speech interests about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion because nothing is efficient about the improper use of public funds, evidence of corruption, impropriety or other malfeasance, wrongdoing or inefficacy in the conduct of official duties and potential illegal conduct by government officials nor can any restriction to cover up or silence speech about the improper use of public funds, corruption, impropriety, malfeasance, wrongdoing or inefficiency be justified, particularly when an employee's expressions of concern to his superiors are ignored.

75.     After several years of repeatedly bringing these matters to his superiors' attention, particularly Drs. Wilson, Heppert and Warren, no action was being taken or satisfactory explanations for inaction provided.  Plaintiff was continually "stonewalled."  Accordingly, plaintiff, following further incidents, increased his expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion in recent years in order to, *inter alia,* warn and draw attention to the likelihood of potential federal audits.

Plaintiff's superiors, then Drs. Heppert and Warren, took no action and, in fact, following plaintiff's five-year review in 2010 advised plaintiff that his expressions of concern to stop accounting irregularities and plagiarism were not welcome while the University, the Center for Research and the KU Medical Center were preparing to submit the National Cancer Institute application to the National Institutes of Health. Plaintiff's frustrations with his superiors' inaction and his own expressions of concern escalated in 2012 and 2013.

76.     Indeed, plaintiff's superiors reacted to his manner of expressing his concerns to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion by accusing him of disruptive and unprofessional conduct.  This may have been, in part, attributable to plaintiff's ADD/ADHD disability, known to his superiors, symptoms of which include persistence correcting perceived wrongs and speaking impulsively and bluntly with supervisory personnel in positions to correct such perceived wrongs and who are otherwise responsible for the efficient, cost effective, ethical and lawful operation of University and Center for Research activities and policies.  Further, as part of plaintiff's training as a scientist at the University and otherwise, plaint was taught to communicate facts to peers in a precise and objective manner, without employing social conventions designed to avoid being unflattering or critical of peers which may also have compounded others' reactions to his manner of expressing concerns.

77.     In that regard, as stated above, para. 22, plaintiff believes he has done well managing his ADD/ADHD disability over the years while employed with the University and the Center for Research. Plaintiff is unaware of and has not been accused of disruptive and unprofessional conduct with others in the University community.  Indeed, plaintiff was and is highly liked and respected by his peers, faculty, students, scientists and researchers throughout the University, the Center for Research and the KU Medical Center community.  Allegations of disruptive and unprofessional conduct were limited to:

(a)     Persons affiliated with the Institute for Advancing Medical Innovations and Commercialized Medical Research who, on information and belief, may specifically have felt

threatened by plaintiff's persistent expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, much of which related to the Commercialized Medical Research; and

(b)     Plaintiff's superiors, namely Drs. Wilson, Heppert and Warren, also involved in Commercialized Medical Research, to whom persons affiliated with the Institute for Medical Innovations and Commercialized Medical Research directed their complaints about plaintiff and to whom plaintiff himself persistently directed his expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, as to which Drs. Wilson, Heppert and Warren consistently failed and refused to investigate and rectify.

As stated above, paras. 21 and 76, persisting in correcting perceived wrongs directed towards persons in positions to stop and correct those wrongs is a common ADD/ADHD behavior.

78.     Plaintiff became so frustrated with his superiors' refusal to even consider, let alone take action, regarding his expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, that he took his concerns to parties outside the University and the Center for Research, and communicated them externally to the following:

(a)     The Kauffman Foundation in Kansas City, Missouri, a significant funder of the University's Commercialized Medical Research program and a highly respected institution that plaintiff believed would embrace high standards for academic conduct and financial responsibility, particularly for endeavors it funded, specifically, to whom plaintiff provided a Power Point® presentation in April 2011 prepared by a distinguished professor with the University of Kansas School of Medicine expressing similar concerns, which plaintiff also provided to Dr. Heppert, his supervisor, to show that plaintiff was not alone in his concerns;

(b)     The *Kansas City Star*, the principal daily newspaper in the region, in April 2011, including his providing the aforesaid Power Point® presentation prepared by the distinguished professor with the University of Kansas School; and

(c)     The Federal Bureau of Investigation, in July 2013, after first informing Dr. Heppert that his next step was going to the Federal Bureau of Investigation, which Dr. Heppert immediately passed on to Dr. Warren and persons in the University's Offices of General Counsel and Human Resources, if his continued expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion were not addressed.

79.     Further, at least one other Core Lab Director reported the same types of concerns to the Federal Bureau of Investigation and so informed Dr. Heppert, as well as informing Dr. Heppert, on information and belief, that plaintiff also had reported the same concerns to the Federal Bureau of Investigation.

80.     Plaintiff finally requested a meeting in the spring of 2013 with Dr. Warren, who then was the Vice Chancellor for Research and Graduate Studies, to go over the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion. Plaintiff met with Dr. Warren on April 23, 2013, which promptly began, however, with Dr. Warren's angrily telling plaintiff, "If it weren't for your science, I would fire you" and that plaintiff "was of so little importance to his [Warren's] job" that Warren refused to "read all those little emails you sent" about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion.  Dr. Heppert, who also attended the meeting, then changed the discussion to an unrelated need for "project managers and project management," issues that he had never raised with plaintiff prior to that time and for which he provided no specifics.  Drs. Warren and Heppert refused to discuss plaintiff's expressions of concern to stop the Federal Funds Mismanagement, MAI Lab

Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion during the meeting.

### Retaliation for Disclosure of Information

81.     Within days of plaintiff's April 2011 communication the Kauffman Foundation, plaintiff learned that his communication had been provided to the Kansas University Endowment Association and then to Dr. Weir, a principal in the Commercialized Medical Research effort (as Director of the Institute for Advancing Medical Innovations and a Senior Leader in the National Cancer Institute application) who became irate and demanded that plaintiff be discharged.

82.     Dr. Weir and Dr. Sittampalam, Deputy Director of the Institute for Advancing Medical Innovations, already had been the subject of plaintiff's expressions of concern to stop the Federal Funds Mismanagement, Plagiarism and Research Bias in Commercialized Medical Research on three occasions:

(a)     In 2008, regarding Dr. Sittampalam's not paying for microscopy imaging and analysis services provided by the MAI Lab for a questionable Commercialized Medical Research stem cell project, *see* para. 146 below;

(b)     In 2009, Dr. Weir's plagiarizing a transmission electron microscope grant application written by plaintiff, not Dr. Weir, *see* para. 128 below; and

(c)     In 2010, Dr. Weir's not making timely payment for microscopy imaging and analysis services provided by the MAI Lab for a Commercialized Medical Research drug screening project for various drug compounds affecting myelin tissues.

83.     Plaintiff's superiors' accusations of unprofessional and disruptive conduct escalated during 2012 and 2013, leading to plaintiff's four-week suspension in September 2013 and discharge in October 2013.

84.     Specifically, on July 26, 2013, Dr. Warren, with the cooperation of Dr. Heppert, and, upon information and belief, at the instigation of Dr. Heppert, by letter informed plaintiff that he was prepared to recommend to Vice Chancellor Jeffrey Vitter that plaintiff be placed on a four-week unpaid

suspension as Assistant Scientist and Director of the MAI Lab under the University's formal disciplinary policies and procedures due to a series of "disruptive" and "unprofessional" behaviors based on plaintiff's persistent expressions of concern over the past several years to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion.

85.     In response to Dr. Warren's July 26, 2013 letter, plaintiff by letters dated August 6, August 16, and August 30, 2013; as well as meetings with University administrators on August 6 and August 16, 2013:

(a)     Explained the facts and circumstances surrounding Dr. Warren's July 26, 2013 letter's allegations as taken out of context, incorrect or otherwise as truthful and reasonably believed assertions by plaintiff to his superiors to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism;

(b)     Again informed the University and the Center for Research of his ADD/ADHD diagnosis and disability, specifically as a factor explaining any perceptions of his behavior as disruptive and unprofessional; and

(c)     Requested and proposed a specific accommodation plan for his ADD/ADHD disability as a factor in any perceived disruptive and unprofessional behavior including (i) his undertaking enhanced ADD/ADHD treatment, (ii) regular monitoring meetings with University personnel to assess his progress and (iii) his accepting a formal warning under the University's disciplinary policies and procedures.

86.     The University and/or the Center for Research, out of hand and without explanation, however, refused to discuss the matter further and by a letter dated September 19, 2013 from Dr. Vitter, with the cooperation of Drs. Warren and Heppert, and, upon information and belief, at the instigation of Drs. Warren and Heppert, rejected plaintiff's request for accommodation and placed plaintiff on a four-week unpaid suspension as Assistant Scientist and Director of the MAI Lab.

87.     Plaintiff's ADD/ADHD disability, including particularly its manifestations in plaintiff's persistent expressions of concern about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, was a motivating factor in the determination to reject plaintiff's request for accommodation and instead place plaintiff on a four-week unpaid suspension as Assistant Scientist and Director of the MAI Lab.

88.     Defendants' rejection of plaintiff's request for accommodation and otherwise exercising his rights as a person with a disability, namely, ADD/ADHD, was in retaliation for and because of plaintiff's request for accommodation and otherwise exercising his rights as a person with a disability.

89.     The reasons given for the four-week suspension without pay, namely, a series of "disruptive" and "unprofessional" behaviors, were false and pretextual.   The real reasons for the termination were:

(a)     Retaliation for plaintiff's persistently expressing good faith concerns, protected under federal law, state law and University policy, to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, including the uncontrolled use of federally funded laboratory instruments without proper charges for private, commercial purposes such as the Commercialized Medical Research program; and

(b)     Retaliation and discrimination against plaintiff because of his disability, including not observing or complying with plaintiff's exercising his rights as a disabled person protected under federal law, state law and University policy to seek accommodation and not be subjected to a hostile work environment.

90.     The University and the Center for Research would not have lawfully reached the same employment decision in the absence of plaintiff's persistently expressing good faith concerns, protected under federal law, state law and University policy, about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion and his

exercising his rights as a disabled person protected under federal law, state law and University policy to seek accommodation and not be subjected to a hostile work environment.

91.     On October 3, 2013, plaintiff appealed his suspension to the University's Faculty Rights Board by filing a written "Notice of Appeal for Review of Disciplinary Action Together with Statement in Support" based on (a) his explaining that the University's allegations were taken out of context, incorrect or were otherwise good faith and truthful assertions based on reasonable beliefs made by plaintiff regarding the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism, (b) his rights to request and propose an accommodation for his ADD/ADHD disability under federal law, state law and University policy regarding disability to the extent a factor in any perceived disruptive and unprofessional behavior and his (c) his rights to protection against retaliation as a "whistleblower" under federal law, state law and University policy regarding "whistleblowing." Plaintiff's concerns up to this point in time had not been not available to general faculty for review.

92.     While plaintiff's appeal to the University Faculty Rights Board was pending, the University and the Center for Research, notwithstanding their knowledge of plaintiff's ADD/ADHD disability and the fact that he was already subject to a number of stresses not of his own creation, intensified their criticisms of plaintiff and increased plaintiff's work load, all as set forth in paras. 104 - 113 below, which knowingly (Dr. Warren was and is a degreed and published Ph.D. behavioral psychologist with extensive knowledge of attentive and cognitive disabilities, particularly among high functioning individuals with attentive and cognitive disabilities) made plaintiff's execution of his job responsibilities more difficult and aggravated his ADD/ADHD symptoms and corresponding ability to perform his employment responsibilities, that was so severe, pervasive, continuing, escalating and exploitative of plaintiff's ADD/ADHD disability that plaintiff's ability to perform his job and focus on his duties were affected by defendants' conduct as a whole, as would that of any reasonable person, thereby creating a hostile work environment for plaintiff. *See* paras. 104 – 113 below.

93.     Ten days after filing his appeal to the Faculty Rights Board, however, on October 14, 2013, plaintiff was called to the office of Dr. Heppert.

94.     When he arrived at Dr. Heppert's office, plaintiff was provided with a letter dated the same day from Dr. Warren, prepared with the cooperation of Dr. Heppert and, upon information and belief, at the instigation of Dr. Heppert, informing plaintiff that his position was being terminated effective that Friday, October 18, 2013, that he immediately was to return any University property to the University and that he immediately was barred from being in the MAI Lab unless he was authorized in advance or was requested by University personnel to perform work to winding up or transitioning existing projects.

95.     The October 14, 2013 letter from Dr. Warren stated that Dr. Warren had considered the future of the MAI Lab and had determined that it was in the best interests of the Research and Graduate Studies program and the University that plaintiff's position with the University be terminated.  No other reasons were given. It was not clear if plaintiff's appeal and lists of concerns were ever made available to the Faculty Rights Board members.

96.     Dr. Warren, however, as stated in the alternative, para. 45, lacked authority to terminate plaintiff's employment and failed to follow University procedures for termination of employment of a University employee.

97.     Plaintiff's ADD/ADHD disability, including particularly its manifestations in plaintiff's persistent expressions of concern about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, was a motivating factor in the determination to discharge plaintiff.

98.     Defendants' discharging plaintiff was in retaliation for and because of plaintiff's request for accommodation and otherwise exercising his rights as a person with a disability, namely, ADHD.

99.     The reason given for termination of plaintiff's position, namely, that the future of the MAI Lab had been considered and that it was in the best interests of the Research and Graduate Studies

program and the University that plaintiff's position with the University be terminated, was false and pretextual.  The real reasons for the termination were:

(a)      Retaliation for plaintiff's persistently expressing good faith concerns, protected under federal law, state law and University policy, to stop the Federal Funds Mismanagement, MAI Lab Renovation Project Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, including the uncontrolled use of federally funded laboratory instruments without proper charges for private, commercial purposes such as the Commercialized Medical Research program; and

(b)      Retaliation and discrimination against plaintiff because of his disability, including not observing or complying with plaintiff's exercising his rights as a disabled person protected under federal law, state law and University policy to seek accommodation and not be subjected to a hostile work environment.

100.      The University and/or the Center for Research would not have lawfully reached the same employment decision, assuming Dr. Warren had authority as stated in the alternative, para. 45, had it followed its own policies and procedures and recognized and accommodated plaintiff's rights under the ADA, 42 U.S.C. Secs. 12,101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. *Sec. 701, et seq.*, in the absence of plaintiff's persistently expressing good faith concerns, protected under federal law, state law and University policy, to stop the Federal Funds Mismanagement, MAI Lab Renovation Project Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, his exercising his rights as a disabled person protected under federal law, state law and University policy to seek accommodation and not be subjected to a hostile work environment.

101.      By terminating plaintiff's employment, whether with or without authority as alleged in the alternative in para. 45, on October 14, 2013, effective October 18, 2013, the University and the Center for Research retaliated, avoided and deprived plaintiff of his right to appeal his suspension to the University's Faculty Review Board, a forum in which he would have the opportunity to have his claims

of Federal Funds Mismanagement, MAI Lab Renovation Project Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, including discrimination and retaliation, publicly aired or otherwise memorialized in a public forum.

102.    The actions of defendants Stephen Warren and Joseph Heppert described in this complaint violated the federal constitutional and statutory rights of plaintiff, namely, his First and Fourteenth Amendment rights of free speech and his rights as "whistleblower" under the Protection From Reprisal Act, 41 U.S.C. Sec. 4712, *et seq.*, and the False Claims Act, ____31 U.S.C. Sec. 3730, *et seq.*, particularly the provisions of 31 U.S.C. Sec 3730(h) protecting persons from retaliatory employment actions.

103.    Further, the federal constitutional and statutory rights of plaintiff, as a public employee and with the scope and duties of employment as aforesaid, to be free from retaliatory employment actions for speaking out as aforesaid outside the scope and duties of his employment under the circumstances set forth in this complaint was clearly established, under the decisions of the 10th Circuit Court of Appeals, at the time defendants Stephen Warren and Joseph Heppert instigated, took or participated in retaliatory adverse employment actions against plaintiff about which a reasonable public employee official in positions as defendants Stephen Warren and Joseph Heppert were in would have known.

104.    Further, upon information and belief, from and during approximately 2010 through 2012 defendants Warren and Heppert were annoyed with and chose to ignore plaintiff's persistently expressing concerns to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, hoping plaintiff ultimately would abandon his unwelcome concerns.

105.    However, plaintiff refused to do so and instead over that period and thereafter increased his expressions of the unacknowledged but known concerns set forth in this complaint leading to a determination in 2012 or 2013 by defendants Warren and Heppert, either and alternatively individually or in concert, that the University's, the Center for Research's and their professional and personal interests

would be better served if plaintiff became so frustrated by design and by efforts of defendants Warren and Heppert, either and alternatively individually or in concert, knowingly to exploit and exacerbate plaintiff's known and/or regarded and perceived ADD/ADHD disability and idiosyncrasies in order to escalate and drive him over several months time in Summer and Fall 2013 to an emotional state that he would end his employment with the University, as well as with the Center for Research as a "borrowed servant," or failing resignation, would build a record of conduct justifying termination of employment for putatively lawful and non-discriminatory reasons.

106.    In that regard, as stated in plaintiff's annual reviews and his five-year review in 2010, plaintiff was extremely successful transforming the MAI Lab from an unremarkable university electron microscopic teaching facility to a highly technical teaching, training and hard-science research facility with several million dollars in additional state-of-the art electron microscopic instruments and equipment, as well as going from two to three visiting scientists or students per week to two to three researchers per hour daily, frequently fully booked several weeks in advance.

107.    The MAI Lab was so successful that that plaintiff's five-year review committee of four University professors in 2010 recommended adding two or more additional research staff persons over the next three to five years and noted the need for additional scientific instrumentation to handle the lab's success and increasing work load.  One additional staff person was added in 2011, but no others.

108.    The work load became more problematic in 2012 and particularly in 2013.  Plaintiff frequently worked late into the night and on weekends, as he had been doing since beginning as the lab's director, to keep up with the most pressing needs but simply did not have the time, staffing or equipment to keep up with all demands.

109.    In that regard, plaintiff was dealing with several significant, separate and simultaneous major projects, all "coming to a head" in Summer 2013, in addition to the full normal workloads in the MAI Lab for plaintiff and his two assistants, of which Dr. Warren, a Ph.D. behavioral psychologist with extensive knowledge of attentive and cognitive disabilities, particularly among high functioning

individuals with attentive and cognitive disabilities, was fully aware, compounding already major stress on plaintiff as an ADD/ADHD sufferer, as follows:

(a)     MAI Lab Renovation Delay.

(i)     Notwithstanding plaintiff's giving his superiors ten months advance notice in September 2012 of the June 2013 delivery of the $2.3 million Dual Beam Electron Microscope for renovation of MAI Lab for, *inter alia*, installation of the Dual Beam Electron Microscope during the 2012-2013 winter break, the University's Design and Construction Management office mismanaged the entire process, as outlined above in the MAI Lab Renovation Mismanagement section of this complaint, para. 135, as well as plaintiff's superiors not identifying adequate funding for the renovation, such that renovation for the installation significantly disrupted lab operations with construction throughout July through September 2013, a time when the MAI Lab was extremely busy with graduate students completing dissertation work and other students beginning the next academic semester ("MAI Lab Renovation Delay").

(b)     Dual Beam Electron Microscope Installation Delay

(i)     The late MAI Lab renovation construction work delayed installation of the $2.3 million Dual Beam Electron Microscope with the instrument vendor until August and September 2013, similarly disrupting lab operations when the lab was extremely busy doing work for graduate students completing dissertation work and when a new semester was beginning ("Dual Beam Electron Microscope Installation Delay").

(c)     Billing Rate Revisions Delay.

(i)     The University and the Center for Research from time to time, on information and belief, every two years, revised billing rates for the use of laboratory instruments and lab staff time to reflect prevailing academic and private sector rates for

the use of such equipment and staff time for Sponsored Research projects with private sector parties.

(ii)     Plaintiff had no difficulties working with University and Center for Research staff revising billing rates in the past, in fact, finishing billing rate revisions in 2011 two weeks before the September 1, 2011 due date.

(iii)     Plaintiff and his staff in Fall 2012 began work on the 2013 billing rate revisions and requested historic and other information on MAI Lab instrument use, staff time and corresponding information from the University and Center for Research staff.

(iv)     However, much of this information was not received until July 2013 and was even then was incomplete, inadequate and/or unclear, generating additional requests for information, some of which was responsive and some of which was not, ultimately extending the billing rate revision process into September and October 2013.

("Billing Rate Revisions Delay").

(d)     Sponsored Research Contracting.

(i)     Plaintiff succeeded attracting private sector companies to do Sponsored Research projects with their researchers working collaboratively with MAI Lab staff in 2011, 2012 and 2013.

(ii)     Notwithstanding plaintiff's repeatedly advising the Center for Research of the need for contracting materials covering collaborative work of this nature, the Center for Research staff and management insisted that plaintiff use "one size fits all" agreements limited to (1) straight rental of MAI Lab instruments with no MAI Lab staff involvement or (2) agreements limited to MAI Lab staff doing all research work on MAI Lab instruments.

(iii)     The situation became particularly acute in July through October 2013 when plaintiff had several such projects waiting for contract approvals but the Center for

Research staff and management refused even to discuss providing a collaborative form of agreement or to provide other written materials on contracting procedures.

("Sponsored Research Contracting Delay").

110.    On July 26, 2013, with these five major delays already compounding plaintiff's work load and following plaintiff's continued unacknowledged expressions of concern about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, Dr. Warren provided plaintiff with his letter advising of his intention to recommend to Dr. Vitter that plaintiff be suspended for four weeks without pay based on the alleged series of "disruptive" and "unprofessional" behaviors based on plaintiff's expressions of concern over the past several years to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion.

111.    With full knowledge of plaintiff's ADD/ADHD disability and the additional workload and stress from the MAI Lab Renovation Delay, Dual Beam Electron Microscope Delay, Billing Rate Revisions Delay and Sponsored Research Contracting Delay putting plaintiff near "the end of his rope" and in need of accommodation and assistance, defendants Warren and Heppert, either and alternatively individually or in concert, nonetheless used their positions as state officials knowingly to exploit and exacerbate plaintiff's ADD/ADHD condition in an effort to further and grossly overextend plaintiff to escalate and drive him to an emotional state that plaintiff would quit his employment or, failing that, to build a record for dismissing plaintiff for putatively lawful, non-discriminatory reasons, by doing the following:

(a)     Defendants Warren and Heppert, and presumably others, refused even to discuss plaintiff's August 6, 2013 request for accommodation of his disability, notwithstanding a clearly established duty to engage in a meaningful dialogue with an employee making such a request;

(b)      Defendant Warren refused out of hand plaintiffs' good faith request for additional time to submit his written response to the allegations set forth in Dr. Warren's July 26, 2013 "suspension without pay" letter;

(c)      Even after plaintiff's August 6, 2015 written notice confirming his disability and requesting an accommodation, defendants instead rejected his accommodation request and advised plaintiff of the intent to suspend him for four weeks without pay, this time with an August 12, 2013 letter from Dr. Vitter, relying in addition on alleged new conduct following plaintiff's August 6, 2013 letter confirming notice of his disability and requesting an accommodation;

(d)      Dr. Vitter actually suspended plaintiff for four weeks without pay by his letter of September 19, 2013, upon information and belief, based on recommendations of Dr. Warren and/or Dr. Heppert, and at the same time expecting plaintiff to handle the normal work load of the MAI Lab, the MAI Lab Renovation Delay, the Dual Beam Electron Microscope Installation Delay, the Billing Rate Revisions Delay, the Sponsored Research Contracting Documentation Delay and, additionally, the University appeals process for the four-week suspension;

(e)      Dr. Heppert intensified demands upon plaintiff for submission of billing rate information even though the Center for Research had not provided plaintiff with timely and complete information as he had been requesting for over one year;

(f)      Dr. Heppert intensified demands upon plaintiff to submit "one size fits all" contract documentation for proposed collaborative Sponsored Research projects with private sector companies, notwithstanding plaintiff's repeated explanations for a different type of agreement and requests for written contracting policies and procedures, which, on information and belief, actually existed but were knowingly withheld from plaintiff;

(g)      Dr. Warren and Dr. Heppert did not inform plaintiff that his expressions of concern to stop the Federal Funds Mismanagement, were, on information and belief, confirmed by a third-party consulting firm; and

(h)      Using calculated ambiguity, highly destructive to an ADD/ADHD sufferer, surely known particularly to Dr. Warren as a Ph.D. behavioral psychologist with extensive knowledge of attentive and cognitive disabilities, particularly among high functioning individuals with attentive and cognitive disabilities, to heighten plaintiff's stress, including:

(i)      When seeking guidance in good faith for how to deal with private sector clients facing the need for decisions on the MAI Lab's performing Sponsored Research, Dr. Heppert avoided straightforward answers and simply vaguely told plaintiff, instead, to use his own judgment; and

(ii)      When seeking guidance in good faith about the comparative importance of preparing a written response to the allegations in Dr. Warren's July 26, 2013 and Dr. Vitter's September 19, 2013 "four week suspension" letters vs. MAI Lab projects, including the MAI Lab Renovation Delay, the Dual Beam Electron Microscope Installation Delay, the Billing Rate Revisions Delay, the Sponsored Research Contracting Documentation Delay, Dr. Heppert (and Dr. Hummert) told plaintiff he should do the former on his own time and otherwise use his own judgment to set priorities for MAI Lab work, even though it was known plaintiff was already working evenings in addition to regular daytime hours on normal MAI Lab work plus the MAI Lab Renovation Delay, the Dual Beam Electron Microscope Installation Delay, the Billing Rate Revisions Delay, the Sponsored Research Contracting Documentation Delay.

112.      As a direct and proximate result of the conduct of defendants the University, the Center for Research, Dr. Warren and Dr. Heppert as aforesaid, including but not limited to ignoring or otherwise not responding in a meaningful manner to plaintiff' expressions of concern about the Federal Funds

Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Diversion of Instrument Funding; refusing to discuss accommodations for his disability; suspending him for four weeks without pay; refusing to allow him additional time to respond to the University's and the Center for Research's allegations of unprofessionalism and other matters; and increasing pressures upon him to provide updated billing rates for scientific instruments without providing needed information and to use contracting forms not consistent with work to be performed in the MAI Lab at a time when plaintiff was already under great pressure due to the MAI Lab Renovation Delay, the Dual Beam Electron Microscope Installation Delay, the Billing Rate Revisions Delay, the Sponsored Research Contracting Documentation Delay, plaintiff suffered emotional stress and distress, mental anguish, personal humiliation, personal embarrassment, confusion, panic, sleeplessness, loss of self esteem, loss of self worth, physical pain and suffering with related symptoms both during his employment and thereafter continuing through the present day.

113.    Further, the acts of the University, the Center for Research, Dr. Warren and Dr. Heppert as aforesaid were undertaken intentionally and with the purpose of causing harm to plaintiff or, in the alternative, were motivated by evil motive or intent or, in the alternative, were undertaken with reckless disregard and deliberate indifference to and for the rights of plaintiff and his well being or, in the alternative, were undertaken with reckless or callous indifference to federally protected rights of others or, in the alternative, with knowledge that their acts may be in violation of federal law.

## Procedural History

114.    On or about November 13, 2013, and within thirty days of his discharge, plaintiff filed a state court civil action for judicial review of his suspension, creation of hostile work environment and discharge, as well as claims for whistleblower employment discrimination, under the Kansas Judicial Review Act, K.S.A. Secs. 77-601, *et seq.*, and the Kansas Whistleblower Act, K.S.A. Sec. 75-2973, against the University and Drs. Vitter, Warren and Heppert with the District Court of Douglas County,

Kansas, in the action styled *David S. Moore v. University of Kansas, et al.*, Case No. 2013-CV-00535, Div. 1, Hon. Robert Fairchild.

115.     On or about December 5, 2013, plaintiff filed a charge of employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. Secs. 12,101*, et seq*., and the federal Rehabilitation Act, 29 U.S.C. Secs. 701*, et seq.*, with the offices of the Equal Employment Opportunity Commission located in Kansas City, Kansas, dually filed with the offices of the Kansas Human Rights Commission in Topeka, Kansas, alleging that the University, by and through Drs. Vitter, Warren and Heppert as managerial officials of the University, discriminated against him under such Acts because of his disability, namely, ADD/ADHD, in terms and conditions of employment, specifically, suspension without pay on September 19, 2013; a hostile work environment thereafter; and termination of employment on October 14, 2013 (effective October 18, 2013) without accommodating his disability and otherwise in retaliation for his exercising his rights under the Americans with Disabilities Act, 42 U.S.C. Secs. 12101*, et seq.*, the federal Rehabilitation Act, 29 U.S.C. Secs. 701*, et seq.*, and the Kansas Act Against Discrimination, K.S.A. Secs. 44-1001, *et seq*.

116.     On or about June 11, 2014, with no action having been taken by the Equal Employment Opportunity Commission or the Kansas Human Rights Commission under plaintiff's dual filing, plaintiff requested a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.

117.     On or about June 19, 2014, plaintiff received from the Equal Employment Opportunity Commission a Notice of Right to Sue letter.

118.     On or about August 7, 2014, plaintiff requested leave of the court to dismiss without prejudice his state court action in order to bring his now matured federal ADA and other disability and whistleblower discrimination claims in federal court under federal law and in order to present his claims in a forum with discovery, an important right not extended to plaintiff under the combined provisions of the Kansas Administrative Procedure Act, K.S.A. Secs. 77-501 *et seq.,* and the Kansas Judicial Review

Act, K.S.A. Secs. 77-601, *et seq.*, in actions against the University.  The court granted his request for dismissal without prejudice on August 12, 2014.

119.    On December 1, 2014, plaintiff dually filed a Joint Administrative Complaint for Mismanagement, Waste, Abuse of Authority and Violation of Laws, Rules and Regulations of the United States Related to Federal Contracts and Grants ("Joint Administrative Complaint") with the Offices of Inspectors General of the National Science Foundation and the United States Department of Health and Human Services by certified mail, return receipt requested, under the federal Pilot Program for Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information Act, National Defense Authorization Act for Fiscal Year 2013, 41 U.S.C. Sec. 4712, *et seq.*

120.    Plaintiff has exhausted his administrative remedies under the under the Pilot Program for Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information Act, 41 U.S.C. Sec. 4712, *et seq.*  Under the Act, if the head of the agency does not issue an order denying relief or otherwise has not issued any order within 210 days after submission of the administrative complaint, administrative remedies are deemed to have been exhausted and a claimant may pursue his or her action in federal court.  The 210 days in this case expired on July 1, 2015.  As of July 1, 2015 and as of this filing, neither the Director of the National Science Foundation nor the Secretary of the United States Department of Health and Human Services has issued an order denying relief to plaintiff under his Joint Administrative Complaint or otherwise has ruled.  Plaintiff informally was advised as follows:

(a)    *National Science Foundation Complaint.*  An investigator with the Office of Inspector General of the National Science Foundation advised counsel for plaintiff on March 23, 2015, that the administrative complaint had been closed out based on lack of jurisdiction under the Act because, in the investigator's view, any grants or cooperative agreements within the scope of the administrative complaint preceded the Act's July 1, 2013 effective date.

(i)    This is not correct.  Plaintiff specifically alleged in the Joint Administrative Complaint that both the University and the Center for Research were the

recipients of numerous federal grants totaling hundreds of millions of dollars from the Public Health Service, the National Institutes of Health and the National Science Foundation and both were contracting parties with the Public Health Service, the National Institutes of Health and the National Science Foundation both before and after the effective date of the Act.

(b)  *National Institutes of Health and Public Health Service.*  An investigator with the Office of Inspector General of the Department of Health and Human Services advised counsel for plaintiff on February 25, 2015, that his office was declining to investigate the complaint because "the matter has been previously addressed in another federal or state judicial or administrative proceeding initiated by the complainant," referring to this civil action.

### Reasonableness and Good Faith of Plaintiff's Beliefs: Federal Funds Mismanagement

121.  Plaintiff's persistently expressing concerns to stop the Federal Funds Mismanagement, in particular, were not only made in good faith and with reasonable belief, they were correct.  At the time of plaintiff's suspension and termination of employment in October 2013, the University and the Center for Research were significantly reorganizing and redirecting the Sponsored Research program, including its management personnel, addressing the very accounting, federal regulatory compliance and research integrity issues plaintiff had been voicing to his superiors, all involved in Commercialized Medical Research, such reorganization and redirection including demotions, reassignments to other duties and expansions of the accounting and federal compliance staff.

122.  Indeed, while not informed at the time, the operations of the University and the Center for Research were reviewed by a national third-party consulting firm, namely, the Huron Group, in 2011 and perhaps thereafter which identified many problems with the University and the Center for Research administration, many of which were the very same compliance problems plaintiff had repeatedly identified and sought to stop, for example, accounting practices and grants compliance, resulting in significant reorganization, reform and redirection of the University and the Center for Research programs.

However, plaintiff's superiors kept him "in the dark" about these findings.  Significant reforms and changes made following plaintiff's suspension and termination of employment include, for example, the following:

> (a)      Dr. Warren, the Vice Chancellor for Research and Graduate Studies, according to a March 31, 2014 University news release, "stepped down" as Vice Chancellor for Research and Graduate Studies, effective at the end of the semester in May 2014, retaining only his Professor of Applied Behavioral Science and Senior Scientist position, but with a one-year research "leave," apparently unpaid, with no return to the University or the Center for Research for teaching or research until Fall 2015.  On information and belief, Dr. Warren's "stepping down" with a one-year research leave, apparently unpaid, was because of, *inter alia,* instances of federal funds mismanagement and noncompliance for which he was responsible for preventing, including some or all of the Federal Funds Mismanagement matters plaintiff sought to stop.

> (b)      The University split the Research and Graduate Studies program, formerly headed by Dr. Warren, into two separate programs headed by new people, (i) the University of Kansas Office of Research, headed by Mary Lee Hummert, Ph.D., as Interim Vice Chancellor for Research and (ii) the University of Kansas Office of Graduate Studies, headed by Michael C. Roberts, Ph.D., as Dean of Graduate Studies.

> (c)      The Center for Research business office was reorganized and expanded, including hiring a significant number of accounting and grant administration and compliance personnel and acquiring accounting software to rectify the accounting and grant compliance problems plaintiff over the years had repeatedly voiced concerns about, including new positions in contracting, pre-award and post-award services, billing and reporting, budgeting, accounting, information services and research integrity.

> (d)      Accounting and grant compliance employees were moved from the physically distant Center for Research business office to the actual University buildings housing Core Labs

to improve communication and compliance between Core Lab and grant compliance employees, a measure plaintiff repeatedly had recommended.

(e)     The Office of Human Resources was reorganized as the Office of Human Resources Management and a new directorship created, namely, an Associate Vice Provost for Human Resource Management or Director of Human Resources and Legal Affairs, for which the University currently is hiring, specifying that the person have (i) a *juris* doctorate law degree and strong experience with employment law matters and (ii) whose responsibilities include maintaining "systems and policies to prevent illegal, unethical or improper conduct in University operations."

123.     On information and belief and unknown to plaintiff at the time, plaintiff's repeated expressions of concern to his superiors to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, together with his and his research staff's recognized scientific capabilities and skill, may have been seen as jeopardizing the Commercialized Medical Research effort of the University, the Center for Research, the Institute for Advancing Medical Innovations and the KU Medical Center, including:

(a)     Revealing the use of Core Labs as a "no charge" hub for the Commercialized Medical Research program by using federally funded scientific equipment without required or any charges as required by federal laws, rules and regulations for federal contract and grant proceeds used in scientific research, instruments, equipment and staffing in research laboratories of the University and the Center for Research;

(b)     Threatening the University's and the KU Medical Center's National Cancer Institute application (a familiar earlier and repeated refrain at the time was "we don't want to draw an audit"); and

(c)     Casting doubt on the direction, clinical integrity, efficacy and patentability of drug formulations developed in the Commercialized Medical Research program, including

particularly Captisol®, the mainstay component of five of the seven drugs supporting the

application for NCI designation and a principal accomplishment of the Commercialized Medical

Research program, for which much of the base assay and methods development microscopy and

imaging work was done in the MAI Lab;

ultimately causing and leading to plaintiff's suspension and termination of employment in October 2013.

**Specifications of Federal Funds Mismanagement;**
**MAI Lab Renovation Mismanagement;**
**Plagiarism; and Research Bias**

*. . . Federal Funds Mismanagement . . .*

124.    Practices and incidents plaintiff observed on numerous occasions and that plaintiff

repeatedly raised with his superiors, including Drs. Heppert, Warren and Wilson, to stop the Federal

Funds Mismanagement include the following:

125.    **Specification**: *Two Sets of Accounting Records*

(a)    Plaintiff in the summer of 2013 learned from an employee and "borrowed

servant" of the University and the Center for Research that the actual accounting for the MAI Lab

and other Core Labs, at least in part, was done not on the University's designated DEMIS or other

public accounting system, but on non-public, *ad hoc* Excel spreadsheet files internally referred to,

upon information and belief, as the "2300" and "1900" accounts, that had been prepared and

maintained by Mark Reynolds, former Controller for the Research and Graduate Studies program,

on a personal, apparently off-network computer, resulting as a practical matter with the

University and the Center for Research maintaining "two sets of books" that, according to the

University and Center for Research employee, "borrowed servant" and others, was "where the

money was laundered" and where the "color of money" changed.

(b)    The dual accounting situation was confirmed two days later in a meeting plaintiff

had with Linda Sadler, Research and Graduate Studies Chief Financial Officer and successor to

Mark Reynolds, who had since taken a similar position with the University's College of Arts and

Sciences where, on information and belief, he currently works, who explained she was having difficulty reconstructing Core Lab accounting records because they were maintained on the confidential Excel spreadsheet files that Mark Reynolds had taken with him when he changed positions to the University's College of Arts and Sciences.

(c)     This was further confirmed by two employees and "borrowed servants" of the University and the Center for Research, indeed, that there were "tears and late night screaming" trying to reconcile and otherwise trying to recreate the accounting records in order to meet an undisclosed deadline.

(d)     *Violation of Law.*  The University's and the Center for Research's mysterious use of the "2300" and "1900" accounts on separate Excel spread sheets for "laundering money" failed to comply with the accounting requirements of OMB Circular A-21 governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced in agreement with the federal government.

(e)     *Information Disclosed to Superiors.*  Plaintiff continually expressed his concerns about the mysterious 2300 and 1900 accounts to his superiors, particularly Dr. Heppert, to stop the practice.

(f)     *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the use of two sets of books and related matters described in this specification violated federal law, federal grant conditions and federal contract conditions.

(g)     *No Action Taken.*  Plaintiff's concerns and efforts to stop the practice were never acknowledged by his supervisors, nor on information and belief was timely corrective action taken, and plaintiff so reminded his superiors on a regular basis.

126.     Fictitious Instrument Billing

(a)     *Specification*: *Todd Williams, Ph.D. Incident*

(i)      On May 15, 2013, plaintiff attended a meeting of Core Lab directors. One Core Lab director, Todd Williams, Ph.D., Director of the Mass Spectrometry Lab, explained to the other Core Lab directors how, apparently as matter of common and prevalent practice, to avoid returning unused federal grant or contract funds by reserving or charging time in advance to Core Lab scientific instruments and then simply not using the scientific instruments.  Dr. Williams from time to time referred to this practice as "banking money."

(ii)     Persons in attendance at this meeting included, in addition to plaintiff, to the best of plaintiff's recollection, the following persons:

(1)      Dewey Barich, Ph.D., Director of the Solid State Nuclear Magnetic Resonance Laboratory;

(2)      Ken Ratzlaff, Ph.D., Director of the Instrument Design Laboratory;

(3)      Annbanandam Asokan, Ph.D., Director of the Biomolecular Nuclear Magnetic Resonance Laboratory;

(4)      Aaron Smalter, Ph.D., Director of the Applied Bioinformatics Laboratory;

(5)      Anu Purta, Ph.D., Interim Director of the High Throughput Screening Laboratory;

(6)      Victor Day, Ph.D., Director of the X-Ray Crystallography Laboratory;

(7)      Scott Lovell, Ph.D., Protein X-Ray Group;

(8)      The Director of the Small Molecule Compound Management Laboratory whose name plaintiff cannot currently recall;

    (9)  Phil Gao, Ph.D., Director of the Protein Production Laboratory; and

    (10)  Janet Good of the Center for Research business office.

  (iii)  While Dr. Williams did not cite specific instances of this practice, plaintiff felt Dr. Williams' advising other Core Lab directors how to do this was inappropriate as a fraudulent business practice and might be evidence that the practice was being or had been used or a suggestion that it might be an appropriate practice.

  (iv)  Plaintiff thereafter orally informed his superiors, Drs. Heppert and Warren, of Dr. Williams' discussion of this practice and his concerns that the practice stop on a number of occasions.  On July 9, 2013, at Dr. Heppert's request, plaintiff submitted his concerns in writing.  Dr. Heppert informed plaintiff by email on July 30, 2013, that the matter had been submitted to the University's appropriate personnel for investigation.

  (v)  Under the University's Fraud and Theft Prevention Policy, all University employees must comply with all state and federal laws.  In addition, a University employee cannot be compelled by a supervisor or University official to violate a law.  The policy applies to known and suspected fraud or theft.  All University employees are prohibited from engaging in or facilitating any fraud or theft.  These policies also apply to University personnel when working as "borrowed servants" for the Center for Research, whether working in supervisory or production capacities.

  (vi)  Further, under the University's Fraud and Theft Prevention Policy the Provost/Executive Vice Chancellor is responsible for establishing controls to prevent and detect fraud.  University managers are responsible for knowing the types of improprieties that might occur within their areas of responsibility as well as identifying irregularities.  The policy provides for investigations of allegations of fraud by the University's Internal

Audit Department and Public Safety office and disciplinary actions, including restitution and paying the costs of investigation.  These policies also apply to University personnel when working as "borrowed servants" for the Center for Research, whether working in supervisory or production capacities.

    (vii)    Plaintiff did not receive a copy of any result such investigation.  Instead, in later court proceedings regarding plaintiff's termination of employment before the District Court of Douglas County, Kansas, plaintiff in January 2014, plaintiff received a copy of a written investigation letter report dated September 18, 2013, four months after plaintiff's written report, from Dr. Heppert to Dr. Vitter, Vice Chancellor for Research and Graduate Studies, that stated he had conducted an investigation of plaintiff's concerns consisting only of questioning three persons, namely, Dr. Williams, who not surprisingly denied the allegations, and two Core Lab directors who "regularly" attended Core Lab directors meetings.  Dr. Heppert's letter report stated that Dr. Williams denied "booking work that was never done in order to help a PI [principal investigator] close out a grant," but that end-of-grant circumstances were sufficiently ambiguous such that he intended to recommend to Core Lab directors that they "avoid this type of strategy for spending end-of-grant funds unless they have explicit written approval from then PI for the project and review the projects with us [Dr. Heppert and Linda Sadler, the Research and Graduate Studies Chief Financial Officer]."  Plaintiff does not know if this action was ever taken.

    (viii)    Because no effort was made to question Core Lab directors who *actually attended* the meeting in question, plaintiff believes the investigation was inadequate and failed to meet the requirements of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other

works produced under grants or in agreement with the federal government, as was well as the University's own Fraud and Theft Prevention policy, also applicable to University personnel when working as "borrowed servants" for the Center for Research, whether working in supervisory or production capacities.

(b)        _Specification_: George Wilson Incident

(i)        On July 25, 2013, Dr. George Wilson, plaintiff's former immediate superior, advised plaintiff by telephone that he had unused NIH grant funds that were approaching the grant's expiration date that he needed to accommodate through use of the MAI Lab.  Plaintiff understood him to mean that he needed to reserve time to use a laboratory instrument, but without actual instrument use before the grant's expiration date, the same practice Dr. Williams had described two months earlier.  Dr. Wilson several days later in an email to plaintiff dated July 31, 2013, stated he "had reached the 11th hour and [he] urgently need a bill so that [he] can balance out the account."

(ii)        Because Dr. Wilson's request was inconsistent with what plaintiff understood was the University's policy for preventing fraudulent use of federal funds and especially because of Dr. Williams' earlier describing the practice as common and prevalent, plaintiff the same day as Dr. Wilson's request reported his concerns about Dr. Wilson's request to his immediate superior, Dr. Heppert, by an email dated July 25, 2013, to stop any unlawful practice.

(iii)        Dr. Heppert contacted Dr. Wilson about his question.  Dr. Wilson reportedly told Dr. Heppert that he had only requested an "estimate" for instrument use. Dr. Heppert accepted Dr. Wilson's explanation.  This is confirmed in two emails     dated July 31, 2013, from Dr. Heppert to plaintiff.

(iv)        Because Dr. Wilson's telephone and email requests sought what amounted to an encumbering of federal grant or contract funds without a federally

permitted use before the grant's expiration date, together with Dr. William's earlier description of this practice as common and prevalent, plaintiff believes Dr. Heppert's not further investigating the matter was improper and told him so.

(c)      _Specification_: *Instrument Design Laboratory.*

(i)      The Instrument Design Laboratory is one of the University's eleven Core Labs.  This lab makes various scientific instrument accessories and other devices for the other Core Labs use.  From time to time other University labs and programs do not have funds to pay the Instrument Design Laboratory for work done in which event other means are employed, including:

(1)      In lieu of payment, upon information and belief, other labs "bank" unused federal grant and contract funds for grants approaching expiration for work not actually done by the Instrument Design Laboratory in order to avoid returning unused grant funds to the federal granting agency, the same practice described in the two preceding specifications.; and

(2)      In lieu of payment, Core Labs would transfer scientific instruments and equipment to the Instrument Design Laboratory for its use, some of which may have been acquired with federal grant or contract funds or otherwise are limited to uses other than those permitted by applicable grants.

(d)      *Violation of Law.*  Avoiding the return of unused federal grant or contract funds by reserving or charging time in advance to Core Lab scientific instruments and then simply not using the scientific instruments, and failing adequately to investigate allegations of this practice as aforesaid, violated and continues to violate federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government, as well as the University's own Fraud and

Theft Prevention policy, also applicable to University personnel when working as "borrowed servants" for the Center for Research, whether working in supervisory or production capacities.

(e)     *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the fictitious billing incidents described in these specifications presented likely violations of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government, as was well as the University's own Fraud and Theft Prevention policy, also applicable to University personnel when working as "borrowed servants" for the Center for Research, whether working in supervisory or production capacities.

(f)     *Information Disclosed to Superiors.*  Plaintiff continually expressed his concerns (including before, during and after 2009 as to the Instrument Design Laboratory discussed above) about the possible use of fictitious instrument billing to avoid the return of federal grant and contract funds to the federal government to his superiors, particularly Dr. Heppert, to stop the practice.   The University's investigation of the Dr. Williams incident was inadequate as stated above and plaintiff so reminded his superiors.

(g)     *No Action Taken.*  Actions taken by his supervisors were insufficient, particularly in the case of Dr. Williams because persons actually attending the meeting in question were not questioned, other than Dr. Williams.

127.   Use and Disposition of Federally Funded Instruments for Private Commercial Purposes

(a)     It is unlawful to use scientific instruments acquired with federal grant or contract funds for private commercial research purposes unless (i) permitted by specific terms of a federal grant or agreement applicable to the instrument and (ii) the user is charged and pays a fee for use of the instrument that is not less than what private companies charge for equivalent services unless the federal grant or agreement provides otherwise.

(b)      <u>Specification</u>:  *Solid State Nuclear Magnetic Resonance Core Lab*

(i)      The principal instrument in the University's Solid State Nuclear Magnetic Resonance Core Lab ("NMR Lab") is a solid state nuclear magnetic resonance spectrometer, acquired with a NSF grant for over $500,000, for purposes described in the grant application.

(ii)      Notwithstanding this federal funding, a private company was allowed unlimited use of the instrument for private drug formulation studies and product development in return for paying one-half of the NMR Lab's director's $120,000 annual salary.  The other half of the NMR Lab director's salary was paid by the University and/or the Center for Research.  Upon information and belief, this was done from early 2010 until 2014.

(iii)      After only three years of use, when the University and/or the Center for Research could not fund its one-half of the lab director's salary, Dr. Heppert in 2012 or 2013 proposed selling the solid state nuclear magnetic resonance spectrometer to the private company in question.  Plaintiff expressed his concerns to Dr. Heppert that selling the nuclear magnetic resonance spectrometer to the private company as proposed would violate federal law.  While Dr. Heppert acceded to plaintiff's views and stopped pursuing the matter, plaintiff's expressions of concern were not welcome and plaintiff was treated accordingly.

(c)      <u>Specification</u> – *Protein Production Laboratory*

(i)      A similar arrangement was and may still be used for the Protein Production Laboratory in which the laboratory is operated by a limited liability company formed by the lab's director who rents the laboratory's federally funded instruments from the University and/or the Center for Research, does the actual work, and bills the work to one or more private companies, in return for the University and/or the Center for

Research taking a percentage of the gross billings.  Plaintiff lacks more specific information about this practice in the Protein Production Laboratory, but on occasions before during and after 2009 expressed his concerns about the unlawful nature of the arrangement to Dr. Heppert to stop the practice.

(d)      *Specification*:  *MAI Lab*

(i)      In late July 2013, only two to three weeks before plaintiff was notified of his suspension without pay, Dr. Heppert advised plaintiff that he should form his own private limited liability company to rent the federally funded MAI Lab instruments from the University and/or the Center for Research just like the Solid State Nuclear Resonance Lab and the Protein Production Laboratory described above, and perform microscopy research as an independent contractor with private sector companies, in return for the University and/or the Center for Research taking one-third of his gross billings, plus hourly rent for the instruments, as plaintiff understood the proposal.

(ii)     According to Dr. Heppert, plaintiff could use higher rate structures than the Center for Research and make more money.

(iii)    According to Dr. Heppert, this was an established practice of the Center for Research and its taking one-third of gross revenues was a standard, non-negotiable amount.

(iv)     Plaintiff objected for numerous reasons, including:

(1)      The MAI Lab and its federally funded instruments were to be used for first and foremost for academic science and any contracting with private sector companies should in all respects comply with federal law;

(2)      The University and its Core Labs, first and foremost are academic institutions, not profit-making businesses;

(3)     The MAI Lab was already fully booked with academic and grant funded research, thereby lacking capacity to perform additional work without additional staff and instrumentation; and

(4)     In any event, the terms supposedly used with other labs such as the Solid State Nuclear Resonance Lab and the Protein Production Laboratory were not economically sustainable.

(v)     Several weeks later, on September 13, 2013, plaintiff was notified that he was being suspended for four weeks without pay and on October 14, 2013, he was discharged from employment.

(vi)    By advising plaintiff to form his own company as aforesaid and under the afore described circumstances, Dr. Heppert was attempting to perpetuate a practice that, on information and belief, likely would result in private, commercial use of the federally funded instrument for less than what private companies would charge for equivalent services and, therefore, would be unlawful.

(e)     *Violation of Law.*  Unlimited use of the solid state nuclear magnetic resonance spectrometer in return for paying one-half of the lab director's salary, on information and belief, likely resulting in private, commercial use of the federally funded instrument for less than what private companies would charge for equivalent services, is unlawful.  Further, disposing of a federally funded instrument for less than its fair value without a public process is unlawful.  In addition, plaintiff's forming his own company to rent MAI Lab instruments (as opposed to his own privately owned, leased or otherwise obtained instruments) in order to perform work for private, commercial interests as proposed would be an unlawful use of federally funded scientific instruments.

(f)     *Good Faith Belief.*  Plaintiff reasonably and in good faith believed that the use of the aforesaid instruments described in these specifications would be uses and dispositions of

federally funded instruments in violation of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the use and disposition of instruments acquired with federal funds in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(g)     *Disclosure of Information to Superiors.*   Plaintiff informed his immediate superior, Dr. Heppert, of his good faith and reasonable belief that use of the aforesaid instruments would be unlawful uses and dispositions of federally funded instruments in order to stop the practice.

(h)     *No Action Taken.*   Plaintiff's concerns to stop the practice were never acknowledged by his supervisors and plaintiff so reminded his superiors.

128.     Double Billing "Facilities and Administration" Charges

(a)     Under federal law, federal grant recipients and federal contract parties like the University and the Center for Research are compensated for overhead and related administrative costs under federal grants and contracts with a "Facilities and Administration" reimbursement negotiated annually as a percentage of the grant or contract amount ranging, for example, from 47% in July 2011 to 49.5% at the time of plaintiff's termination in October 2013.   Additional overhead and administrative costs are not allowed.   However, the Center for Research consistently charged the MAI Lab and other Core Labs for overhead and administrative expenses for federally funded work in addition to the "Facilities and Administration" reimbursement the Center for Research was receiving from the federal government.

(b)     <u>Specification</u>: *Charge Backs.*   Throughout the years plaintiff was Director of the MAI Lab, the Center for Research monthly billed the MAI Lab and, upon information and belief, all Core Labs, for federally funded research activities in the Core Labs and the use of scientific instruments in the Core Labs acquired with federal grant or contract funds, for what it called "charge backs" and "cost recovery" for overhead and administration, charged as a percentage of

the MAI Lab's monthly billings for instrument and staff time to researchers, not actual cost recovery, ranging from six percent to as much as 30% of monthly billings, in addition to the negotiated "Facilities and Administration" reimbursements the Center for Research took from federal grants.

(c)     _Specification_: *Data Lines and Ports.*  Throughout the years plaintiff was Director of the MAI Lab, in addition to the flat six percent to 30 percent general charge for overhead and administration, the Center for Research separately charged the MAI Lab and, upon information and belief, all Core Labs on a monthly basis for telephone lines and internet data ports, both items already recovered by the Center for Research under its "Facilities and Administration" reimbursement from federal grants.

(d)     _Specification_: *Accounting Position.*  In addition, the Center for Research employed a staff person, Liz Bennett Monroe, to handle all Core Labs' billings, collections of accounts receivable, monthly reports of income and expense and related accounting services, but in addition to the services not being provided, *see* paras. 121 and 122 below, Ms. Bennett Monroe's full salary and benefits were allocated and collected ratably across all Core Labs, referred to by one Core Lab director, Todd Williams, Ph.D., at a Core Lab directors meeting in April, 2013, as the "Liz Tax."

(e)     _Specification_: *Commodities and Staff Time.*  The Center for Research separately charged the MAI Lab and, on information and belief, the other Core Labs, for additional commodity and administrative staff overhead items properly includible as "Facilities and Administration" charges including, but not limited to, the Core Labs' utilities, chemicals, reagents, accounting software, calendaring software, instrument user login software, computer programming services, business office administrative staff time, photocopies and office supplies.

(f)     _Specification: General Administrative Services Software._  In 2011, the Center for Research attempted to charge the MAI Lab for the purchase of "Paragon" information technology

software used not by the MAI Lab but by the central Information Services office of the Center for Research for general administrative purposes, not the MAI Lab or any other Core Lab.  Plaintiff objected to the charge.  Plaintiff's objection, while not welcome, was acceded to.

(g)      *Violation of Law.*  The Center for Research's practice of charging the MAI Lab and, on information and belief, other Core Labs for general overhead and administration; Ms. Bennett Monroe's salary and benefits; specific charges for internet lines and data ports, utilities, chemicals, re-agents, accounting software, calendaring software, instrument user login software, computer programming services, business office administrative staff time, photocopies and office supplies; and software purchased for central Information Services' administrative purposes, was and is duplicative of the negotiated "Facilities and Administration" reimbursements received from federal grants and contracts, violated and continues to violate federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government, particularly the eligibility and calculation of expenses for facilities and administration under OMB Circular A-21, 2 C.F.R. Part 220, Appendix A, Sections E, F and G.

(h)      *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the Center for Research's practice of charging Core Labs for general overhead and administration; Ms. Bennett Monroe's salary and benefits; internet lines and data ports, utilities, chemicals, re-agents, accounting software, calendaring software, instrument user login software, computer programming services, business office administrative staff time, photocopies and office supplies; and software purchased for central Information Services' administrative purposes described in this specification, violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in

agreement with the federal government, particularly the eligibility and calculation of expenses for facilities and administration under OMB Circular A-21, 2 C.F.R. Part 220, Appendix A, Sections E, F and G.

(i)     *Disclosure to Superiors.*   Throughout the years plaintiff was Director of the MAI Lab, particularly during and after 2009, plaintiff continually expressed his concerns to stop the MAI Lab, and other Core Labs, from being charged for general overhead and administration; Ms. Bennett Monroe's salary and benefits; specific charges for internet lines and data ports, utilities, chemicals, re-agents, accounting software, calendaring software, instrument user login software, computer programming services, business office administrative staff time, photocopies and office supplies; and software purchased for the information services administrative purposes as duplicative of the negotiated "Facilities and Administration" reimbursements received from federal grants.   Plaintiff reported these concerns to Drs. Heppert and Warren; Mark Reynolds, Research and Graduate Studies Controller until 2012; and thereafter, in addition, Deb Mitra, Research and Graduate Studies Comptroller through 2013.   Plaintiff also reported these concerns during this time period to other University and Center for Research personnel including Liz Bennett Monroe, Julie Nagel and Linda Sadler, as well as Katrina Yoakum, University Comptroller.

(j)     *No Action Taken.*   Notwithstanding his reporting these concerns to stop these practices, corrective actions were not taken, nor were satisfactory explanations provided. Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

129.   <u>Specification</u>: *Ad Hoc Tracking of Use of Federally Funded Instruments and Projects*

(a)     Throughout the years plaintiff was Director of the MAI Lab, the University and the Center for Research lacked any effective internal controls systems to ensure that the use of Core Lab scientific instruments acquired with federal grant or contract funds were (i) restricted to

federally eligible research projects for such instruments or other eligible federal research projects or (ii) whether federally required charges for the use of such instruments were made and paid if used for ineligible private commercial or other purposes.

(b)      Plaintiff on his own instituted a "logon-logoff" open source, "off the shelf" computer application for each scientific instrument in the MAI Lab in approximately 2006 that prevented use without the researcher first entering his or her advisor's name and then automatically recorded the beginning, end and lapsed period of time of the instrument's use.  This open source application was too limited also to include grant or academic vs. commercial project identification for proper billing.  Theoretically, under the University and Center for Research systems, principal investigators would do this manually every month when reviewing printed "logon-logoff" reports for instruments when billed.

(c)      Upon information and belief, other Core Labs used only "honor system" handwritten logs that the researcher filled out with his or her name and amount of time used that, nonetheless, allowed instruments to be used without completing the handwritten log.  Plaintiff also used the "honor system" handwritten logs, but used the "logon-logoff" computer application to check the accuracy of the handwritten logs.

(d)      As a result, researchers would come into the MAI Lab to use its instruments by doing no more than manually signing in by name and logging on by name to an instrument without informing anyone whether the research being performed was for general academic purposes, grant or contract funded research, a commercial project or for litigation purposes, the latter two of which would require proper charges for use and contracting documentation for scope, pricing, limitations on liability, intellectual property protection and similar legal protections.

(e)      Plaintiff requested assistance from both the Center for Research Information Systems office and the University's Information Technology and Telecommunications Center to

improve his MAI Lab "logon-logoff" system to a web-based reservation system including, among other features, federal grant or contract, private grant or contract, academic or commercial account identification, but was continually resisted, with the exception of assistance in approximately 2007 or 2008 from Greg Harris, a programmer in the Center for Research Information Systems office, and his superior Rebecca Ryan.

(f)     Persons with the University and the Center for Research from whom plaintiff sought assistance for developing a system for identifying federal grant or contract, private grant or contract, academic or commercial accounts applicable to instrument use and to whom plaintiff expressed his concerns before, during and after 2009 to stop the failure to record federal grant or contract information for instrument use included Drs. Wilson and Heppert; Greg Harris, Rebecca Ryan, Rick McMullen and Nick Stevens with the Center for Research Information Systems office; and Victor Frost with the University's Information Technology and Telecommunications Center.

(g)     *Violation of Law.*   Upon information and belief, the University and the Center for Research not having  systems to ensure that the use of Core Lab scientific instruments acquired with federal grant or contract funds were (i) restricted to federally qualified research projects for such instruments or other qualified federal research projects or (ii) properly charged and paid for under federal law for private sector commercial projects violated and continues to violate federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(h)     *Reasonable Belief.*   Plaintiff reasonably and in good faith believed that the University and the Center for Research not having systems to ensure that the use of Core Lab scientific instruments acquired with federal grant or contract funds was (i) restricted to federally qualified research projects for such instruments or other qualified federal research projects or (ii)

was charged and paid for as required by federal law for private sector commercial projects as described in this specification violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(i)     *Information Disclosed to Superiors.*  Plaintiff continually expressed his concerns in order to stop the failure to use systems to track this information, before, during and after 2009, to his superiors, Dr. Heppert particularly, about the University and the Center for Research not having internal controls systems to ensure that the use of Core Lab scientific instruments acquired with federal grant or contract funds was (i) restricted to federally qualified research projects for such instruments or other qualified federal research projects or (ii) was charged and paid for by private sector commercial projects as required by federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(j)     *No Action.*  Notwithstanding his reporting these concerns, corrective actions were not taken, nor were satisfactory explanations provided.   Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

130.     *Specification: Use of Federal Funds for Ineligible Purposes.*

(a)     In 2012, the National Science Foundation approved a $2.3 million Major Research Instrument Grant application submitted by plaintiff and three other University researchers for the purchase and installation of a highly sophisticated, custom-built, dual beam (focused ion beam and scanning transmission beam) low voltage acceleration scanning transmission electron microscope ("Dual Beam Electron Microscope").  Plaintiff negotiated with

the vendor and was able to save approximately $178,000 on the actual purchase of the Dual Beam Electron Microscope.

(b)    Dr. Heppert, plaintiff's immediate superior, frequently proposed using the $178,000 savings to purchase an unrelated small angle x-ray crystallography system to replace an older small angle x-ray crystallography system in a University or Center for Research materials science laboratory, namely, the Center for Environmentally Beneficial Catalysis, unrelated to the installation and use of the Dual Beam Electron Microscope.  Plaintiff objected to the use of the savings for such unrelated instrument.  Plaintiff's objections while not welcome from either Dr. Heppert or Bala Subramaniam, Ph.D., the Center's director, ultimately were accepted.

(c)    The $178,000 savings instead were used to purchase additional qualifying features and capabilities for a companion transmission electron microscope attachment selected by plaintiff used in conjunction with the Dual Beam Electron Microscope in the MAI Lab.

(d)    *Violation of Law.*  The proposal to use the $178,000 savings on the purchase of the Dual Beam Electron Microscope to purchase the unrelated small angle x-ray crystallography system in the other laboratory failed to meet the purchasing and accounting requirements of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(e)    *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the attempt to use the $178,000 savings to purchase an unrelated small angle x-ray crystallography system to replace an older small angle x-ray crystallography system in another laboratory unrelated to the installation and use of the Dual Beam Electron Microscope described in this specification would have violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in

support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(f)      *Information Disclosed to Superiors.*  Plaintiff expressed his concern to his superior, Dr. Heppert particularly, that use of the $178,000 savings to purchase an unrelated small angle x-ray crystallography system to replace an older small angle x-ray crystallography system in another laboratory unrelated to the installation and use of the Dual Beam Electron Microscope described in this specification would have violated federal law, federal grant conditions and federal contract conditions.

(g)      *Action Taken.*  While Dr. Heppert acceded to plaintiff's position, plaintiff's expressions of concern were not welcome and plaintiff was treated accordingly.

131.      *Specification: Ad Hoc Accounts Receivable Collection.*

(a)      Throughout the years plaintiff was Director of the MAI Lab, the University and the Center for Research failed to make efforts to collect accounts receivable of the MAI Lab and, upon information and belief, other Core Labs, against federal grant and contract funds for researchers' use of Core Lab instruments resulting in selective, untimely and uncollected charges against federal grant and contract funds for the use of Core Lab instruments acquired with federal grant or contract funds, thereby not accounting for or reflecting the actual or accurate use of funds for federally funded research projects and the use of scientific instruments acquired with federal grant or contract funds.

(b)      *Admission.*  Indeed, at one point, at a meeting of Core Lab directors during April 2012, Mark Reynolds, then Research and Graduate Studies Controller, admitted to plaintiff and other Core Lab directors present that the University and the Center for Research had let them down for not collecting accounts receivable of Core Labs and other accounting services, against federal grant and contract funds for researchers' use of Core Lab instruments, as well as all other accounting functions, reports and information.  Mr. Reynolds repeated his admission in an email

dated April 10, 2012.  Following this admission, collection of accounts receivable against federal grant and contract funds improved for several months, but without any accounting or allocation to grant or contract specific revenues or expenses.

(c)     *Admission.*  Further, several weeks later in Spring 2012, Core Lab directors, including plaintiff, were informed by Mark Reynolds and Linda Sadler of the University and the Center for Research that the employee in the Center for Research whose principal job duties included collection of accounts receivable against federal grant and contract funds, namely, Liz Bennett Monroe, as well as Mr. Reynolds, had been redirected to work instead on "special projects" of Dr. Warren.   On information and belief, this was during a time when patent expiration and renewal activity in the Commercialized Medical Research program was at a high level.

(d)     *Additional Admission.*   Plaintiff ultimately learned, from an employee and "borrowed servant" of the University and the Center for Research that no efforts were made to collect accounts receivable against federal grant or contract funds other than initial billing.

(e)     Upon information and belief, the apparent failure to collect accounts receivable of the MAI Lab and, upon information and belief, other Core Labs, against federal grant and contract funds for researchers' use of Core Lab scientific instruments was due to the University's and the Center for Research's failure to follow or otherwise adhere to consistent practices for accounting and internal controls for the eligibility and calculation of costs in support of sponsored research, development, training and other works produced with federal grant or contract funds and in agreement with the federal government.

(f)     Upon information and belief, the apparent failure to collect accounts receivable of the MAI Lab and, upon information and belief, other Core Labs, against federal grant and contract funds for researchers' use of Core Lab scientific instruments was due to a loose *ad hoc* accounting system and environment that created opportunities for federal grant or contract funds

to be applied to ineligible purposes and expenses and for equipment acquired with federal grant or contract funds to be used for ineligible purposes and projects, including use for private, commercial purposes without charges required by federal law.

(g)     *Violation of Law.*  Upon information and belief, the University and the Center for Research not making efforts to collect accounts receivable of the MAI Lab and, upon information and belief, other Core Labs, against federal grant and contract funds for researchers' use of Core Lab instruments violated and continues to violate federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.   Among other things, failure to collect accounts receivable can result in free use of federally funded scientific instruments for ineligible private, commercial purposes in violation of federal law.

(h)     *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the University's and the Center for Research's failure to collect accounts receivable of Core Labs against federal grant and contract funds for researchers' use of Core Lab instruments described in this specification violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(i)     *Information Disclosed to Superiors.*  Throughout the years plaintiff was Director of the MAI Lab, before, during and after 2009, plaintiff continually advised his superiors with the University and the Center for Research, namely Drs. Heppert and Warren, of his concerns about the failure to collect accounts receivable of the MAI Lab to stop the practice and, upon information and belief, other Core Labs, against federal grant and contract funds for researchers' use of Core Lab instruments

(j)      *Corrective Action Not Taken.*   Notwithstanding his reporting these concerns, corrective actions were not taken, nor on information and belief was timely corrective action taken, nor were satisfactory explanations provided.   Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

132.      **Specification**: *Ad Hoc Financial Reporting*.

(a)      Throughout the years plaintiff was Director of the MAI Lab, plaintiff, and to the best of his knowledge information and belief, other Core Lab Directors, from time to time were provided with general summaries of monthly revenues and expenditures attributable to respective Core Labs but without any attribution to any federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocation to identified Core Lab instruments acquired with federal grant or contract funds, as well as without identification as to whether federally funded instruments were used for private, commercial purposes without proper charges and payment.

(b)      *Missing Financial Reports.*   During this time period, monthly and year-to-date general summaries of revenues and expenditures were provided, but not on a regular or timely basis, including at one point, no summaries of monthly revenues and expenditures were provided for the four or five month period from August or September 2012 until January 2013.

(c)      *Admission.*   Indeed, as stated above, at a meeting of Core Lab directors in April 2012, Mark Reynolds, Research and Graduate Studies Comptroller, admitted to plaintiff and the other Core Lab directors that the University and/or the Center for Research had let them down for not providing this information on a regular and timely basis, as well as all other accounting functions, reports and information.  Mr. Reynolds repeated his admission in an email to plaintiff dated April 10, 2012.  Following this admission, monthly reporting improved for several months, but without any accounting or allocation to grant or contract specific revenues or expenses.

(d)    *Additional Admission.*  Further, as stated above, shortly thereafter Mark Reynolds and Linda Sadler of the University and/or Center for Research administration informed plaintiff in a meeting that the employee in the University and/or Center for Research administration whose principal job duties included collection of accounts receivable against federal grant and contract funds had been redirected to work instead on "special projects" of Dr. Warren.  On information and belief, this was during a time when patent expiration and renewal activity in the Commercialized Medical Research program was at a high level.

(e)    Upon information and belief, Core Labs were not provided with this information because the University and/or the Center for Research did not use accounting systems or internal controls to attribute or otherwise account for federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocate revenues and expenses to identified Core Lab instruments acquired with federal grant or contract funds, as well as whether federally funded instruments were used for private, commercial purposes without proper charges and payment.

(f)    The University's and/or the Center for Research's providing irregular and untimely general summaries of monthly revenues and expenditures attributable to Core Labs but without any attribution to any federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocation to identified Core Lab instruments acquired with federal grant or contract funds contributed to a loose *ad hoc* accounting system and environment that created opportunities for federal grant or contract funds to be applied to ineligible purposes and expenses and for equipment acquired with federal grant or contract funds to be used for ineligible purposes and projects, including use of federally funded instruments without charges as required by federal law.

(g)     *Violation of Law.*  The University's and/or the Center for Research's providing irregular and untimely general summaries of monthly revenues and expenditures attributable to Core Labs but without any attribution to any federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocation to identified Core Lab instruments acquired with federal grant or contract funds or whether federally funded scientific instruments were used for private, commercial purpose without charges or payment violated and continues to violate the federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(h)     *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the University's and/or the Center for Research's failure to provide regular and timely general summaries of monthly revenues and expenditures attributable to Core Labs but without any attribution to any federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocation to identified Core Lab instruments acquired with federal grant or contract funds described in this specification violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(i)     *Information Disclosed to Superiors.*  To stop the practice, plaintiff continually advised his superiors, before, during and after 2009, with the University and the Center for Research, namely Drs. Heppert and Warren, of his concerns about providing irregular and untimely general summaries of monthly revenues and expenditures attributable to Core Labs but without any attribution to any federal grant or contract funds as grant-or-contract-specific sources

for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocation to identified Core Lab instruments acquired with federal grant or contract funds.

(j)      *No Corrective Action.*  Notwithstanding his reporting these concerns, corrective actions were not taken, nor on information and belief was timely action taken, nor were satisfactory explanations provided.  Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

133.   **Specification**: *No Core Lab Budgeting.*

(a)      Throughout the years plaintiff was Director of the MAI Lab, neither plaintiff nor, to the best of his knowledge information and belief, other Core Lab Directors, were provided with annual or other operating or capital budgets for Code Labs nor were they asked to submit proposed annual or other operating and capital budgets for Core Labs including, for example, projected Core Lab revenues derived from federal grant or contract funds or projected expenditures of federal grant or contract funds.

(b)      Upon information and belief, Core Lab directors were not provided with this information because the University and/or the Center for Research did not use accounting systems or internal controls to attribute or otherwise account for federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses for identified Core Lab expenditures or allocate revenues and expenses to identified Core Lab instruments acquired with federal grant or contract funds.

(c)      Upon information and belief, the apparent failure to attribute or otherwise account for federal grant or contract funds as grant-or-contract-specific sources for identified Core Lab revenues or grant-or-contract-specific uses as identified Core Lab expenditures or to allocate revenues and expenses to identified instruments acquired with federal grant or contract funds contributed to a loose *ad hoc* accounting system and environment that created opportunities

for federal grant or contract funds to be applied to ineligible purposes and expenses and for equipment acquired with federal grant or contract funds to be used for ineligible purposes and projects.

(d)     *Violation of Law*.   Upon information and belief, the University's and/or the Center for Research's failure to use or provide annual or other operating and capital budgets violated and continues to violate the requirements of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(e)     *Reasonable Belief*.   Plaintiff reasonably and in good faith believed that the University's and/or the Center for Research's failure to use annual or other operating or capital budgets for our respective Core Labs provide described in this specification violated the requirements of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(f)     *Information Disclosed to Superiors*.   Throughout the years plaintiff was Director of the MAI Lab, before, during and after 2009, plaintiff continually advised his superiors with the University and the Center for Research, namely Drs. Wilson, Heppert and Warren, of his concerns about the lack of operating and capital budgeting to stop the practice.

(g)     *No Corrective Action*.   Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

134.     **Specification**: *No Policy on Commercial Use of Federally Funded Instruments.*

(a)     Throughout the years plaintiff was Director of the MAI Lab, and particularly after acquisition of a new transmission electron microscope in late 2009, plaintiff on a number of

occasions asked his superiors and personnel in the University and/or the Center for Research administration to explain and provide written (i) policies and (ii) forms addressing whether, when or how scientific instruments acquired with federal grant or contract funds could be used for purposes other than those designated in the applicable federal grant or contract.

(b)     During that time period, federally funded instruments in the MAI Lab were used for what plaintiff understood was commercial work for outside businesses, for example, Crititech, Inc., a drug testing laboratory; the Kansas Lottery, regarding "nano-inks" used to detect counterfeit lottery tickets; the University's Vaccine Stabilization Lab, which did substantial work for outside companies; and unidentified persons who Dr. Wilson, then plaintiff's immediate superior, would bring to the MAI Lab from time to time.  However, accounting procedures were so lax that it could not be determined if such private, commercial users were properly charged for and paid for the use of such scientific equipment.

(c)     Plaintiff, however, never received answers to his questions, written or oral, until early 2012 when the University hired an employee for contracting commercial work at which time a "one size fits all" short form contract limiting University and/or Center for Research liability was provided for commercial work, but not including a written policy for proper and improper use of federally funded instruments by private, commercial businesses.

(d)     Later, in Spring or Summer 2013, two "one-size-fits-all" short form contracts were provided, one a "rental" agreement price-structured for use when an outside company's employee would use MAI Lab instruments and the other a "special research project" agreement with a different pricing structure for use when MAI Lab personnel would perform all work using MAI Lab instruments for an outside company, neither including a written policy for proper and improper use for federally funded instruments.

(e)     The two "one size fits all" short form agreements and pricing were insufficient and plaintiff repeatedly so reminded his superiors.  In that regard, much work in the MAI Lab

was collaborative with an outside company's employee working with MAI Lab research staff together on a project, frequently evaluating experiment and method feasibilities and determining project scope as work progressed.  Plaintiff beginning in January or February of 2012 explained the need for a written policy and form of contract to be used for commercial/Center for Research collaborative projects, including different pricing structures and disposition of patent rights, but his requests were resisted and went unheeded.

(f)      Julie Nagel of the Center for Research business office explained the "rental" agreements were used so lower instrument rates could be charged to outside companies.  Plaintiff questioned the propriety and lawfulness of using instruments acquired with federal grant or contract funds for commercial work, particularly for lower rates, but no explanation was provided.

(g)      Plaintiff on a number of occasions, beginning as early as 2009, requested accounting information from the Center for Research on historic revenues, expenses and frequency of use for MAI Lab scientific instruments in order to determine appropriate billing rates for the use of MAI Lab scientific instruments to be charged to outside companies but the Center for Research failed to provide adequate and relevant information to do so, consistently insisting that plaintiff develop billing rates without accurate and relevant accounting information on historic  revenues, expenses and frequency of use of MAI Lab scientific instruments.

(h)      *Violation of Law.*  It is unlawful to use scientific instruments acquired with federal grant or contract funds for private, commercial research unless (i) permitted by specific terms of the federal grant or agreement applicable to the instrument or (ii) the user is charged and pays a fee for use of the instrument that is not less than what private companies charge for equivalent services, unless the federal grant or agreement provides otherwise.

(i)      *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the Center for Research's failure to provide a written policy and forms of contract to be used for

commercial/Center for Research collaborative projects, including a different pricing structures and disposition of patent rights described in this specification violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(j)    *Information Disclosed to Superiors.*   As stated above, plaintiff repeatedly informed his superiors and persons in the University and/or Center for Research administration beginning as early as 2009 that the "one size fits all" forms agreement and pricing were insufficient.  Plaintiff's requests were resisted and went unheeded.

(k)    *No Corrective Action.*   Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

*. . . MAI Lab Renovation Mismanagement . . .*

135.    MAI Lab Renovation Project Waste and Mismanagement

(a)    As the MAI Lab's work and capabilities increased following plaintiff's appointment as its director, plaintiff in good faith expressed concerns to his superiors, including Drs. Heppert and Warren, about the amount and condition of physical space for the MAI Lab.

(b)    The need for improvements to the MAI Lab's physical space was acknowledged, resulting in plans for the expansion and renovation of the MAI Lab space.

(c)    Renovation of the MAI Lab's physical space became particularly necessary in 2012 when the National Science Foundation Major Research Instrumentation Award for the purchase of the $2.3 million Dual Beam Electron Microscope was approved, as explained above, para. 109.  Limited funds ($20,000) from such grant were eligible and used for space preparation for the Dual Beam Electron Microscope.

(d)     The renovations to the MAI Lab's space were planned, designed, estimated, bid and supervised by the University's Design and Construction Management office ("DCM Office"), including space preparation for installation of the Dual Beam Electron Microscope.

(e)     The MAI Lab renovations as planned, designed, estimated, bid and supervised by the DCM Office, including space preparation for installation of the $2.3 million Dual Beam Electron Microscope, encountered numerous problems resulting in needless waste in the use of federal and other funds and mismanagement, in plaintiff's good faith belief, including the following:

(i)     **Specification:**  Renovations were not completed in a timely manner or anywhere near budget.  For example:

(1)     Plaintiff in September 2012 alerted Dr. Heppert and the University's DCM Office that the Dual Beam Electron Microscope would be delivered most likely in June 2013.  This was done in order to allow sufficient time (ten months) to plan, design, bid and construct the MAI Lab Renovations over the 2012-2013 winter semester break ("Winter Break"), as opposed to constructing the renovations during an academic semester, so the renovations would be completed before delivery and installation of the Dual Beam Electron Microscope ten months later in June 2013.

(2)     However, the DCM Office did not provide its cost estimate, namely $190,000, until November 2012, only weeks before the renovation work was to be performed during the Winter Break.  Funding for $190,000 was identified, but in late November or early December the DCM Office increased the estimate by $25,000 to $215,000.

(3)     Plaintiff immediately advised Dr. Heppert of the need for the additional $25,000 who stated he would identify funds, but he did not pursue

additional funding until much later, not securing the additional $25,000 until February 2013, well after the Winter Break when the renovation was to have been completed.

(4)     At that time, for reasons unknown to plaintiff, the DCM Office in February 2013 stated the cost would be around $260,000, $70,000 higher than the original DCM Office $190,000 estimate and further stated it could not begin work without $290,000, apparently adding a 10% fee for itself.

(5)     Even then, the DCM Office did not did not put the renovation project out for bid until April 2013, only two months before the Dual Beam Electron Microscope delivery date, at which time only two contractors could be found to bid the job due to the short lead time, resulting in bids in the range of $360,000 to $370,000, nearly twice the original $190,000 DCM Office estimate.

(6)     Plaintiff insisted that the renovation be completed for the amount of $215,000 available funds and, accordingly, all but space preparation for the Dual Beam Electron Microscope was deferred until the following year's winter semester break (December 2013 - January 2014).

(7)     The DCM Office estimate for limiting the immediate work to space preparation for the Dual Beam Electron Microscope was $50,000.

(8)     The Dual Beam Electron Microscope components were delivered in June 2013, but space preparation for the Dual Beam Electron Microscope did not begin until July 2013 and was not completed until August 2013 when, among other things, the MAI Lab was fully booked with doctoral candidates trying to finish dissertation work, private companies wanting to contract with the Center for Research for work in the MAI Lab and the Fall 2013 academic semester beginning.  Problems with the MAI Lab Renovation Project

were so severe and the lab in such physical disarray that the MAI Lab's assistant director gave notice that she would seek other employment unless Dr. Heppert made a commitment that the rest of the MAI Lab Renovation work would be completed by December 2013.

(9)    While the DCM Office had estimated that space preparation for the Dual Beam Electron Microscope would cost $50,000, it ended up costing approximately $65,000. Further, the DCM Office ultimately projected the full MAI Lab Renovation Project costs to be over $400,000, including fees for itself, more than twice its original $190,000 estimate.

(10)    While $20,000 of the $2.3 million grant for the Dual Beam Electron Microscope was authorized for space preparation, for unknown reasons, the $20,000 had been diverted to the Center for Research's Center for Environmentally Beneficial Catalysis laboratory. The Center for Environmentally Beneficial Catalysis could not account for the $20,000 in federal funds when reimbursement to the Dual Beam Electron Microscope project was sought.

(ii)    **Specification**: Renovations were not properly designed. For example:

(1)    The DCM Office, although informed, did not include a three-phase electrical power source circuit breaker required for the Dual Beam Microscope in the renovation.

(2)    The DCM Office, although informed, did not include a safety exhaust for the instrument's gas ion system.

(3)    The DCM Office, although informed to do otherwise, located a heating and cooling vent directly over the Dual Beam Microscope, creating temperature fluctuations and air movement in a highly sensitive environment for

an instrument used to view and manipulate samples at nano-scale molecular and atomic levels.

(4)    The DCM Office, although informed, used a stationary heating and cooling vent grill directly over the Dual Beam Microscope that could not be properly adjusted to divert forced air away from the Dual Beam Microscope and otherwise and avoid movement in the highly sensitive environment for an instrument used to view and manipulate samples at nano-scale molecular and atomic levels.

(5)    The DCM Office, although informed, did not plan for temperature controls for maintaining lab temperatures in ranges and minimal temperature fluctuations necessary for proper operation for an instrument as sensitive as the Dual Beam Electron Microscope.

(6)    Although informed, new incandescent ceiling lighting was omitted that was needed to replace existing fluorescent lighting that emitted 60 cycle noise interfering with operation of electron microscopic instruments (but nonetheless was included in the renovation budget upon which other charges were based).

(Altogether, "MAI Lab Renovation Mismanagement").

(f)    In addition, as stated above, para. 120, plaintiff was able to save approximately $178,000 on the actual purchase of the Dual Beam Electron Microscope, which Dr. Heppert repeatedly wanted to use for the significant cost overruns on the MAI Lab Renovation Project unrelated to space preparation for the Dual Beam Electron Microscope.  Plaintiff objected to the use of these funds for such cost overruns as not authorized under the grant each time Dr. Heppert brought the matter up in order to stop the unlawful expenditure of federal funds.  Plaintiff's objections, while not welcome, ultimately were accepted.

(g)     *Violation of Law.*  The handling of federal funds for space preparation for the Dual Beam Electron Microscope by the University's DCM Office and the Center for Research was marked with gross waste and gross mismanagement, including:

(i)     Losing the entire $20,000 federal funds allocated for space preparation for the Dual Beam Electron Microscope to another Center for Research laboratory;

(ii)     Final space preparation costs for the Dual Beam Electron Microscope exceeding the budget by 30% ($65,000 final costs vs. $50,000 budget); and

(iii)     Repeated attempts to use the $178,000 purchase price savings for ineligible renovation cost overruns;

such that the project as planned, estimated, bid and supervised by the DCM Office as well as the Center for Research was so grossly wasteful and mismanaged that it violated the requirements of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(h)     *Reasonable Belief.*  Plaintiff reasonably and in good faith believed that the MAI Lab renovations as planned, estimated, bid and supervised by the DCM Office and the Center for Research was so grossly wasteful and mismanaged that it violated the requirements of federal law, federal grant conditions and federal contract conditions, particularly federal requirements governing the eligibility and calculation of costs in support of sponsored research, development, training and other works produced under grants or in agreement with the federal government.

(i)     *Information Disclosed to Superiors.*  Plaintiff in good faith reported his concerns about such MAI Lab Renovation Mismanagement to the University and the Center for Research including, particularly, Dr. Heppert, throughout the 2012 and 2013 design and construction process, as well as thereafter, in order to stop the mismanagement and waste of federal funds.

(j)      *No Corrective Action.*  Plaintiff's concerns were never adequately acknowledged by his supervisors and plaintiff so reminded his superiors.

*. . . Plagiarism . . .*

136.    As the MAI Lab's work and capabilities increased following plaintiff's appointment as its Director, plaintiff in good faith became concerned about toleration of research misconduct, specifically, plagiarism, in the University and the Center for Research by faculty and researchers using MAI Lab instruments and staff time including, but not limited to, plagiarism and faculty not providing authorship credit to the MAI Lab and its personnel for research projects successfully submitted for peer-reviewed publications ("Plagiarism").

137.    Three incidents in particular concerned plaintiff and were the basis for his continually expressing concerns about toleration of plagiarism in the University and the Center for Research during both Dr. Wilson's tenure as his immediate superior and that of Dr. Heppert through and including termination of his employment in October 2013.

138.    **Specification**: *Scott Weir, Ph.D., Director, Institute for Advancing Medical Innovations.*

(a)      In February 2010, Dr. Wilson, then plaintiff's immediate superior, asked plaintiff to work with Dr. Weir and Sitta Sittampalam, Ph.D., Director and Deputy Director, respectively, of the Institute for Advancing Medical Innovations and lead organization for the Commercialized Medical Research initiatives, in preparing a federal grant proposal to the Health Resources and Services Administration, Department of Health and Human Services, for the acquisition of a $730,000 high content imager (an automated light microscope) to be shared by the High Throughput Screening Lab and the MAI Lab.

(b)      Plaintiff informed Dr. Wilson that existing commitments in the MAI Lab, specifically, his already writing a grant application to the National Institutes of Health for a high-speed fluorescence spinning disk confocal microscope, would make it difficult if not impossible

to write the grant application by its due date, but he would rearrange his schedule to do so if credited as a co-author on the grant application, to which Dr. Wilson agreed.

(c)      Plaintiff prepared the grant proposal in its entirety.  Dr. Weir contributed no assistance or information for the proposal.  Dr. Sittampalam made minor revisions to the summary abstract for the grant proposal.  On information and belief, neither Dr. Weir nor Dr. Sittampalam had ever written a federal grant proposal, both having come to the Institute for Advancing Medical Innovations from private industry, not academic or research institutions.

(d)      While the NIH accepted the proposal and in March 2011 funded $407,000 for acquisition of the high content imager, plaintiff later learned that Dr. Weir submitted the proposal under his name as the sole author and provided credit to no other persons, contrary to plaintiff's agreement.

(e)      In addition, plaintiff negotiated the price of the High Content Imager down to $375,000, but the $32,000 saved was not used to support the instrument as required under the grant.  Plaintiff understands the $32,000 went to Dr. Weir's Institute for Advancing Medical Innovations for other, unrelated uses.

(f)      Plaintiff ultimately learned that other University, Center for Research or KU Medical Center researchers had written grant proposals to which Dr. Weir had added his name as an author even though he had not contributed to such proposals, amounting to an institutionalized "ghost writing" process in the Institute for Advancing Medical Innovations.

(g)      Persons writing grant proposals to which Dr. Weir added his name as an author without having contributed to such papers include Roger Rajewski, Ph.D., Research Faculty Member in Pharmaceutical Chemistry, and George Vielhauer, Ph.D., Research Assistant Professor with the KU Medical Center.

139.    **Specification**: *Sitta Sittampalam, Ph.D.*

(a)      In 2010 - 2011, when the University's and KU Medical Center's National Cancer Institute designation application was pending, two papers authored by three University or Center for Research researchers, namely, Dr. Sittampalam, Deputy Director of the Institute for Advancing Medical Innovations; Mahesh Visvanathan, Ph.D.; and Gerry Lushington, Ph.D., were the subject of an investigation by Dr. Warren as the University's Research Integrity Officer (and plaintiff's superior above Dr. Heppert) and the Department of Health and Human Services' Office of Research Integrity, resulting in a finding of plagiarism and censure imposed on Dr. Lushington.   Dr. Sittampalam, Deputy Director of the Institute for Advancing Medical Innovations and a principal investigator in the University's National Cancer Institute application, (listed in the National Cancer Institute application for, *inter alia,* "Major Recent Scientific Achievements" and for "developing novel cancer therapeutic strategies" for stem cell based therapies and a former student of Dr. Wilson at a different university), received no sanctions, nor did Dr. Visvanathan.

(b)      Plaintiff in good faith questioned the propriety of no sanctions for Dr. Sittampalam, at the same time the University's and KU Medical Center's application for National Cancer Institute designation prominently listing Dr. Sittampalam was pending, as a measure to avoid embarrassing the University or otherwise affecting the National Cancer Institute designation application.   In addition, Dr. Weir's son Joshua Weir was working as a research assistant in Dr. Sittampalam's laboratory at the time of the plagiarism incident.

(c)      Plaintiff orally expressed his concerns about Dr. Sittampalam to both Dr. Wilson and Dr. Warren during Dr. Wilson's tenure as his immediate superior and thereafter to Dr. Heppert from 2010 through and including termination of his employment in October 2013, as an example of tolerance for plagiarism and the apparent favoritism to Dr. Sittampalam based on his affiliation with Dr. Weir, the Institute for Advancing Medical Innovations and the University's pending application for National Cancer Institute designation.

140.   **Specification**:  *Steven Warren, Professor of Applied Behavioral Science*

(a)   Plaintiff ultimately learned that other University researchers had written grant proposals to which Dr. Warren, when he was the Vice Chancellor for Research and Graduate Studies and, in addition, was the University's Research Integrity Officer, had added his name as an author even though he had not contributed to such proposals, adding to the institutionalized "ghost writing" process.

(b)   Specifically, the University in 2011 needed an informatics facility in place to support its application for the National Cancer Institute designation.  The grant application for the informatics facility was written by Rick McMullen, Ph.D., Director of the Research Information Technologies Core Lab, and Gerry Lushington, Ph.D., Director of the Bioinformatics Core Lab.  However, Dr. Warren submitted the grant application for the informatics facility with himself as the sole author, not including Drs. Mullen or Lushington.  Dr. McMullen is no longer with the University.  On information on belief, Dr. Lushington remains affiliated with the University in some capacity, perhaps as an independent contractor.

141.   **Specification**:  *Kristi Neufeld, Ph.D., Assistant Professor, Department of Molecular Biosciences*

(a)   In 2009, Kristi Neufeld, Ph.D., shortly before a tenure review she had requested, asked for plaintiff's assistance revising two papers she had submitted for publication in peer review journals that had been rejected.  Dr. Neufeld asked for plaintiff's and the MAI Lab's assistance, to which he agreed, providing reagents, cell fixation, imaging and analysis on the MAI Lab's confocal microscope.

(b)   The project required a higher magnification lens than those on hand for the MAI Lab's confocal microscope.  Accordingly, plaintiff secured a lens with the needed magnification.  This lens, however, was not color corrected, thereby requiring offset calculations for the final datasets.

(c)      Before finishing the datasets with the offset calculations, however, plaintiff had to travel on University business.  He provided interim images and datasets to Dr. Neufeld, advising her more work needed to be done.  When he returned, he calculated the offsets and provided the final images and datasets to Dr. Neufeld.

(d)      Unknown to plaintiff, however, Dr. Neufeld completed and submitted her articles for publication using the interim images and datasets, not the final images and datasets.  Plaintiff did not learn of this until the articles were published.  Dr. Neufeld's interpretations were not supported by the final images and datasets.

(e)      Dr. Neufeld's articles were used to support and were listed in the University's National Cancer Institute designation application.  Dr. Neufeld was one of the three principal investigators on the National Cancer Institute application, along with Dr. Weir and Roy Jensen, M.D., and otherwise was listed prominently in the National Cancer Institute application, including "Major Recent Scientific Achievements."

(f)      Plaintiff was not listed as a co-author or otherwise acknowledged, nor did Dr. Neufeld pay for the MAI Lab's instrument use or staff time.

(g)      Plaintiff expressed his concerns about the questionable interpretations based on interim datasets, non-payment and not being acknowledged to Dr. Wilson, his immediate superior at the time, and Robert Cohen, Ph.D., chair of Molecular Biosciences, but to the best of plaintiff's knowledge, information and belief, no action was taken.

142.     The rules and regulations of the Office of Research Integrity, United States Department of Health and Human Services, specifically prohibit research misconduct, including plagiarism, namely, "the appropriation of another person's ideas, processes, results, or words without giving appropriate credit."  42 C.F.R. Sec. 93.103(c).

143.     The rules and regulations of the Health and Human Services Office of Research Integrity also require institutions such as the University and the Center for Research to conduct inquiries and

investigations in a "thorough, competent, objective and fair manner, including precautions to ensure that individuals responsible for carrying out any part of the research misconduct proceeding do not have unresolved personal, professional or financial conflicts of interest with the plaintiff, respondent or witnesses." 42 C.F.R. Sec. 93.300(b).

144.     The rules and regulations of the Health and Human Services Office of Research Integrity also require institutions such as the University and the Center for Research to foster a research environment that promotes the responsible conduct of research, research training, and activities related to that research or research training, discourages research misconduct, and deals promptly with allegations or evidence of possible research misconduct. 42 C.F.R. Sec. 93.300(c).

145.     The rules and regulations of the Health and Human Services Office of Research Integrity also require institutions such as the University and the Center for Research to take all reasonable and practical steps to protect the positions and reputations of good faith complaining parties, witnesses and committee members and protect them from retaliation by respondents and other institutional members. 42 C.F.R. Sec. 93.300(d).

146.     The rules and regulations of the Health and Human Services Office of Research Integrity also require institutions such as the University and the Center for Research to have an active assurance of compliance. 42 C.F.R. Sec. 93.300(i).

147.     The University's adopted policies prohibit plagiarism.  Article IX of the University Senate Rules and Regulations prohibits "scholarly misconduct" including, specifically plagiarism, defined as "the appropriation of another person's ideas, processes, results, or words without giving appropriate credit" and, further, requires that federal law, including the regulations of the National Science Foundation, 45 C.F.R. Part 689, and the regulations of the Department of Health and Human Services, 42 C.F.R.  Parts 50 and 93, apply to "both inquiry and investigative processes when allegations involved activities under sponsored activities sponsored by these agencies."

148.     Further, Sec. 9.1.7 provides, "No person employed by or who has a formal affiliation with the University may retaliate against a person who files a complaint alleging scholarly misconduct. However, a person who knowingly or recklessly files a false or frivolous complaint under these provisions may be subject to appropriate sanctions imposed pursuant to applicable grievance procedures."

149.     The preceding University policy on scholarly misconduct, including plagiarism, sets forth extensive inquiry, investigation and appeal procedures for allegations of plagiarism, including a sixty-day inquiry process with a written determination whether there is a reasonable basis for believing there is merit to the complaint warranting a further investigation and a 120-day investigation process with a hearing on the record with presentation and cross-examination of witnesses and a final written report including a recommended action by the Vice Chancellor.

150.     *Information Disclosed to Superiors.*  In order to stop further incidents of plagiarism, plaintiff expressed his concerns to Dr. Wilson in both his five-year employment review and thereafter that Dr. Weir's submitting the grant proposal as the sole author constituted plagiarism under the research misconduct and scholarly misconduct regulations of the Health and Human Services Office of Research Integrity and the University Senate Rules and Regulations, Art. IX.  His assertions that plaintiff was the sole author of the grant proposal and that Dr. Weir submitted the grant proposal as the sole author was undisputed.  Notwithstanding his expressions of concern to stop plagiarism and the undisputed nature of the allegations, no formal investigation or corrective action was taken.  Plaintiff continued to express his concerns to stop the toleration of plagiarism based on the incidents with Drs. Weir, Sittampalam and Neufeld to Dr. Heppert after he became his immediate superior in early 2010 through termination of his employment in October 2013.

151.     *Information Disclosed to Superiors, Additional.*  On July 9, 2013, at Dr. Heppert's request plaintiff submitted his concerns about the Weir and Sittampalam/Visanathan/Lushington plagiarism and favoritism in writing.  Dr. Heppert informed plaintiff by email on July 30, 2013, that the

matter had been submitted to the University's appropriate personnel for an inquiry under the University's Plagiarism policy.

152.    *Violation of Law.*  The University by failing to respond to his good faith concerns about incidents of plagiarism and to conduct investigations in a thorough and competent manner, and otherwise tolerating an environment tolerating research misconduct, violated federal law, federal grant conditions and federal contract conditions, particularly federal requirements prohibiting research misconduct, including plagiarism, in federally sponsored research, development, training and other works produced under grants or in agreement with the federal government, as well as the University Senate Rules and Regulations on Scholarly Misconduct.

153.    *Good Faith Belief.*  Plaintiff reasonably and in good faith believed that the University and the Center for Research by failing to respond to his concerns to about the above incidents of plagiarism and to conduct investigations in a thorough and competent manner, and otherwise to stop toleration of plagiarism, violated federal law, federal grant conditions and federal contract conditions, particularly the research misconduct requirements of the Health and Human Services Office of Research Integrity as well as the University's own Senate Rules and Regulations on Scholarly Misconduct.

154.    *Insufficient Action Taken.*  Plaintiff's concerns about such Plagiarism were not, in plaintiff's good faith belief, timely or satisfactorily rectified and plaintiff so informed his University superiors on numerous occasions.

. . . *Research Bias* . . .

155.    Incidents of Research Bias as to which researchers acted with resentment and enmity toward plaintiff include the following:

156.    **Specification**:  Sitta Sittampalam.

(a)    In 2008 or 2009, Dr. Sittampalam, Deputy Director of the Institute for Advancing Medical Innovations, came to Dr. Moore and the MAI Lab to discuss conducting a stem cell research project in connection with proposed cancer treatments.   The basic premises and

methodology for the project were inconsistent with scientific research already done and established in the nation.  Accordingly, as done with other MAI Lab clients in similar situations, plaintiff suggested alternative approaches and methodologies to Dr. Sittampalam that might better address the current state of established knowledge regarding the topic and contribute to the established body of knowledge.

(b)     Dr. Sittampalam, however, resisted plaintiff's suggestions and insisted upon pursuing methodologies consistent with his theory and more likely to produce desired results. Plaintiff performed the research as directed by Dr. Sittampalam.  When the research results were not consistent with Dr. Sittampalam's theory and desired results, Dr. Sittampalam was displeased with plaintiff and, in addition, never paid for the work performed.

(c)     *Information Disclosed to Superiors.*  Plaintiff on numerous occasions informed his superior, Dr. Wilson at that time, of Dr. Sittampalam's research bias as an inappropriate use of MAI Lab instrumentation and staff time, as well as Dr. Sittampalam's not paying for the research he insisted upon as a misuse of federally funded scientific instrumentation.

(d)     *No Corrective Action.*  Notwithstanding his reporting these concerns, corrective actions were not taken nor were satisfactory explanations provided.  Plaintiff's concerns were never acknowledged by his supervisors and plaintiff so reminded his superiors on numerous occasions.

157.   **Specification**:  Kristi Neufeld

(a)     Plaintiff incorporates herein by reference para. 141 above.

158.   **Specification**:  Corey Berkland

(i)     During June or July, 2013, Corey Berkland, Ph.D., Professor, Chemical and Petroleum Engineering and Pharmaceutical Chemistry, came to the MAI Lab with a bottle of eye drops and had a lab assistant use the lab's transmission electron microscope to view and save microscopic images characterizing the eye drop fluid.

(ii)     Plaintiff recognized the eye drops as Allergan Restasis®, which complainant later learned was a Captisol® formulation from the Commercialized Medical Research Program.

(iii)     When the work was complete, complainant reviewed the work and learned from the lab assistant that Dr. Berkland directed that only images at levels of magnification, sensitivity and fields of view that did not show crystals in the eye drops be provided to him and that images showing crystals should not leave the MAI Lab.

(iv)     Plaintiff reviewed the images and discovered that crystals were clearly evident, meaning the therapeutic drug in the sample had gone out of solution.  The observed crystals could cause eye damage.

(v)     Dr. Berkland was able to use the transmission electron microscope without identifying its purpose or account, *i.e.,* academic v. commercial use or project designation, because the KU Center for Research did not provide accounting or other controls for requiring such information, notwithstanding complainant's repeated requests for such internal controls.

(vi)     Notwithstanding Dr. Berkland's request, plaintiff provided to Dr. Berkland a compressed "zip" file with all images prepared as part of the assignment, including those showing crystals.

(vii)     *Disclosure to Superiors.*  Plaintiff questioned both the scientific propriety of being selective about scientific research results and the apparent use of the instruments for commercial or other purposes without charge, accounting controls or prior notice of purpose.  Plaintiff communicated his concerns to Dr. Heppert.

(viii)     *Insufficient Action Taken.*  Dr. Heppert informed plaintiff to inform a staff person with the Center for Research, Jennifer Haaga, who advised complainant that a contract should have been in place covering the work, even though the Center for

Research had no controls in place for screening researchers' work as academic, grant funded or private commercial work before using Core Lab instruments. Otherwise, to the best of complainant's knowledge, information and belief, no corrective or other action was taken.

*. . . Instrument Funding Diversion . . .*

159.    When originally hired as Assistant Scientist and Director of the MAI Lab, plaintiff's salary and compensation was funded 100% by the University.

160.    In 2008, the funding source for plaintiff's salary and other compensation, including on information and belief, that of other Core Lab directors, was changed from 100% University funding sources to 80% University funding sources and 20% Center for Research funding sources. This was done in order to permit Center for Research revenues derived from Sponsored Research to be returned to the respective Core Labs generating the revenues to fund equipment reserves for each Core Lab.

161.    In early February 2013, when identifying funds needed for new equipment in the MAI Lab, specifically, a plasma cleaner for eliminating carbon deposits from samples examined and manipulated in the Dual Beam Electron Microscope to significantly shorten the time needed for various uses of the Dual Beam Electron Microscope, plaintiff learned that no Center for Research revenues from Sponsored Research were being returned to the MAI Lab, as well as, upon information and belief, other Core Labs, leaving the MAI Lab without an equipment reserve for needed instruments and equipment, in this case, the needed plasma cleaner.

162.    Instead, plaintiff learned that that while that may have been the original purpose of the 80%/20% split, its purpose was permanently changed in 2010 as part of budget cuts and any Sponsored Research revenues to have been returned to the Core Labs for equipment reserves were instead being kept by the Center for Research for its own purposes. However, plaintiff was never informed of this nor, on information and belief, were other Core Lab directors.

163.     Plaintiff expressed his concerns about the unannounced change to Dr. Heppert; Mark Reynolds, Center for Research Controller; and Katrina Yoakum, University Comptroller; about earned income not being returned to the MAI Lab, as well as other Core Labs.  On information and belief, other Core Lab directors expressed the same concern.

164.     While plaintiff's expressions of concern about the unannounced change were reasonable, his inquires were not welcome and plaintiff was treated accordingly by his superiors.

&#x2767;

165.     Plaintiff's expressions of concern about the aforesaid Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion were treated as highly unwelcome and plaintiff was treated as a pariah among his superiors and those persons who were the subjects of plaintiff's expressions of concern about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion for continually raising what plaintiff in good faith saw as serious violations of law. Indeed, during the April 23, 2013 meeting scheduled to discuss plaintiff's concerns, as stated above in para. 80, Dr. Warren stated that plaintiff was of "so little importance to [his] job" that he refused to "read all those little emails" plaintiff sent setting forth his concerns, even though one of Dr. Warren's principal duties as the top executive in the University and the Center for Research included monitoring and certifying the lawful use of millions in federal grants and contracts for scientific research in compliance with federal laws, rules, regulations, grant requirements and federal contract requirements.

### Count One
### Americans with Disabilities Act, 42 U.S.C. Secs. 12,101, *et seq.*

For Count One of his *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights*, said count asserted against defendants University of Kansas Center for Research, Bernadette Gray-Little, Jeffrey Vitter, Steven Warren and Joseph Heppert for violations of the rights of plaintiff under Title One of the federal Americans with Disabilities Act, 42 U.S.C. Secs. 12,101, *et seq.*, plaintiff states as follows:

166.     Plaintiff incorporates by reference the contents of paragraphs 1 through 155 of this complaint as though set forth fully herein.

167.     This count is asserted against defendant Center for Research for money damages including, but not limited to, back pay for violations of the rights of plaintiff under the federal Americans with Disabilities Act, 42 U.S.C. Secs. 12,101, *et seq.* This count is asserted subject to the pending *Motion for Summary Judgment of Defendant University of Kansas Center for Research, Inc.* (ECF No. 156).

168.     This count is asserted against defendants Bernadette Gray-Little, Jeffrey Vitter, Steven Warren and Joseph Heppert in their official capacities for prospective injunctive relief for continuing violations of the rights of plaintiff under the federal Americans with Disabilities Act, 42 U.S.C. Secs. 12,101, *et seq.*,

169.     As stated above, plaintiff is a "qualified individual" as defined in the Americans with Disabilities Act, 42 U.S.C. Secs. 12,101, *et seq.* ("ADA") in that he is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position of Assistant Scientist and Director of the MAI Lab.

170.     As stated above, defendant Center for Research is a contractor, subcontractor or grantee of federal contracts and grants in that is has been the recipient, custodian or administrator of numerous federal grants from the Public Health Service, the National Institutes of Health and the National Science Foundation, and has been and/or continues to be a contracting party with the Public Health Service, the National Institutes of Health and the National Science Foundation for approximately $150 million annually used to conduct scientific research, including the purchase of scientific instruments and compensation of scientific personnel to operate such instruments in Core Labs in the University and the Center for Research.

171.     Defendants Bernadette Gray-Little, Jeffrey Vitter, Steven Warren and Joseph Heppert at all times relevant to the claims set forth in this complaint were managerial officials of the University and

the Center for Research with supervisory authority over plaintiff and who in fact supervised the work of plaintiff as Assistant Scientist and Director of the MAI Lab.

172.   Plaintiff was diagnosed with Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder ("ADD/ADHD") while an employee of the University and the Center for Research, as a "borrowed servant," and continued to suffer ADD/ADHD through and including the dates of his four-week suspension without pay, hostile work environment and termination of employment by and through the acts of defendants Jeffrey Vitter, Steven Warren and Joseph Heppert as managerial officials of the University and the Center for Research.

173.   Plaintiff's ADD/ADHD constituted a "disability" as defined in the ADA in that his ADD/ADHD was a mental impairment that substantially limited one or more major life activities of plaintiff including but not limited to learning, concentrating, thinking, communicating and working and major bodily functions including but not limited to neurological and brain functions.

174.   More particularly, plaintiff's ADD/ADHD affected his ability to concentrate, avoid distractions, get organized, meet deadlines, set priorities, manage time, focus on tasks, speak impulsively without first fully processing thoughts, observe social norms, obsess and persist in correcting perceived wrongs, and deal with anxiety and restlessness, notwithstanding mitigation with prescription medication, counseling and learned behavioral modifications.

175.   Plaintiff informed University and Center for Research personnel, as aforesaid, of his ADD/ADHD condition and, on information and belief, was so regarded and perceived in the workplace.

176.   Plaintiff requested and suggested reasonable accommodations, as aforesaid, of his ADD/ADHD condition.

177.   Notwithstanding plaintiff's requesting and suggesting reasonable accommodations for his ADD/ADHD condition, defendants Jeffrey Vitter, Steven Warren and Joseph Heppert as managerial officials of the University refused to extend or even discuss extending any accommodations to plaintiff; failed to engage in an interactive process with plaintiff to develop reasonable accommodations for

plaintiff's disability; suspended plaintiff's employment without pay for a period of four weeks; intensified demands upon plaintiff in a manner known to plaintiff's superiors with the University and the Center for Research to intensify and exacerbate the conditions of plaintiff's ADD/ADHD disability, thereby creating a hostile work environment as aforesaid; and shortly thereafter terminated plaintiff's employment.

178.    The reasons given by defendants Jeffrey Vitter, Steven Warren and Joseph Heppert as managerial officials of the University and the Center for Research for terminating plaintiff's employment were a consideration of the MAI Lab's future and plaintiff's continued employment as not in the best interests of the MAI Lab and the University's Research and Graduate Studies program.

179.    Such reasons were pretextual.  The real reasons for the termination were:

(a)    Retaliation for plaintiff's persistently expressing good faith concerns, protected under federal law, state law and University policy, about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, including the uncontrolled use of federally funded laboratory instruments without proper charges for private, commercial purposes such as the Commercialized Medical Research program; and

(b)    Retaliation and discrimination against plaintiff because of his disability, including not observing or complying with plaintiff's exercising his rights as a disabled person protected under federal law, state law and University policy to seek accommodation and not be subjected to a hostile work environment.

180.    Defendants Jeffrey Vitter, Steven Warren and Joseph Heppert as managerial officials of the University and the Center for Research suspended plaintiff's employment as aforesaid; intensified demands upon plaintiff in a manner known to plaintiff's superiors with the University to intensify and exacerbate the conditions of plaintiff's ADD/ADHD disability, thereby creating a hostile environment; and terminated plaintiff's employment on October 14, 2013 (effective October 18, 2013), because of his

disability and in retaliation for his seeking to exercise his rights as a disabled person under the Americans with Disabilities Act.

181.     On or about December 5, 2013, plaintiff filed a charge of employment discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. Sec. 12,10*1, et seq*., and the federal Rehabilitation Act, 29 U.S.C. *Sec. 701, et seq.*, with the offices of the Equal Employment Opportunity Commission located in Kansas City, Kansas, dually filed with the offices of the Kansas Human Rights Commission in Topeka, Kansas, alleging that the University, by and through defendants Jeffrey Vitter, Steven Warren and Joseph Heppert as managerial officials of the University, discriminated against him under such Acts because of his disability, namely, Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder in terms and conditions of employment, specifically, suspension without pay on September 19, 2013; a hostile work environment thereafter; and termination of employment on October 14, 2013 (effective October 18, 2013) without accommodating his disability and otherwise in retaliation for his exercising his rights under the Americans with Disabilities Act, 42 U.S.C. Sec. 12101, et seq.; the federal Rehabilitation Act, 29 U.S.C. *Sec. 701, et seq.*; and the Kansas Act Against Discrimination, K.S.A. Sec. 44-1001, *et seq.*

182.     On or about June 11, 2014, with no action having been taken by the Equal Employment Opportunity Commission or the Kansas Human Rights Commission under plaintiff's dual filing, plaintiff requested a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.

183.     On or about June 19, 2014, plaintiff received from the Equal Employment Opportunity Commission a Notice of Right to Sue letter.

184.     Defendants Jeffrey Vitter, Steven Warren and Joseph Heppert as managerial officials of the University and the Center for Research have violated the rights of plaintiff under the Americans with Disabilities Act by refusing to extend or even discuss extending any accommodations to plaintiff for his disability; failing to engage in an interactive process with plaintiff to develop reasonable accommodations for plaintiff's disability; suspending plaintiff's employment without pay for a period of four weeks;

intensifying demands upon plaintiff in a manner known to plaintiff's superiors with the University to exacerbate the conditions of plaintiff's ADD/ADHD disability, thereby creating a hostile environment; and shortly thereafter terminating plaintiff's employment on October 14, 2013, and in so doing avoided and deprived plaintiff of his right to appeal his suspension to the University's Faculty Rights Board, a forum in which he would have the opportunity to have his claims of discrimination, retaliation, mismanagement, waste, noncompliance and academic misconduct publicly aired or otherwise memorialized in a public forum.

185.    The acts of Jeffrey Vitter, Steven Warren and Joseph Heppert are continuing violations of the rights of plaintiff under the ADA because plaintiff is currently, on an ongoing basis, being deprived of his rightful employment as Assistant Scientist and Director of the MAI Lab on account of the aforesaid rights of plaintiff under federal law, particularly, the Americans with Disabilities Act, 42 U.S.C. Sec. 12101, *et seq.*

WHEREFORE, plaintiff requests that judgment be entered in his favor as follows:

(a)    Against defendant University of Kansas Center for Research, Inc., subject to the pending *Motion for Summary Judgment of Defendant University of Kansas Center for Research, Inc.* (ECF No. 156), (i) money damages in an amount equivalent to back pay and employment benefits from and including October 18, 2013; (ii) prejudgment and post-judgment interest thereon at the maximum lawful rates; (iii) compensatory damages for emotional distress and related nonpecuniary injury; (iv) his costs herein incurred and expended, including reasonable attorneys' fees, (v) equitable relief as may be appropriate to eliminate any patterns and practices of discrimination against faculty and academic staff working as "borrowed servants" of the Center for Research for discrimination in employment based on disabilities as provided under Title I of the Americans with Disabilities Act, Sec. 42 U.S.C. Secs. 12,101, *et seq.* and (vi) such other just, appropriate and additional relief as is just and appropriate in the premises.

(b)      Against defendants Bernadette Gray-Little, Jeffrey Vitter, Steven Warren and Joseph Heppert in their official capacities as managerial officials of the University for (i) reinstatement to his position as Assistant Scientist and Director of the Microscopy and Analytical Imaging Laboratory (defendants Bernadette Gray-Little and Jeffrey Vitter only); (ii) his costs herein incurred and expended including reasonable attorneys' fees; (iii) equitable relief as may be appropriate to eliminate any patterns and practices of discrimination against faculty and staff of the University and the University of Kansas Center for Research for discrimination in employment based on disabilities as provided under Title I of the Americans with Disabilities Act, Sec. 42 U.S.C. Secs. 12,101, *et seq.;* and (iv) such other just, appropriate and additional non-monetary relief as is just and appropriate in the premises.

**Count Two**
**Rehabilitation, Comprehensive Services**
**and Developmental Disabilities Act, 29 U.S.C. Sec. 701***, et seq.*

For Count Two of his *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights*, said count asserted under the federal Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701*, et seq.*, as amended, against defendants University of Kansas and the University of Kansas Center for Research, Inc., plaintiff states as follows:

186.     Plaintiff incorporates by reference the contents of paragraphs 1 through 175 of this complaint as though set forth fully herein.

187.     Plaintiff is a "qualified individual with a disability" as defined in the Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701*, et seq.*, as amended ("Rehabilitation Act") in that he is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position of Assistant Scientist and Director of the MAI Lab.

188.    The University during plaintiff's employment by the University received, and continues to receive, federal financial assistance for numerous programs and activities conducted by the University, including the programs and activities of the Research and Graduate Studies program, including those of its Core Labs and the MAI Lab.

189.    The Center for Research during plaintiff's employment by the University as well as by the Center for Research as a "borrowed servant" received, and continues to receive, federal financial assistance for numerous programs and activities conducted by the Center for Research, including the programs and activities in Sponsored Research, including those of its Core Labs and the MAI Lab.

190.    The University during plaintiff's employment by the University and continuing to the present day is a college, university, or other postsecondary institution, or a public system of higher education as defined under the Rehabilitation Act.

191.    The Center for Research during plaintiff's employment by the University as well as by the Center for Research as a "borrowed servant" and continuing to the present day is a corporation to which federal financial assistance has been and continues to be extended as defined under the Rehabilitation Act.

192.    The operations of the University during plaintiff's employment by the University and continuing to the present day are a "program or activity" as defined under the Rehabilitation Act.

193.    The operations of the Center for Research during plaintiff's employment by the University and by the Center for Research as a "borrowed servant" and continuing to the present day are a "program or activity" as defined under the Rehabilitation Act.

194.    Plaintiff was diagnosed with ADD/ADHD while an employee of the University and of the Center for Research as a "borrowed servant" and continued to suffer ADD/ADHD through and including the date of his termination of employment by University.

195.    Plaintiff's ADD/ADHD constituted a "disability" as defined in the Rehabilitation Act in that his ADD/ADHD was a mental impairment that substantially limited one or more major life activities

of plaintiff including but not limited to learning, concentrating, thinking, communicating and working and major bodily functions including but not limited to neurological and brain functions.

196.     More particularly, plaintiff's ADD/ADHD affected his ability to concentrate, avoid distractions, get organized, meet deadlines, set priorities, manage time, focus on tasks, speak impulsively without first fully processing thoughts, observe social norms, obsess and persist in correcting perceived wrongs, and deal with anxiety and restlessness, notwithstanding mitigation with prescription medication, counseling and learned behavioral modifications.

197.     Plaintiff informed University personnel, as aforesaid, of his ADD/ADHD condition and, on information and belief, was so perceived and regarded in the workplace.

198.     Plaintiff informed Center for Research personnel, as aforesaid, of his ADD/ADHD condition and, on information and belief, was so perceived and regarded in the workplace.

199.     Plaintiff requested and suggested reasonable accommodations, as aforesaid, of his ADD/ADHD condition.

200.     Notwithstanding plaintiff's requesting and suggesting reasonable accommodations for his ADD/ADHD condition, the University and the Center for Research refused to extend or even discuss extending any accommodations to plaintiff; failed to engage in an interactive process with plaintiff to develop reasonable accommodations for plaintiff's disability; suspended plaintiff's employment without pay for a period of four weeks; intensified demands upon plaintiff in a manner known to plaintiff's superiors with the University and the Center for Research to intensify the conditions of plaintiff's ADD/ADHD disability, thereby creating a hostile environment; and shortly thereafter terminated plaintiff's employment on October 14, 2013 (effective October 18, 2013), and in so doing avoided and deprived plaintiff of his right to appeal his suspension to the University's Faculty Rights Board, a forum in which he would have the opportunity to have his claims of discrimination, retaliation, mismanagement, waste, noncompliance and academic misconduct publicly aired or otherwise memorialized in a public forum.

201.    The reasons given by the University and the Center for Research for terminating plaintiff's employment were a consideration of the MAI Lab's future and plaintiff's continued employment as not in the best interests of the MAI Lab and the University's Research and Graduate Studies program.

202.    Such reasons were pretextual.  The real reasons for the termination were:

(a)    Retaliation for plaintiff's persistently expressing good faith concerns, protected under federal law, state law and University policy, about the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, including the uncontrolled use of federally funded laboratory instruments without proper charges for private, commercial purposes such as the Commercialized Medical Research program; and

(b)    Retaliation and discrimination against plaintiff because of his disability, including not observing or complying with plaintiff's exercising his rights as a disabled person protected under federal law, state law and University policy to seek accommodation and not be subjected to a hostile work environment.

203.    The University and/or the Center for Research suspended plaintiff's employment, intensified demands upon plaintiff in a manner known to plaintiff's superiors with the University and the Center for Research to intensify the conditions of plaintiff's ADD/ADHD disability, thereby creating a hostile environment; and terminated plaintiff's employment on October 14, 2013 (effective October 18, 2013) because of his disability and in retaliation for his seeking to exercise his rights as a disabled person under the Rehabilitation Act.

204.    On or about December 5, 2013, plaintiff filed a charge of employment discrimination in violation of the federal Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701, *et seq.*, as amended, with the offices of the Equal Employment Opportunity Commission located in Kansas City, Kansas, dually filed with the offices of the Kansas Human Rights Commission in

Topeka, Kansas, alleging that defendant University discriminated against him under such Act because of his disability, namely, Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder in terms and conditions of employment, specifically, suspension without pay on September 19, 2013; a hostile work environment thereafter; and termination of employment on October 14, 2013 (effective October 18, 2013) without accommodating his disability and otherwise in retaliation for his exercising his rights under the Americans with Disabilities Act, 42 U.S.C. Sec. 12101, et seq., the federal Rehabilitation Act, 29 U.S.C. *Sec. 701, et seq.*, and the Kansas Act Against Discrimination, K.S.A. Sec. 44-1001, et seq.

205.    On or about June 11, 2014, with no action having been taken by the Equal Employment Opportunity Commission or the Kansas Human Rights Commission under plaintiff's dual filing, plaintiff requested a Notice of Right to Sue letter from the Equal Employment Opportunity Commission.

206.    On or about June 19, 2014, plaintiff received from the Equal Employment Opportunity Commission a Notice of Right to Sue letter.

207.    The University and the Center for Research have violated the rights of plaintiff under the Rehabilitation Act by refusing to extend or even discuss extending any accommodations to plaintiff for his disability; failing to engage in an interactive process with plaintiff to develop reasonable accommodations for plaintiff's disability; suspending plaintiff's employment without pay for a period of four weeks; intensifying demands upon plaintiff in a manner known to plaintiff's superiors with the University to exacerbate the conditions of plaintiff's ADD/ADHD disability, thereby creating a hostile environment; and shortly thereafter terminating plaintiff's employment on October 14, 2013 (effective October 18, 2013), and in so doing avoiding and depriving plaintiff of his right to appeal his suspension to the University's Faculty Rights Board, a forum in which he would have the opportunity to have his claims of discrimination; retaliation; mismanagement, waste and noncompliance in the use of federal funds; and academic misconduct publicly aired or otherwise memorialized in a public forum.

WHEREFORE, plaintiff requests that judgment be entered in his favor against defendants as follows:

(a)     Against the University of Kansas for (i) reinstatement to his position as Assistant Scientist and Director of the Microscopy and Analytical Imaging Laboratory; (ii) all other appropriate relief as may be appropriate under the Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701, *et seq.*, as amended; (iii) his costs herein incurred and expended, including reasonable attorneys' fees, (iv) equitable relief as may be appropriate to eliminate any patterns and practices of discrimination against faculty, staff and researchers of the University of Kansas and University of Kansas Center for Research, Inc. for discrimination in employment based on disabilities as provided under the federal Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701, *et seq.*, as amended, and (v) such other just, appropriate and additional non-monetary relief as is just and appropriate in the premises; and

(b)     Subject to the pending *Motion for Summary Judgment of Defendant University of Kansas Center for Research, Inc.* (ECF No. 156), against defendant the University of Kansas Center for Research, Inc. for (i) reinstatement to his position as Assistant Scientist and Director of the Microscopy and Analytical Imaging Laboratory; (ii) compensatory damages for emotional distress and related nonpecuniary injury for intentional acts, but not retaliatory acts; (iii) all other appropriate relief as may be appropriate under the Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701, *et seq.*, as amended; (iv) his costs herein incurred and expended, including reasonable attorneys' fees, (v) equitable relief as may be appropriate to eliminate any patterns and practices of discrimination against faculty, staff and researchers of the University of Kansas and University of Kansas Center for Research, Inc. for discrimination in employment based on disabilities as provided under the federal Rehabilitation, Comprehensive Services and Developmental Disabilities Act, 29 U.S.C. Sec. 701, *et seq.*, as amended, and (vi) such other just, appropriate and additional non-monetary relief as is just and appropriate in the premises.

**Count Three – Not Reasserted**
**Pilot Program for Enhancement of Contractor Protection**
**from Reprisal for Disclosure of Certain Information,**
**National Defense Authorization Act for Fiscal Year 2013, 41 U.S.C. Sec. 4712**

Count Three under plaintiff's *Second Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights*, asserted under the federal Pilot Program for Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information, National Defense Authorization Act for Fiscal Year 2013, 41 U.S.C. Sec. 4712, *et seq.,* against defendants University of Kansas Center for Research, Inc., Bernadette Gray-Little, Jeffrey Vitter, Steven Warren and Joseph Heppert, was dismissed by the Court without prejudice on December 17, 2015 by its *Memorandum and Order* (ECF No. 109) and is not reasserted in this *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights*.  Said claim will be asserted in a separate civil action.

**Count Four**
**False Claims Act, 31 U.S.C. Sec. 3730, *et seq.***

For Count Four of his *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights*, said count asserted under the federal False Claims Act, 31 U.S.C. Sec. 3730, *et seq.,* particularly 31 U.S.C. Sec. 3730(h) for retaliatory employment actions, against defendant University of Kansas Center for Research, Inc., Bernadette Gray-Little, Jeffrey Vitter, Stephen Warren and Joseph Heppert, plaintiff states as follows:

208.    Plaintiff incorporates by reference the contents of paragraphs 1 through 208 of this complaint as though set forth fully herein.

209.    This count is asserted against defendant Center for Research for retrospective monetary relief at law and prospective injunctive in equity for violations of the rights of plaintiff under the federal False Claims Act, 31 U.S.C. Sec. 3730, *et seq.,* particularly 31 U.S.C. Sec. 3730(h) for retaliatory employment actions.  This count is asserted subject to the pending *Motion for Summary Judgment of Defendant University of Kansas Center for Research, Inc.* (ECF No. 156).

210.     This count is asserted against defendants Bernadette Gray-Little, Jeffrey Vitter, Steven Warren and Joseph Heppert for prospective non-monetary injunctive relief in their official capacities for continuing violations of the rights of plaintiff under the federal False Claims Act, 31 U.S.C. Sec. 3730, *et seq.*, particularly 31 U.S.C. Sec. 3730(h) for retaliatory employment actions.

211.     The instances of Federal Funds Mismanagement and the MAI Lab Renovation Mismanagement as aforesaid caused plaintiff reasonably to believe that the University and the Center for Research had permitted the violation of federal laws, rules and regulations for the expenditure and reporting of expenditure of federal funds, resulting in the submission of false or fraudulent claims for payment or approval, or false records or statements material to a false or fraudulent claim, to fund activities of the University and the Center for Research program from federal funds.

212.     Plaintiff look lawful actions regarding his concerns to stop the instances of Federal Funds Mismanagement and the MAI Lab Renovation Mismanagement as aforesaid by investigating what he reasonably believed were violations of federal laws, rules and regulations for the expenditure and reporting of expenditure of federal funds, resulting in the submission of false or fraudulent claims for payment or approval, or false records or statements material to a false or fraudulent claim, to fund activities of the University and the Center for Research from federal funds, including but not limited to requests for information from the University and the Center for Research and informing his superiors of possible Federal Funds Mismanagement and MAI Lab Renovation Mismanagement in violation of federal law.

213.     Following plaintiff's seeking information regarding and informing his superiors of suspected the Federal Funds Mismanagement and the MAI Lab Renovation Mismanagement, the University and the Center for Research retaliated against plaintiff by suspending plaintiff's employment without pay for a period of four weeks, intensifying demands upon plaintiff in a manner known to plaintiff's superiors to create a hostile working environment for plaintiff and shortly thereafter terminating plaintiff's employment, and in so doing avoiding and depriving plaintiff of his right to appeal

his suspension to the University's Faculty Rights Board, a forum in which he would have the opportunity to have his claims of discrimination, retaliation, mismanagement, waste, noncompliance and academic misconduct publicly aired or otherwise memorialized in a public forum.

214.   The acts of the Center for Research as aforesaid directly and proximately caused substantial damages to plaintiff including but not limited to lost earnings and related benefits of employment in an amount to be determined at trial of this matter.

215.   The acts of Jeffrey Vitter, Steven Warren and Joseph Heppert are continuing violations of the rights of plaintiff under the Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information Act because plaintiff is currently and on an ongoing basis is being deprived of his rightful employment as Assistant Scientist and Director of the MAI Lab on account of the aforesaid rights of plaintiff under federal law, namely, the federal False Claims Act, 31 U.S.C. Sec. 3730, *et seq.,* particularly 31 U.S.C. Sec. 3730(h) for retaliatory employment actions.

WHEREFORE, plaintiff requests that judgment be entered in his favor as follows:

(a)   Subject to the pending Motion for Summary Judgment of Defendant University of Kansas Center for Research, Inc. (ECF No. 156), against defendant University of Kansas Center for Research, Inc. for (i) money damages for lost earnings in an amount equal to twice the amount of back pay and employment benefits from and including October 18, 2013; (ii) prejudgment and post-judgment interest thereon at the maximum lawful rates; (iii) compensatory damages for emotional distress and related nonpecuniary injury; (iv) his costs herein incurred and expended including reasonable attorneys' fees; (v) equitable relief as appropriate to enjoin and eliminate any Center for Research patterns and practices in the future to intimidate, discipline, discharge or otherwise negatively affect terms and conditions of employment of employees reporting, investigating or speaking out regarding suspected mismanagement of federal grants and funds and noncompliance; and (vi) such other just, appropriate and additional relief as is just and appropriate in the premises; and

(b)     Against defendants Bernadette Gray-Little, Jeffrey Vitter, Stephen Warren and Joseph Heppert for (i) reinstatement to his position as Assistant Scientist and Director of the Microscopy and Analytical Imaging Laboratory (defendants Bernadette Gray-Little and Jeffrey Vitter only); (ii) his costs herein incurred and expended, including reasonable attorneys' fees; (iii) equitable relief as appropriate to enjoin and eliminate any patterns and practices in the future to intimidate, discipline, discharge or otherwise negatively affect terms and conditions of employment of University employees reporting, investigating or speaking out regarding suspected mismanagement of federal grants and funds and noncompliance; and (d) such other just, appropriate and additional relief as is just and appropriate in the premises.

### Count Five
### Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, 1988, *et seq.*,
### Freedom of Speech

For Count Five of his *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights*, said count asserted under the federal Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, *et seq.*, against defendants Steven F. Warren and Joseph A. Heppert, such defendants being sued in their individual capacities, plaintiff states as follows:

216.    Plaintiff incorporates by reference the contents of paragraphs 1 through 216 of this complaint as though set forth fully herein.

217.    Plaintiff throughout his employment by the University had a right of free speech secured by the United States Constitution, First and Fourteenth Amendments, and federal laws to speak out on matters of public concern regarding activities of the University, including compliance with federal laws governing the use of federal grants to the University and other federal funds and the conduct of academicians and other personnel using those and other funds and programs and facilities using those funds, including speaking out on the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism as aforesaid.

218.    Defendants Warren and Heppert, acting under color of state law, including but not limited to the statutes, ordinances, regulations, customs, and usages of the State of Kansas, possessed by virtue of state law and clothed with the authority of state law as a state university and state university personnel supervising the work of plaintiff, subjected and caused to be subjected plaintiff to a deprivation of his constitutional right to speak out on matters of public concern regarding activities of the University including speaking out on the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism as aforesaid, by subjecting plaintiff to discriminatory and retaliatory actions for his speaking out on such issues including but not limited to unfavorable employment reviews, suspending plaintiff's employment without pay for a period of four weeks, intensifying demands upon plaintiff in a manner known to plaintiff's superiors to create a hostile working environment for plaintiff and shortly thereafter, whether with or without authority as alleged in the alternative in para. 45, terminating plaintiff's employment, and in so doing avoiding and depriving plaintiff of his right to appeal his suspension to the University's Faculty Rights Board, a forum in which he would have the opportunity to have his claims of discrimination, retaliation, mismanagement, waste, noncompliance in the use of federal funds and academic misconduct publicly aired or otherwise memorialized in a public forum.

219.    The acts defendants Warren and Heppert as aforesaid transgressed the clearly established rights of a University employee under federal law, as well as state law and the University's own policies mirroring and repeating such federal rights, aggravated by their having immediate access to University human resources professionals and legal counsel for professional guidance, to speak out on matters of public concern regarding activities of the University and its Research and Graduate Studies program including the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism as aforesaid, such rights secured under the following:

(a)    Federal Constitution

(i)    First Amendment, as made applicable to the states under the Fourteenth Amendment, not to abridge the right of freedom of speech;

(b)     Federal Statutes

(i)     Federal Pilot Program for Enhancement of Contractor Protection from Reprisal for Disclosure of Certain Information Act, 41 U.S.C. Sec. 4712, *et seq.;* and

(ii)     Federal False Claims Act, 31 U.S.C. Sec. 3730, *et seq.*;

(c)     Federal judicial decisions of the 10th Circuit Court of Appeals

(d)     Kansas Statutes

(i)     Kansas False Claims Act, K.S.A. Secs. 75-7501, *et seq.*; and

(ii)     Kansas Whistleblower Protection Act, Sec. 75-2973;

(e)     University of Kansas Formal Policies

(i)     "University of Kansas Fraud and Theft Prevention Policy," eff. December 11, 2009;

(ii)     "University of Kansas Whistleblower Policy: Reporting Suspected Wrongdoing and Protection from Retaliation," eff. December 11, 2009;

(iii)     University Academic Misconduct Policy, University Senate Rules and Regulations, Art. IX, Secs. 9.1.1, *et seq.*; and

(iv)     University of Kansas "Handbook for Faculty and Other Unclassified Staff," Part I, Sec. B, second para.; Part II, first para.; Part I, Sec. B, third para.; and Part II, Sec. D(2), regarding officials authorized to terminate employment.

220.     The acts of defendants Warren and Heppert directly and proximately caused substantial damages to plaintiff including but not limited to lost earnings and related benefits of employment in an amount to be determined at trial of this matter.

221.     The acts of defendants Warren and Heppert as aforesaid were undertaken intentionally and with knowledge of the clearly established rights of plaintiff to speak out on matters of public concern regarding activities of the University and the Center for Research program including the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism or, in the alternative, were

undertaken with reckless disregard and indifference to the clearly established rights of plaintiff to speak out on matters of public concern regarding activities of the University and the Center for Research program including the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism so as to justify the imposition of punitive damages.

222.    The act of defendant Warren terminating plaintiff's employment was knowingly undertaken without authority as stated in the alternative, para. 45, to terminate plaintiff's employment.

223.    Further, plaintiff is entitled to recover from defendants Warren and Heppert his reasonable attorneys' fees incurred in this matter in such amount as may be determined by the Court under the provisions of 42 U.S.C. Sec. 1988.

224.    As aforesaid in this complaint, the expressions of concern to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement and Plagiarism were made outside his duties as Assistant Professor and Director of the MAI Lab and his rights to do so were clearly established at the time and would be known to a reasonable public official.

WHEREFORE, plaintiff requests that judgment be entered in his favor against defendants Steven F. Warren and Joseph A. Heppert, each in their capacities as individuals, for (i) compensatory damages in an amount equivalent to the lost earnings and related benefits of employment sustained by plaintiff in such amount as may be determined at the trial of this matter, (ii) prejudgment and post-judgment interest thereon at the maximum lawful rates; (iii) compensatory damages for emotional distress and related nonpecuniary injury; (iv) punitive damages; (v) interest thereon at the maximum lawful rate, (vi) his costs herein incurred and expended including reasonable attorneys' fees and expert fees, under 42 U.S.C. Sec. 1988 and otherwise; (vii) equitable relief as appropriate to enjoin and eliminate any patterns and practices in the future by such individuals to intimidate, discipline, discharge or otherwise negatively affect terms and conditions of employment of University and Center for Research employees reporting or speaking out regarding suspected mismanagement of federal grants and funds and noncompliance; and (vii) such other just, appropriate and additional relief as is just and appropriate in the premises.

**Count Six**
**Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, 1988,** *et seq.,*
**Substantive Due Process Simpliciter**

For Count Six of his *Third Amended Complaint for Disability Discrimination and Retaliation,*
*Whistleblowing Retaliation and Deprivation of Constitutional Rights*, said count asserted under the
federal Civil Rights Act of 1871, as amended, 42 U.S.C. Sec 1983, *et seq.,* against defendants Steven F.
Warren and Joseph A. Heppert, such defendants being sued in their individual capacities, plaintiff states
as follows:

225.    Plaintiff incorporates by reference the contents of paragraphs 1 through 225 of this
complaint as though set forth fully herein.

226.    Plaintiff throughout his employment by the University had a right not to be subjected to
arbitrary, capricious and irrational actions by his superiors as public officials directed to plaintiff
employing, misusing and abusing their powers over plaintiff, at best deliberately indifferent as to
consequences and at worst fully intended as to consequences, as conscious and reflective instruments of
oppression and exploitation of plaintiff's known disabilities and accompanying idiosyncrasies, all for
private advantage, pecuniary and otherwise, and with serious, actual harm to plaintiff, of a magnitude so
egregious and outrageous as to shock the conscience, all secured by the United States Constitution,
Fourteenth Amendment.

227.    Defendants Warren and Heppert, acting under color of state law, including but not
limited to the statutes, ordinances, regulations, customs, and usages of the State of Kansas, possessed by
virtue of state law and clothed with the authority of state law as state university officials supervising the
work of plaintiff, subjected and caused to be subjected plaintiff to a deprivation of his clearly established
constitutional right to substantive due process including but not limited to an oppressive, intentional, self-
serving effort to exploit and, indeed, exacerbate plaintiff's known ADD/ADHD disability and related
behaviors to frustrate and destroy plaintiff's employment with the University by escalating and driving
plaintiff to an emotional state resulting either in his quitting his employment out of frustration or, in the

alternative, building a record justifying termination of employment for putatively lawful and non-discriminatory reasons as a cover for in fact terminating plaintiff's employment because of and in retaliation for:

(a)     Plaintiff's exercising his clearly established rights that would be known to reasonable person in defendants Warren's and Heppert's positions, as a person with a disability to be free from discrimination in the workplace based on his disability, to request and receive reasonable accommodations for his disability, not be retaliated against for exercising his rights as a disabled person and not have his disability be exploited and exacerbated to his detriment; and

(b)     Plaintiff's exercising his clearly established rights that would be known to reasonable person in defendants Warren's and Heppert's positions, to persistently and in good faith express his concerns to stop the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion;

undertaken altogether out of the self interests of defendants Warren and Heppert to silence plaintiff as a "fall guy" or "scapegoat" by grievous means in order to "cover up" and avoid:

(c)     Threatening their professional and, upon information and belief, personal and pecuniary standing by revealing known unlawful financial conduct and other improprieties in the University and the Center for Research known to, but persistently ignored or, upon information and belief, concealed by defendants Warren and Heppert notwithstanding their managerial and personal responsibilities to prevent such unlawful conduct and improprieties including, but not limited the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion;

(d)     Threatening their professional and, upon information and belief, personal and pecuniary standing by revealing known unlawful financial conduct and other improprieties in the Commercialized Medical Research program known to, but persistently ignored or, on information and belief, concealed by defendants Warren and Heppert notwithstanding their managerial and

personal responsibilities to prevent such unlawful conduct and improprieties including, but not limited to, on information and belief, using Core Labs as a "no charge" hub for the Commercialized Medical Research program by using federally funded scientific equipment without charges required by federal laws, rules and regulations for federal contract and grant proceeds used in scientific research, instruments, equipment and staffing in research laboratories of the University and the Center for Research;

(e)     Threatening their professional and, upon information and belief, personal and pecuniary standing by casting doubt on the direction, clinical integrity, efficacy and patentability of drug formulations developed in the Commercialized Medical Research program, including particularly Captisol®, the mainstay component of five of the seven drugs supporting the application for NCI designation and a principal accomplishment of the Commercialized Medical Research program, for which much of the base assay and methods development microscopy and imaging work was done in the MAI Lab;

(f)     Threatening their professional and, upon information and belief, personal and pecuniary standing by casting doubt on the Commercialized Medical Research program, including particularly the application for and continuation of the University's National Cancer Institute designation; and

(g)     Threatening their professional and, upon information and belief, personal and pecuniary standing by exposing their failures properly to handle the MAI Lab Renovation, the installation of the dual beam electron microscope, the providing of timely information necessary for the 2015 billing rate revisions and the providing of proper contracting documentation, policies and procedures for Sponsored Research with private sector corporations and foundations.

228.    Additional arbitrary, capricious and irrational actions by Drs. Warren and Heppert, either and in the alternative individually or in concert, as public officials directed to plaintiff employing, misusing and abusing their powers over plaintiff, at best deliberately indifferent as to the consequences

and at worst fully intended as to consequences, as conscious and reflective instruments of oppression, all for private advantage, pecuniary and otherwise, and with serious, actual harm to plaintiff, of a magnitude so egregious and outrageous as to shock the conscience, included the following:

(a)     Dr. Warren summarily discharged plaintiff, upon information and belief and in the alternative, without authority, on October 14, 2015, while plaintiff's appeal of the four-week suspension was pending, only days before the University's written answer was due and a hearing to be set, thereby knowingly depriving plaintiff of his right under University policies and procedures to a forum of peers in which he would have the opportunity to have his claims of Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias and Instrument Funding Diversion, including discrimination and retaliation, publicly aired or otherwise memorialized in a public forum;

(b)     Dr. Warren and Dr. Heppert, either and in the alternative individually or in concert, attempted to make plaintiff appear to be responsible, as the "fall guy" or "scapegoat," for their own responsibilities and failures for the MAI Laboratory Renovation Delay, the Dual Beam Electron Microscope Installation Delay, the Billing Rate Revisions Delay and the Sponsored Research Contracting Documentation Delay;

(c)     While Dr. Warren's letter of October 14, 2013 claimed that the reasons for discharging plaintiff, whether with or without authority as alleged in the alternative in para. 45, were "considerations of the future of the MAI Lab" and "a determination that it was in the best interests of the Research and Graduate Studies program" to terminate plaintiff, and no others, the 1,400 page Administrative Record thereafter produced upon which plaintiff's discharge allegedly was based contained not one page . . .  not one scintilla of evidence . . . of any determination about any "considerations of the future of the MAI Lab" or "a determination that it was in the best interests of the Research and Graduate Studies program" that plaintiff be discharged; and

(d)     The alleged Administrative Record supporting plaintiff's suspension and discharge was compiled *after* plaintiff's discharge in which Drs. Warren and/or Heppert, either and in the alternative individually or in concert, "cherry picked" information favorable to their positions only and acted either and in the alternative individually or in concert,  as "judge, jury and executioner."

229.     The acts defendants Warren and Heppert as aforesaid in the preceding paragraphs transgressed the clearly established rights of plaintiff as a University employee under federal law, as well as state law and the University's own policies mirroring and repeating such federal rights, aggravated by their having ample time for calm and reflective deliberation and immediate access to University human resources professionals and legal counsel for professional guidance, as would be known to reasonable high-level university administrators in their shoes, not to be deprived of his constitutional right to substantive due process by being subjected to oppressive, intentional, self-serving efforts by his superiors as public officials to exploit and, indeed, exacerbate plaintiff's known ADD/ADHD disability and related behaviors to frustrate and destroy plaintiff's employment with the University by driving plaintiff to an emotional state resulting either in his quitting his employment out of frustration or, in the alternative, building a record justifying termination of employment for putatively lawful and non-discriminatory reasons, as a cover for terminating plaintiff's employment because of and in retaliation for exercising his rights under federal law and to avoid disclosure of known unlawful financial conduct and other improprieties and defalcations in the University and the Center for Research known to, but ignored by, defendants Warren and Heppert notwithstanding their managerial and personal responsibilities to prevent such unlawful conduct, improprieties and defalcations including, but not limited the Federal Funds Mismanagement, MAI Lab Renovation Mismanagement, Plagiarism, Research Bias, Instrument Funding Diversion, MAI Lab Renovation Delay, Dual Beam Electron Microscope Installation Delay, Billing Rate Revisions Delay and Sponsored Contract Documentation Delay.

230.     The acts of defendants Warren and Heppert as aforesaid directly and proximately caused substantial damages to plaintiff including but not limited to lost earnings and related benefits of employment in an amount to be determined at trial of this matter.

231.     The acts of defendants Warren and Heppert as aforesaid were undertaken intentionally and with knowledge of the clearly established rights of plaintiff not to be treated with arbitrary, capricious and unreasonable actions as described in this count or, in the alternative, were undertaken with reckless disregard and indifference to the clearly established rights of plaintiff not to be treated with arbitrary, capricious and unreasonable actions as described in this count so as to justify the imposition of punitive damages.

232.     Further, plaintiff is entitled to recover from defendants Warren and Heppert his reasonable attorneys' fees incurred in this matter in such amount as may be determined by the Court under the provisions of 42 U.S.C. Sec. 1988.

WHEREFORE, plaintiff requests that judgment be entered in his favor against defendants Steven F. Warren and Joseph A. Heppert, each in their capacities as individuals, for (i) compensatory damages in an amount equivalent to the lost earnings and employment benefits sustained by plaintiff in such amount as may be determined at the trial of this matter, (ii) prejudgment and post-judgment interest thereon at the maximum lawful rates; (iii) compensatory damages for emotional distress and related nonpecuniary injury; (iv) punitive damages; (v) his costs herein incurred and expended including reasonable attorneys' fees and expert fees, under 42 U.S.C. Sec. 1988 and otherwise; (vi) equitable relief as appropriate to enjoin and eliminate any patterns and practices in the future by such individuals to intimidate, discipline, discharge or otherwise negatively affect terms and conditions of employment of University employees reporting or speaking out regarding suspected mismanagement of federal grants and funds and noncompliance with federal requirements; and (vi) such other just, appropriate and additional relief as is just and appropriate in the premises.

Respectfully submitted,

THIRD AMENDED COMPLAINT FOR
DISABILITY DISCRIMINATION, WHISTLEBLOWING AND                     128
DEPRIVATION OF CONSTITUTIONAL RIGHTS

_____ /s/ Daniel R. Cofran
Daniel R. Cofran, Esq.
Kansas Supreme Court Enrollment No. 23258

1000 W. 70th St.
Kansas City, Missouri
Phone: 816-363-1218
Email: dcofan@swbell.net

ATTORNEY FOR PLAINTIFF DAVID S. MOORE,
PH. D.

## Certificate of Service

The undersigned hereby certifies that a copies of the above and foregoing his *Third Amended Complaint for Disability Discrimination and Retaliation, Whistleblowing Retaliation and Deprivation of Constitutional Rights* was sent by filing the same with the Court's EM/ECF electronic filing system; and/or were mailed by first class mail, postage prepaid; facsimile; or hand delivery, as indicated, this _____ _____ day of _____, 2016 to:

David R. Cooper, Esq.               (By the Court's EM/ECF electronic filing system)
Kevin J. Grauberger, Esq.        (By the Court's EM/ECF electronic filing system)
Fisher, Patterson, Sayler & Smith, L.L.P.
3550 SW 5th Street
P.O. Box 949
Topeka, Kansas  66601-0949
Attorneys for defendants University of Kansas,
Jeffrey S. Vitter, Steven F. Warren and Joseph P. Heppert.


_____ /s/ Daniel R. Cofran _____
Daniel R. Cofran